**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

RIVERS END OUTFITTERS, LLC., ET.
AL,

     Plaintiffs,

      v.

U.S. DEPARTMENT OF COMMERCE,
ET. AL,

      Federal Defendants.

No. 2:20-cv-2312

**Federal Defendants' Opposition to Plaintiffs' Motion for Summary Judgment and Cross-Motion for Summary Judgment**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 1

   I.   Statutory Background ................................................................................................ 1

   II.   Factual and Procedural Background ........................................................................ 3

STANDARD OF REVIEW ................................................................................................ 5

ARGUMENT ...................................................................................................................... 6

   I.   The MSA Provides Statutory Authority To Require Owners and Operators of  Permitted Vessels to Obtain and Install VMS Devices. ........................................ 7

   II.   The Final Rule fully complies with the APA .......................................................... 10

      A.   Reporting of five specific socio-economic data elements falls within the scope of the proposed rule or, in the alternative, is a Logical Outgrowth of the proposed rule......... 10

      B.   NMFS did not ignore any "relevant factors" .................................................. 12

      C.   NMFS provided adequate responses to public comments ............................. 13

   III.   NMFS complied with the Regulatory Flexibility Act .......................................... 15

   IV.   The Court Should Reject Plaintiffs' Back-Door Attempt to Bring a Fifth Amendment Takings Claim. ................................................................................... 18

      A.   The Court Lacks Jurisdiction to Hear Plaintiffs' Fifth Amendment Damages  Claims Against the United States. ........................................................... 19

      B.   The VMS Requirement is Not a Per Se Taking .............................................. 21

   V.   The VMS requirement is constitutional under the Fourth Amendment ................ 23

      A.   The Fishing Industry is a "Pervasively Regulated" Industry ......................... 25

      B.   Under either the property-based approach of *Jones* or the reasonable expectation of privacy approach of *Carpenter*, the VMS requirement is    constitutional. ................... 29

         1.   The VMS requirement is Constitutional under the property-based approach articulated in *United States v. Jones* ....................................... 30

         2.   The VMS requirement is Constitutional under the reasonable-expectation-of-privacy approach of Carpenter v. United States ...................................... 31

CONCLUSION ................................................................................................................... 35

# TABLE OF AUTHORITIES

**CASES**                                                                        **PAGE**

*A.M.L. Int'l, Inc. v. Daley*,
    107 F. Supp. 2d 90 (D. Mass. 2000) ................................................................. 15, 16

*Ace Lobster Co. v. Evans*,
    165 F. Supp. 2d 148 (D. R. I. 2001) ........................................................................ 17

*Alenco Commc'ns, Inc. v. FCC*,
    201 F.3d 608 (5th Cir. 2000) ............................................................................. 16, 17

*All. Auto. Mfrs. v. Gwadosky*,
    430 F.3d 30 (1st Cir. 2005) ..................................................................................... 10

*Am. Health Care Ass'n v. Burwell*,
    217 F. Supp. 3d 921 (N.D. Miss. 2016) .................................................................. 16

*Am. Pelagic Fishing Co. v. United States*,
    379 F.3d 1363 (Fed. Cir. 2004) .............................................................................. 21

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) .................................................................................................. 6

*Andrus v. Allard*,
    444 U.S. 51 (1979) .................................................................................................. 23

*Anglers Conservation Network v. Pritzker*,
    809 F.3d 664 (D.C. Cir. 2016) ................................................................................. 3

*Assoc'd Builders & Contractors of Tex., Inc. v. Nat'l Lab. Rels. Bd.*,
    826 F.3d 215 (5th Cir. 2016)……………………………………………………23, 24

*Associated Fisheries of Me. v. Daley*,
    127 F.3d 104 (1st Cir. 1997) ....................................................................... 15, 16, 18

*Atchafalaya Basinkeeper v. Bostick*,
    2015 WL 3824318 (E.D. La. June 19, 2015) ........................................................... 6

*Balelo v. Baldrige*,
    724 F.2d 753 (9th Cir. 1984) .................................................................................. 26

*Blanchard v. St. Paul Fire & Marine Ins. Co.*,
    341 F.2d 351 (5th Cir. 1965) .................................................................................. 20

*Builders & Contractors of Tex., Inc. v. Nat'l Lab. Rels. Bd.*,
    826 F.3d 215 (5th Cir. 2016) .................................................................................. 24

*Burlington Truck Lines v. United States*,
    371 U.S. 156 (1962) .............................................................................................. 12

*C & W Fish Co. v. Fox*,
    931 F.2d 1556 (D.C. Cir. 1991) ............................................................................... 3

*Calzone v. Olson*,
    931 F.3d 722 (8th Cir. 2019) .................................................................................. 27

*Carpenter v. United States*,
    138 S. Ct. 2206 (2018) ............................................................................... 31, 32, 33

*Carroll v. United States*,
    267 U.S. 132 (1925) .............................................................................................. 24

*Cedar Point Nursery v. Hassid*,
    141 S. Ct. 2063 (2021) .......................................................................................... 23

*Cinel v. Connick*,
    15 F.3d 1338 (5th Cir. 1994) .................................................................................. 18

*City of El Cenizo, Tex. v. Texas*,
    890 F.3d 164 (5th Cir. 2018) .................................................................................. 24

*City of Los Angeles v. Patel*,
    576 U.S. 409 (2015) ...............................................................................24, 26, 27, 28

*Coastal Conservation Ass'n. v. U.S. Dep't. of Com.*,
2016 WL 54911 (E.D. La. Jan. 5, 2016) ………………………………………..…………………7

*Conti v. United States*,
    291 F.3d 1334 (Fed. Cir. 2002) ............................................................. 21

*Cutrera v. Bd. of Supervisors of La. State Univ.*,
    429 F.3d 108 (5th Cir. 2005) ................................................................ 18

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
    140 S. Ct. 1891 (2020) ......................................................................... 14

*Donovan v. Dewey*,
    452 U.S. 594 (1981) ............................................................................. 26

*Dow Chem. Co. v. United States*,
    476 U.S. 227 (1986) ............................................................................. 34

*Elkins v. Elenz*,
    2012 WL 2952435 (M.D. Fla. July 19, 2012) ...................................... 30

*Env't Integrity Project v. EPA*,
    425 F.3d 992 (D.C. Cir. 2005) ............................................................. 12

*Fisher v. Metro. Life Ins. Co.*,
    895 F.2d 1073 (5th Cir. 1990) ............................................................. 19

*Flaherty v. Ross*,
    373 F. Supp. 3d 97 (D.D.C. 2019) ........................................................ 3

*Food and Drug Administration v. Brown & Williamson Tobacco Corp.*,
    529 U.S. 120 (2000) ............................................................................... 8

*Forman v. Davis*,
    371 U.S. 178 (1962) ............................................................................. 19

*Gen. Category Scallop Fishermen v. Sec'y, U.S. Dep't of,*
    *Com.*, 635 F.3d 106 (3d Cir. 2011) ........................................................ 3

*Goethel v. Pritzker*,
    2016 WL 4076831 (D.N.H. July 29, 2016) ........................................... 7

*Gulf of Maine Trawlers v. United States*,
    674 F. Supp. 927 (D. Me. 1987) .......................................................... 25

iv

*Hayward v. U.S. Dep't of Labor*,
   536 F.3d 376 (5th Cir. 2008) ................................................................................ 6

*Hester v. United States*,
   265 U.S. 57 (1924) ..............................................................................................33

*Huawei Techs. USA, Inc. v. Fed. Commc'ns Comm'n.*,
   2 F. 4th 421 (5th Cir. 2021) .................................................................................11

*Hester v. United States*,
   265 U.S. 57 (1924) .............................................................................................. 34

*J.H. Miles & Co., Inc. v. Brown*,
   910 F. Supp. 1138 (E.D. Va. 1995) ...................................................................... 3

*Katz v. United States*,
   389 U.S. 347 (1967) .......................................................................... 24, 30, 33

*Kennecott Copper Corp. v. EPA*,
   612 F.2d 1232 (10th Cir. 1979) ........................................................................ 15

*Killgore v. City of S. El Monte*,
   3 F. 4th 1186 (9th Cir. 2021) .............................................................................27

*Larson v. Domestic & Foreign Com. Corp.*,
   337 U.S. 682 (1949) .......................................................................................... 20

*Liberty Coins, LLC v. Goodman*,
   880 F.3d 274 (6th Cir. 2018) ............................................................................ 27

*Loper Bright Enterprises, Inc. v. Ramaindo*,
   2021 WL 2440511 (D.D.C. June 15, 2021) .........................................................9

*Loretto v. Teleprompter Manhatten CATV Corp.*,
   458 U.S. 419 (1982) ..........................................................................................22

*Louisiana Public Services Commission v. FCC*,
   476 U.S. 355 (1986) ............................................................................................ 8

*Lovgren v. Byrne*,
   787 F.2d 857 (3rd Cir. 1986) ...................................................................... 25, 26

*Lovgren v. Locke,*
  701 F.3d 5 (1st Cir. 2012) ......................................................................... 6

*Luminant Generation Co. LLC v. U.S. EPA,*
  714 F.3d 841 (5th Cir. 2013) ..................................................................... 13

*Med. Ctr. Pharmacy v. Mukasey,*
  536 F.3d 383 (5th Cir. 2008) ...................................................................... 9

*Minnesota v. Olson,*
  495 U.S. 91 (1990) ..................................................................................... 27

*Motor Vehicle Mfrs. Ass' of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29 (1983) ..................................................................................... 12

*National Federation of Independent Business v. Perez,*
  2016 WL 3766121 (N.D. Tex. June 27, 2016)……………………………………16

*N.C. Fisheries Ass'n, Inc. v. Gutierrez,*
  518 F. Supp. 2d 62 (D.D.C. 2007) ............................................................. 15

*N.C. Fisheries Ass'n, Inc. v. Gutierrez,*
  550 F.3d 16 (D.C. Cir. 2008) ...................................................................... 2

*New Jersey v. T.L.O.,*
  469 U.S. 325 (1985) ................................................................................... 35

*New York v. Burger,*
  482 U.S. 691 (1987) ......................................................................... 24, 25, 28

*Oliver v. United States,*
  466 U.S. 170 (1984) ......................................................................... 33, 34, 35

*Owner-Operator Indep. Drivers Ass'n, Inc. v. U.S. Dep't of Transp.,*
  840 F.3d 879 (7th Cir. 2016) ...................................................................... 27

*Palmyra Pac. Seafoods, LLC v. United States,*
  561 F.3d 1361 (Fed. Cir. 2009) .................................................................. 21

*Patel v. City of Montclair,*
  798 F.3d 895 (9th Cir. 2015) ...................................................................... 30

*Perez v. Mortg. Bankers Ass'n,*
    575 U.S. 92 (2015) ................................................................................................ 13

*Relentless Inc. v. U.S. Dep't of Com.,*
    2021 WL 4256067 (D.R.I. Sept. 20, 2021)…………………………………………………..9

*Rivera-Corraliza v. Morales,*
    794 F.3d 208 (1st Cir. 2015) ................................................................................. 27

*Roedler v. U.S. Dep't of Energy,*
    255 F.3d 1347 (Fed. Cir. 2001) .............................................................................. 20

*Ruckelshaus v. Monsanto Co.,*
    467 U.S. 986 (1984) ........................................................................................ 20, 22

*S & W Enters. v. Southtrust Bank of Ala., NA,*
    315 F.3d 533 (5th Cir. 2003) ................................................................................. 19

*State v. United States Nuclear Regul. Comm'n,*
    824 F.3d 1012 (D.C. Cir. 2016) ............................................................................. 14

*Stoner v. California,*
    376 U.S. 483 (1964) .............................................................................................. 27

*Tarabochia v. Adkins,*
    766 F.3d 1115 (9th Cir. 2014) ............................................................................... 29

*United Mine Workers of America v. Mine Safety and Health Administration,*
    407 F.3d 1250 (D.C. Cir. 2005) ............................................................................. 11

*United States v. DSD Shipping, A.S.,*
    2015 WL 5164306 (S.D. Ala. Sept. 2, 2015) ......................................................... 30

*United States v. Dunn,*
    480 U.S. 294 (1987) .............................................................................................. 34

*United States v. Johnson,*
    632 F.3d 912 (5th Cir. 2011) ................................................................................. 12

*United States v. Jones,*
    565 U.S. 400 (2012) .................................................................................... 25, 30, 34

*United States v. Kaiyo Maru No. 53*,
   699 F.2d 989 (9th Cir. 1983)................................................................................. 25

*United States v. Miller*,
   425 U.S. 435 (1976) .......................................................................................... 33

*United States v. Perez*,
2020 WL 9554484 (M.D. Fla. Nov. 3, 2020)…………………………………………….30

*United States v. Raub*,
   637 F.2d 1205 (9th Cir. 1980)............................................................................... 26

*United States v. Salerno*,
   481 U.S. 739 (1987) .......................................................................................... 23

*United States v. Soto*,
   988 F.2d 1548 (10th Cir. 1993)............................................................................. 31

*United States v. Taylor*,
   458 F.3d 1201 (11th Cir. 2006).............................................................................. 33

*United States v. Vilches-Navarrete*,
   523 F.3d 1 (1st Cir. 2008) ................................................................................... 31

*United States v. Whitmire*,
   595 F.2d 1303 (5th Cir. 1979)............................................................................... 34

*United States v. Whitted*,
541 f.3d 480 (3d. Cir. 2008)...................................................................................34

*U.S. Telecom Ass'n. v. FCC,*
   400 F.3d 29 (D.C. Cir. 2005) ............................................................................... 16

*Wash. State Grange v. Wash. State Republican Party*,
   552 U.S. 442 (2008) .......................................................................................... 23

*Wilkerson v. United States*,
   67 F.3d 112 (5th Cir. 1995).................................................................................. 20

*Yee v. City of Escondido,*
    503 U.S. 519 (1992) ................................................................................ 22, 23

*Nat'l Fed'n of Indep. Bus. v. Sebelius,*
    567 U.S. 519 (2012) ................................................................................ 9, 10

*Zadeh v. Robinson,*
    928 F.3d 457 (5th Cir. 2019) ................................................................... 27

## STATUTES

5 U.S.C. § 553(b)(3) ....................................................................................... 10
5 U.S.C. § 704 ................................................................................................. 6
5 U.S.C. § 706(2)(A) ....................................................................................... 6
5 U.S.C. § 706(2)(A)-(D) ................................................................................ 6
5 U.S.C. § 551 ................................................................................................. 3, 10
5 U.S.C. § 601(6) ............................................................................................ 16
5 U.S.C. § 603(b) ............................................................................................ 16
5 U.S.C. § 603(c) ............................................................................................ 16
5 U.S.C. § 604(a)(5) ........................................................................................ 16
5 U.S.C. § 605(b) ............................................................................................ 16


16 U.S.C. § 1801 ............................................................................................. 1
16 U.S.C. § 1801(a) ........................................................................................ 27
16 U.S.C. § 1801(a)(6) .................................................................................... 1
16 U.S.C. § 1801(a)(8) .................................................................................... 2
16 U.S.C. § 1801(b)(1) .................................................................................... 2, 24
16 U.S.C. § 1801(b)(3) .................................................................................... 25
16 U.S.C. § 1802(11) ...................................................................................... 1
16 U.S.C. § 1811(a) ........................................................................................ 1

16 U.S.C. § 1851(a) ........................................................................................ 2
16 U.S.C. § 1851(a)(1) .................................................................................... 2
16 U.S.C. § 1851(a)(2) .................................................................................... 2
16 U.S.C. § 1851(a)(8) .................................................................................... 2
16 U.S.C. § 1852(a) ........................................................................................ 3
16 U.S.C. § 1852(h)(1) .................................................................................... 3
16 U.S.C. § 1852(h)(3) .................................................................................... 3
16 U.S.C. § 1852(i)(2) ..................................................................................... 3
16 U.S.C. § 1853(a)(1)(A) ............................................................................... 2, 7
16 U.S.C. § 1853(a)(9) .................................................................................... 12

16 U.S.C. § 1853(a)(15) ................................................................................. 2
16 U.S.C. § 1853(b)(4) ................................................................................. 7, 9
16 U.S.C. § 1853(b)(14) ................................................................................ 7
16 U.S.C. § 1853(c) ...................................................................................... 3
16 U.S.C. § 1855(f)(1) .................................................................................. 6

18 U.S.C. § 1854(a)(1)(B) ............................................................................ 3
18 U.S.C. § 1854(b) .................................................................................. 3, 12

28 U.S.C. § 1491(a) .................................................................................... 20
28 U.S.C. § 1491(a)(1) ................................................................................ 20
28 U.S.C. § 1346(a)(2) ................................................................................ 20

Fed. R. Civ. P. 56(a) .................................................................................... 6
Fed. R. Civ. P. 15(a)(2) ............................................................................... 18

50 C.F.R. § 600.305 ..................................................................................... 2
50 C.F.R. § 600.310 (e)(3)(iii)(B) .............................................................. 12
50 C.F.R. § 622.20(b) ............................................................................ 4, 26
50 C.F.R. § 622.370(b) ................................................................................ 4
50 C.F.R. § 622.373 ..................................................................................... 4

## **REGULATIONS**

83 Fed. Reg 54,069 (Oct. 26, 2018) ...................................................... 4, 10
85 Fed. Reg.44,005 (July 21, 2020) .................................................. passim

## INTRODUCTION

The National Marine Fisheries Service (NMFS) promulgated the Gulf Council's recommended Gulf For-Hire Reporting Rule to support the substantial interest in improving the collection of reliable data for the conservation and management of the Nation's fishery resources. Fisheries of the Caribbean, Gulf of Mexico, and South Atlantic; Electronic Reporting for Federally Permitted Charter Vessels and Headboats in Gulf of Mexico Fisheries, 85 Fed. Reg. 44,005 (July 21, 2020) (Final Rule). The Final Rule contains a vessel monitoring system (VMS) requirement that collects real-time location data to independently verify when a fishing vessel leaves the dock and therefore may be on a fishing trip.  This data is matched with electronic logbook records to determine if vessel activity is accurately reported, and allows NMFS to plan for dockside sampling of catch.  Plaintiffs are covered by the Final Rule because they own and operate for-hire charter vessels that hold permits allowing them the exclusive right to take paying passengers to fish for federally-managed species in the Gulf of Mexico. They invite the Court to invalidate the Final Rule on unpersuasive statutory and constitutional grounds. The Court should deny this invitation and uphold the Final Rule as a reasonable exercise of congressionally delegated authority that is supported by the administrative record.

## BACKGROUND

### I.     Statutory Background

The Magnuson-Stevens Fishery Conservation and Management Act (MSA), 16 U.S.C. §§ 1801 *et seq*., establishes a national program for conservation and management of fishery resources with federal jurisdiction over such resources within the exclusive economic zone (EEZ), which extends from the seaward boundary of each coastal State out to 200 nautical miles.  *Id*. §§ 1801(a)(6), 1811(a), 1802(11).  The MSA recognizes that "[t]he collection of reliable data is

essential to the effective conservation, management, and scientific understanding of the fishery resources of the United States." *Id.* § 1801(a)(8). NMFS, acting under authority delegated from the Secretary of Commerce, is responsible for managing fisheries under the MSA.

Key purposes of the MSA are to "take immediate action to conserve and manage the fishery resources found off the coasts of the United States. . ." and "promote domestic commercial and recreational fishing under sound conservation and management principles. . . ." *Id.* §§ 1801(b)(1), (3). Regulation of fisheries is accomplished through fishery management plans (FMPs), amendments to those plans, and implementing regulations. *See N.C. Fisheries Ass'n, Inc. v. Gutierrez*, 550 F.3d 16, 17 (D.C. Cir. 2008) (noting that FMPs "do not themselves have any regulatory effect—implementing regulations must also be enacted in order to effectuate them."). The MSA sets forth required provisions for FMPs, including that FMPs must contain measures "necessary and appropriate for the conservation and management of the fishery, to prevent overfishing and rebuild overfished stocks, and to protect, restore, and promote the long-term health and stability of the fishery." 16 U.S.C. § 1853(a)(1)(A). FMPs must also establish mechanisms for annual catch limits and accountability measures.[1] *Id.* § 1853(a)(15).

To assist in fishery management, the MSA established eight regional fishery management councils (Councils), 16 U.S.C. § 1852(a), each of which "is granted authority over a specific

---

[1] All FMPs and their implementing regulations must be consistent with ten National Standards (NS). 16 U.S.C. § 1851(a). As relevant to this case, NS1 requires that "[c]onservation and management measures shall prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery for the United States fishing industry." *Id.* § 1851(a)(1). NS2 requires that measures be based on the "best scientific information available." *Id.* § 1851(a)(2). NS8 requires that "[c]onservation and management measures shall, consistent with the conservation requirements of this [Act] (including the prevention of overfishing and rebuilding of overfished stocks), take into account the importance of fishery resources to fishing communities by utilizing economic and social data that meet the requirements of [NS2], in order to (A) provide for the sustained participation of such communities, and (B) to the extent practicable, minimize adverse economic impacts on such communities." *Id.* § 1851(a)(8). Advisory guidelines for the NSs are set forth at 50 C.F.R. §§ 600.305 *et seq*.

geographic region [within the EEZ] and is composed of members who represent the interests of the states included in that region." *C & W Fish Co. v. Fox*, 931 F.2d 1556, 1557-58 (D.C. Cir. 1991) (citing 16 U.S.C. § 1852). Each Council is required to prepare and submit to NMFS an FMP "for each fishery under its authority that requires conservation and management," as well as proposed regulations that the Council "deems necessary or appropriate" to implement the FMP. 16 U.S.C. §§ 1852(h)(1), 1853(c). The FMPs are then developed through a public process that includes notice of meetings of Councils, scientific and statistical committees that provide ongoing scientific advice for fishery management decisions, and advisory panels; opportunity for interested persons to submit oral and written statements during those meetings; and public hearings. *Id.* § 1852(h)(3), (i)(2). When a Council transmits an FMP to NMFS, the agency publishes a notice of availability in the Federal Register announcing a 60-day comment period. *Id.* § 1854(a)(1)(B). NMFS reviews proposed regulations for consistency with the FMP and applicable law, and under a process outlined in the MSA, publishes proposed rules, solicits public comment, and promulgates final rules.[2] *Id.* § 1854(b).

## II.   Factual and Procedural Background

The Gulf of Mexico Fishery Management Council (Gulf Council) prepared the Gulf For-Hire Electronic Reporting Amendment, which modifies reporting requirements for vessels issued Gulf of Mexico charter vessel/headboat permits. These limited access permits allow owners and operators of the permitted charter vessels or headboats[3] to take paying passengers to fish for

---

[2] Councils cannot promulgate regulations, and are not considered federal agencies for purposes of the Administrative Procedure Act (APA), 5 U.S.C. §§ 551 *et seq.*; *Gen. Category Scallop Fishermen v. Sec'y, U.S. Dep't of Com.*, 635 F.3d 106, 112 n.15 (3d Cir. 2011) (citing *J.H. Miles & Co., Inc. v. Brown,* 910 F. Supp. 1138, 1159 (E.D. Va. 1995)); *Anglers Conservation Network v. Pritzker*, 809 F.3d 664, 667 (D.C. Cir. 2016); *Flaherty v. Ross*, 373 F. Supp. 3d 97, 101 (D.D.C. 2019).

[3] As defined in the Amendment, headboats are federally permitted for hire vessels that participate in the Southeast Regional Headboat Survey and charter vessels are federally permitted for hire vessels that do not participate in the Southeast Regional Headboat Survey. AR07722.

federally managed reef fish and Coastal Migratory Pelagic (CMP) species in the Gulf of Mexico EEZ.  50 C.F.R. §§ 622.20(b), 622.370(b), 622.373.  The Gulf Council recognized that improved data reporting in these fisheries could reduce the likelihood that annual catch limits are exceeded and improve estimates of bycatch and discard mortality rates. AR07722.[4] As NMFS explained in the proposed rule, "catch from federally permitted for-hire vessels represents a substantial portion of the total recreational catch for some fish species managed by the Gulf Council, such as red snapper, gray triggerfish, greater amberjack, and mutton snapper."  Fisheries of the Caribbean, Gulf of Mexico, and South Atlantic; Electronic Reporting for Federally Permitted Charter Vessels and Headboats in Gulf of Mexico Fisheries, 83 Fed. Reg 54,069, 54,070 (Oct. 26, 2018). Accordingly, NMFS determined that "[a]ccurate and reliable fisheries information about catch, effort, and discards is important for stock assessments and the evaluation of management measures." *Id.*

The Final Rule requires owners or operators of federally permitted charter vessels and headboats to notify NMFS before departing for a trip and declare whether the vessel will be operating as a charter vessel or headboat, or taking another type of trip. 85 Fed. Reg. at 44,005. If the vessel is operating as a charter vessel or headboat, then an electronic fishing report must be submitted before removing any fish from the vessel, or within 30 minutes of arriving at the dock if no fish are landed.  *Id.* at 44,005. This trip report includes any species that were caught or harvested, as well as information about the permit holder, vessel, location fished, fishing effort, discards, and socio-economic data.  *Id.*  In addition, each permitted vessel must be equipped with NMFS-approved hardware and software with a minimum capability of archiving GPS locations

---

[4] Documents from the Administrative Record in this case are cited as AR00001-AR11615. The Administrative Record can be found on the docket at ECF No. 63 through ECF No. 70.

(i.e., satellite VMS or cellular VMS)[5] once per hour, 24 hours a day, every day of the year. *Id.* at 44,006-07.[6] Vessels that take customers to fish only for non-federally managed species do not require a permit, and thus need not comply with the requirements of the Final Rule.

This data collection provides robust data on landed and discarded catches, effort, and socio-economic information that are integral to conducting stock assessments as well as other required analyses under the MSA and other applicable laws, and monitoring landings to constrain harvest to specified catch limits. *See* AR07730-731; AR07737-38, AR07740-41. Given NMFS's staffing and funding constraints, the requirements to report prior to offload, have an operating VMS, and complete the hail-out are critical for validating fishing effort and trip reports, and increases the enforceability of the reporting program. *See* AR11232 ("[VMS] monitors vessel location to determine when vessels left for trips, and the notification allows sufficient planning for dockside sampling of catch."); *see also* AR07866 ("Validation of vessel activity (or inactivity) is critical to determining compliance with logbook reporting requirements. Information on whether or not a vessel is in or out of port on a particular day can be matched with logbook records or hail-out/hail-in requirements to determine if vessel activity was accurately reported.").

## STANDARD OF REVIEW

Federal Defendants bring this Cross-Motion for Summary Judgment under Rule 56(c) of the Federal Rules of Civil Procedure. Summary judgment is appropriate where no genuine issue of material fact exists, and a party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a);

---

[5] Cellular-based systems collect and store data while a vessel is not within range of a cellular signal, e.g., during the majority of fishing trips in Federal waters, and then transmit the data when the vessel is within cellular range. Satellite-based systems transmit data as they are collected. 85 Fed. Reg. at 44,007.

[6] The Final Rule has two exceptions for the GPS monitoring: (1) an in-port exemption that allows the location data to be transmitted every four hours when the vessel is docked; and (2) a power-down exemption that allows for location data transmission requirements to be suspended when the vessel is out of the water for more than 72 hours. 85 Fed. Reg. at 4406-07.

*see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). As this case involves review of a final agency action under the APA, 5 U.S.C. § 704, however, the standard in Rule 56(c) does not apply because of the limited role of a court in reviewing the administrative record. *See, e.g., Atchafalaya Basinkeeper v. Bostick*, No. 14-649 , 2015 WL 3824318, at *6 (E.D. La. June 19, 2015) (In the context of judicial review of an administrative agency's decision, a "motion for summary judgment stands in a somewhat unusual light, in that the administrative record proves the complete factual predicate for the court's review." (citation omitted)). "[T]he district court must 'determine whether as a matter of law, evidence in the administrative record permitted the agency to make the decision it did, and summary judgment is an appropriate mechanism for deciding the legal question of whether an agency could reasonably have found the facts as it did.'" *Id.* (citation omitted).

In this context, the Final Rule is subject to limited judicial review under the APA. 16 U.S.C. § 1855(f)(1); 5 U.S.C. § 706(2)(A)-(D); *see, e.g., Lovgren v. Locke*, 701 F.3d 5, 20 (1st Cir. 2012) (MSA regulations reviewed under APA standards).  That is, a reviewing court is to affirm final agency action unless that action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).  The standard is "highly deferential" and the agency's decision is entitled to a presumption of validity. *Hayward v. U.S. Dep't of Labor*, 536 F.3d 376, 379 (5th Cir. 2008) (per curiam) (citation omitted).

## <u>ARGUMENT</u>

Plaintiffs hold permits that allow them the exclusive right to take customers to fish for federally managed fish species.  Contrary to their arguments, the VMS requirement is lawful and supported by the record.  NMFS complied with the procedural requirements of the APA and the Regulatory Flexibility Act (RFA) in issuing the Final Rule.  And the VMS requirement passes Constitutional muster under the Fourth and Fifth Amendments.

I.      **The MSA Provides Statutory Authority To Require Owners and Operators of Permitted Vessels to Obtain and Install VMS Devices.**

The MSA expressly authorizes any FMP to "require the use of specified types and quantities of fishing gear, fishing vessels or equipment for such vessels, *including devices which may be required to facilitate enforcement of the provisions of this Act*." 16 U.S.C. § 1853(b)(4) (emphasis added). It also requires that FMPs contain measures "necessary and appropriate" for the conservation and management of a fishery, and authorizes FMPs to "prescribe such other measures, requirements, or conditions and restrictions as are determined to be necessary and appropriate for the conservation and management of the fishery." 16 U.S.C. §§ 1853(a)(1)(A), 1853(b)(14); *see Coastal Conservation Ass'n v. U.S. Dep't of Com.*, No. 15-1300, 2016 WL 54911, at *4 (E.D. La. Jan. 5, 2016) (finding that "necessary and appropriate" in 16 U.S.C. § 1853(a)(1)(A) is "empowering language" representing a "delegation of authority to the agency"), *aff'd*, 846 F.3d 99 (5th Cir. 2017); *Goethel v. Pritzker*, No. 15-cv-497-JL, 2016 WL 4076831, at *4 (D.N.H. July 29, 2016) (same), *aff'd sub nom. Goethel v. U.S. Dep't of Com.*, 854 F.3d 106 (1st Cir. 2017).

The Final Rule's requirement that permitted vessels obtain and install VMS units on board to monitor the vessels' position is neither novel nor a violation of law. Consistent with the MSA's broad conferral of authority and the explicit authorization to require vessels to obtain equipment which may be required to facilitate its enforcement provisions, the Council and NMFS reasonably determined that VMS units are necessary and appropriate for the management of the fishery to allow NMFS to independently determine when a vessel leaves the dock and to aide with enforcement of the reporting requirements. 85 Fed. Reg. at 44,102; *see also*, AR11263 ("Archivable GPS data that transmits when a cell signal is detected can provide the location information desired for management, enforcement, and science."); AR11232 ("With the understanding that the [Southeast Regional Headboat Survey (SRHS)] program was not scalable

7

due to staffing and funding needs, alternative methods need to be developed to equate to the port agent validation actions in the SRHS program" and further discussing VMS as an element to decrease costs of compliance and validation); AR07866 ("Validation of vessel activity (or inactivity) is critical to determining compliance with logbook reporting requirements"); AR05837 ("Look, if you want to really provide useful vessel position, then you have to have some way of knowing that the position that you're getting is actually that vessel. If you don't have something affixed to it, you have no way of knowing it"); AR5836 ("the ideal way to know whether a boat is working out on the water or on the dock is to have some piece of equipment that is permanently affixed to the boat").

NMFS's clear authority to require VMS units stands in stark contrast to the unusual assertions of federal power that were found to be impermissible in the cases that Plaintiffs cite. ECF No. 73-1 (Pls.' Mem.) at 30. For example, Plaintiffs cite *Food and Drug Administration v. Brown & Williamson Tobacco Corp.*, a case in which the Supreme Court declined to defer to the Food and Drug Administration's expansive reading of a statute that would confer authority upon the agency for the first time to regulate tobacco products. 529 U.S. 120, 160-161 (2000). In *Louisiana Public Services Commission v. FCC,* the Supreme Court declined to defer to the agency's view that state regulation was preempted by federal law when the statute expressly provided that Congress did not confer jurisdiction on the FCC to regulate intrastate communication services. 476 U.S. 355, 373-77 (1986). Unlike *Louisiana Public Services Commission*, here there is no express prohibition on requiring vessels to be equipped with VMS units. To the contrary, the MSA plainly authorizes various measures to monitor fisheries, including requiring vessels to install "devices which may be required to facilitate enforcement provisions of this [Act]." 16 U.S.C. § 1853(b)(4). That the MSA also authorizes NMFS to charge a fee to "recover the actual

costs" of limited access privilege programs and community development quota programs does not support the inference that NMFS cannot also require vessels to install VMS devices. C*f.* Pls.' Mem. at 30. Congress provided NMFS with the authority to do both. *Med. Ctr. Pharmacy v. Mukasey*, 536 F.3d 383, 394 (5th Cir. 2008) ("There is no better or more authoritative expression of congressional intent than the statutory text . . . [a]nd where the statutory language is unambiguous and the statutory scheme is coherent and consistent, the language of the statute is usually where we end" (citations and internal quotation marks omitted)).

The court's analysis of similar arguments against industry-funded at-sea monitors in *Loper Bright Enterprises, Inc. v. Raimondo* is instructive. *Id.*, No. 20-466 (EGS), 2021 WL 2440511 (D.D.C. June 15, 2021). There, the court found that the MSA's broad mandate that FMPs contain measures "necessary and appropriate for the conservation and management of the fishery" was sufficient to authorize industry funding of at-sea monitors. *Id.* at *10-11. Even where explicit authorization is absent, where Congress has delegated power to an agency to administer a statutory regime, it "necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress." *Chevron, U.S.A, Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984) (citation omitted); *see also*, *Relentless Inc. v. U.S. Dep't of Com.*, No. 20-108 WES, 2021 WL 4256067, at *7 (D.R.I. Sept. 20, 2021) (finding NMFS's determination that MSA authorized industry-funded at sea monitors reasonable). Inherently, measures that may be required to conserve and manage the fishery may result in costs to the regulated industry. The MSA does not need to authorize the *imposition* of the costs of regulatory requirements such as a VMS—it just needs to authorize the requirements themselves. *See Nat'l Fed'n of Indep. Bus. v. Sebelius*, (*NFIB*) 567 U.S. 519, 652 (2012) ("Government regulation typically imposes costs on the regulated industry" (Scalia, J., dissenting)); *see also All. of Auto. Mfrs. v. Gwadosky*, 430 F.3d

30, 43 (1st Cir. 2005). NMFS's interpretation that the MSA authorizes the purchase and installation of VMS units is reasonable.

The facts here are also fundamentally different than those at issue in *NFIB*. *See* Pls.' Mem. at 31. There, the challenged provision required individuals who otherwise would choose not to purchase health insurance to do so or face a tax penalty. 567 U.S. at 539, 548. Thus, the statute "regulate[d] individuals precisely *because* they are doing nothing." *Id.* at 552. In contrast to the provision at issue in *NFIB*, the VMS requirement does not *compel* Plaintiffs to engage in commerce. Plaintiffs are free to decide whether to obtain a permit that allows them the exclusive right to take paying passengers to fish for federally managed species. If Plaintiffs choose to participate in the limited access permit system, then that decision carries with it certain obligations. If on the other hand, Plaintiffs forego a limited access permit and elect to take customers to fish only in state waters, then there is no requirement to obtain a VMS device. In short, Plaintiffs' arguments fail to demonstrate a lack of statutory authority for the VMS requirement, or that it otherwise violates the law.

## II.     The Final Rule fully complies with the APA

### A.     Reporting of five specific socio-economic data elements falls within the scope of the proposed rule or, in the alternative, is a Logical Outgrowth of the proposed rule.

In cases where rulemaking is required, Section 553 of the APA requires an agency to provide published notice of its proposed rulemaking.  5 U.S.C. § 551 et seq.  Such notice must include "either the terms or substance of the proposed rule or a description of the subjects and issues involved." 5 U.S.C. § 553(b)(3). Here, the notice of proposed rulemaking clearly stated that the submission of electronic fishing reports would be required and that these reports would include "information about . . . socio-economic data." 83 Fed. Reg. at 54,071.  The final rule did not change

the proposed requirement, but merely provided more detail about the five specific questions. Thus, it is unnecessarily to apply the logical outgrowth test.

However, to the extent the logical outgrowth test is relevant, the Final Rule is a logical outgrowth of the notice of proposed rulemaking and NMFS provided adequate notice under the APA. The focus of the "logical outgrowth" test is whether the notice "adequately frame[s] the subjects for discussion" such that "the affected party 'should have anticipated' the agency's final course in light of the initial notice." *Huawei Techs. USA, Inc. v. Fed. Commc'ns Comm'n*, 2 F.4th 421, 447 (5th Cir. 2021) (citation omitted).

Here, the proposed regulatory text required "an electronic fishing report of all fish harvested and discarded, and any other information requested," and the preamble explained that this other information would include "information about the permit holder, vessel, location fished, fishing effort, discards, and socio-economic data." 83 Fed. Reg. at 54,071, 54,076, 54,077. The Final Rule maintained the same regulatory text and provided additional information of the requested socio-economic data. Plaintiffs should have anticipated that socioeconomic data would encompass economic factors.

This is distinguishable from cases like *International Union, United Mine Workers of America v. Mine Safety and Health Administration* where the court found that a final rule setting a maximum mine belt air velocity of 500 feet per minute was not a logical outgrowth of a proposed rule for a "minimum air velocity of 300 feet per minute." 407 F.3d 1250, 1259 (D.C. Cir. 2005). There, the court held that the logical outgrowth test was not satisfied because the agency "could not have expected" interested parties to realize that the agency would consider abandoning the proposed regulatory approach "simply because [the Secretary of the Agency] invited commentary on a proposed rule that included a minimum air velocity." *Id.* at 1260; *see also Env't Integrity*

*Project v. EPA*, 425 F.3d 992, 998 (D.C. Cir. 2005) (rule was not a logical outgrowth where agency "repudiate[d] its proposed interpretation and adopt[ed] its inverse" in the final rule). The Final Rule is a logical outgrowth of the notice of proposed rulemaking and NMFS provided adequate notice under the APA.[7]

### B.     NMFS did not ignore any "relevant factors"

NMFS's decision to require the collection of crew size and charter fees was reasonable and did not "entirely fail[] to consider an important aspect of the problem." *See Motor Vehicle Mfrs. Ass' of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). First, neither the MSA nor the APA requires that NMFS adopt the recommendations of the Data Collection Technical Subcommittee. Instead, the obligation on the agency is to review proposed regulations for consistency with the FMP amendment and applicable law (18 U.S.C. § 1854(b)) and to make a "rational connection between the facts found and the choice made." *Burlington Truck Lines v. United States,* 371 U.S. 156, 168 (1962).

In the Final Rule, NMFS did just that. It explained why charter fees and crew size were necessary data elements. NMFS reasoned that all five economic values were necessary because they would "enhance the Gulf Council and NMFS'[s] ability to monitor and assess the economic effects of fishing regulations and environmental factors[,] . . . will increase the accuracy of economic impacts and value estimates specific to the for-hire industry… [and] will help generate estimates of lost revenue when a disaster occurs." 85 Fed. Reg. at 44,011.[8] NMFS also reasoned

---

[7] In the alternative, the failure to provide notice and comment in this case was harmless error, and a second round of notice and comment was therefore unnecessary. *See United States v. Johnson*, 632 F.3d 912, 931 (5th Cir. 2011) (finding harmless error where the agency "thoroughly engage[d] the issues and challenges inherent in the regulation" and "was able to address objections in the interim rulemaking").

[8] This type of data is important because FMPs and amendments to FMPs must include a fishery impact statement that analyzes cumulative conservation, economic, and social impacts. 16 U.S.C. § 1853(a)(9); *see also*, 50 C.F.R. § 600.310(e)(3)(iii)(B) ("Councils should consider the management

that requiring this information directly from the electronic logbooks "will be superior, in terms of quality and usefulness, to information that can be obtained from websites or separate surveys." *Id*.

The administrative record supports this conclusion. For example, even though the technical data committee recommended against the collection of charter fee, it acknowledged that collection of this data is "[c]ritical for ANY economic analysis/assessment." AR07849 (emphasis in original). As to crew size, the committee explicitly identified the "number of crew" as an essential data element for collection. AR07842. It is also important to keep in mind that the committee's goal was to recommend the elements to be collected, AR07838, not to foreclose the collection of data elements that NMFS would later determine to be necessary. Thus, even if the committee expressed reservations about charter fees, NMFS explained that collection through the electronic log-books is superior to other data sources. 85 Fed. Reg. at 44,011. When, as here "the agency's reasons and policy choices conform to minimal standards of rationality, then its actions are reasonable and must be upheld." *Luminant Generation Co. LLC v. U.S. EPA,* 714 F.3d 841, 857 (5th Cir. 2013) (citation omitted).

### C.    NMFS provided adequate responses to public comments

Finally, NMFS robustly responded to the public comments about the VMS requirement. An agency must consider and respond to the material comments and concerns that are voiced. *See Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015) ("An agency must consider and respond to significant comments received during the period for public comment."). But so long as the agency considered, and rationally responded to, those material comments, this Court cannot "substitute its own analysis [or Plaintiffs' analysis] for the agency's." *State v. United States Nuclear Regul.*

---

objectives of their FMPs and their management framework to determine the relevant social, economic, and ecological factors used to determine [optimum yield].")

*Comm'n*, 824 F.3d 1012, 1022 (D.C. Cir. 2016) (internal quotation marks omitted); *see also Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1905 (2020) (asking whether the agency's decision was "based on a consideration of the relevant factors and whether there has been a clear error of judgment" (citation omitted)).   NMFS fulfilled its duty to respond to public comments.

Some public comments contained the following identical language: "[p]roviding all confidential transiting details is a violation of our 4ᵗʰ Amendment right to privacy . . . [s]uch details are considered confidential by [NOAA] and utilized by other agencies not associated with management of the fishery." AR08179-80 (public comment from Michael Pierdinock); AR08192-93 (public comment from Timothy Brady); AR08237-238 (public comment from Gregory Mercurio).   NMFS reasonably interpreted the text of these comments to reflect a concern about the location data from the VMS being acquired by "other agencies," as well as a concern about the public disclosure of repeat fishing spots.   NMFS fully responded to this category of comments, stating that the data "shall be confidential and shall not be disclosed, except under the limited circumstances specified in the [MSA]."   85 Fed. Reg. at 44,010.

NMFS also adequately responded to comments regarding the need for the VMS requirement, and how it complemented the electronic catch reporting requirement.   In the Final Rule, it responded that the VMS is an "additional mechanism that verifies vessel activity" and would allow it to "independently determine whether the vessel leaves the dock," which "help[s] validate effort and aid with enforcement of the reporting requirements.   85 Fed. Reg. at 44, 012.

Finally, NMFS's response to comments expressing concern about the cost of the VMS requirement was sufficient.   The Final Rule made clear that all permit holders can get reimbursed for the cost of approved VMS units.   85 Fed. Reg. at 44, 013; *see also Vessel Monitoring System*

*Reimbursement Program (VMS),* Pac. States Marine Fisheries Comm'n, http://www.psmfc.org/program/vessel-monitoring-system-reimbursement-program-vms (last visited Sept. 24, 2021) (explaining requirements of VMS reimbursement program, which has been in place since July 2006).  And NMFS carefully considered average monthly costs for charter businesses, which it estimated to be $5,171, and determined that the monthly service fees of "$10 to $40" for the VMS requirement would not "materially alter cash flows, profits, or the solvency" of these businesses.  85 Fed. Reg. at 44,013.  NMFS balanced this relatively nominal monthly service fee against its need for the VMS's real-time location data for fishery management, enforcement, and scientific purposes.

Plaintiffs may disagree with the substance of NMFS's responses.  But that does not mean that NMFS did not adequately respond to public comments.  At bottom, "agencies need not supply comprehensive explanations and record citations for each and every conclusion. . . . These rules are to ensure satisfaction of due process requirements and meaningful public participation in rulemaking, not to straitjacket agency proceedings." *Kennecott Copper Corp. v. EPA*, 612 F.2d 1232, 1236 (10th Cir. 1979).  NMFS satisfied those requirements here.

## III.    NMFS complied with the Regulatory Flexibility Act

Plaintiffs next argue that NMFS violated the Regulatory Flexibility Act ("RFA") when it approved the Final Rule.  Pls.' Mem. at 39-41. The RFA is "[p]urely procedural." *See, e.g., N.C. Fisheries Ass'n, Inc. v. Gutierrez*, 518 F. Supp. 2d 62, 95 (D.D.C. 2007); *see also Associated Fisheries of Me. v. Daley*, 127 F.3d 104, 114 (1st Cir. 1997) (alteration in original); *A.M.L. Int'l, Inc. v. Daley*, 107 F. Supp. 2d 90, 105 (D. Mass. 2000). It does not prohibit regulations from having adverse economic effects on small entities or even require agencies to minimize those effects. *N.C. Fisheries Ass'n, Inc.,* 518 F. Supp. 2d at 95-96; *Associated Fisheries,* 127 F.3d at 114-116; *A.M.L.*

*Int'l, Inc.,* 107 F. Supp. 2d at 105.  Instead, it simply requires that an agency conduct a "regulatory flexibility analysis" whenever it proposes a rule that will have "a significant economic impact on a substantial number of small entities." 5 U.S.C. §§ 601(6), 603, 605(b). The standard for judicial review of agency compliance with the RFA is "only to determine whether an agency has made a 'reasonable, good-faith effort' to carry out the mandate of the RFA." *Alenco Commc'ns, Inc. v. FCC*, 201 F.3d 608, 625 (5th Cir. 2000) (citing *Associated Fisheries,* 127 F.3d at 114). The proper question for the court, therefore, "is not whether the [agency] reached the correct determination, but whether the agency followed the procedural steps set out in the RFA." *Am. Health Care Ass'n v. Burwell*, 217 F. Supp. 3d 921, 941 (N.D. Miss. 2016) (citations omitted).

Here, NMFS complied with the RFA by preparing both an initial and final regulatory flexibility analysis. 83 Fed. Reg. at 54,072-75; 85 Fed. Reg. at 44,013-17. NMFS identified the small entities that would be affected, described the reporting, recordkeeping, and other compliance requirements of the proposed rule, evaluated alternatives to each element of the final rule and, explained the steps that it had taken to minimize the economic effects of the Final Rule on small entities. 83 Fed. Reg. at 54,072-75; 85 Fed. Reg. at 44,013-17  Contrary to Plaintiffs' assertions, NMFS expressly evaluated an alternative that would not require a VMS device to be installed on charter vessels.[9] *See*, 83 Fed. Reg. at 54,075; 85 Fed. Reg. at 44,016; *cf.* Pls.' Mem. at 40. The Gulf Council rejected this alternative because it would not allow for the desired "level of trip validation, because it would not require GPS unit hardware to be permanently affixed to the

_____

[9] As such, the circumstances here are unlike in Plaintiffs' cited cases. *See*, Pls.' Mem. at 40-41. In *U.S. Telecom Ass'n v. FCC*, the Federal Communications Commission failed to produce any regulatory flexibility analysis at all. 400 F.3d 29, 42-43 (D.C. Cir. 2005). In *National Federation of Independent Business v. Perez*, the Department of Labor deferred analysis of the costs associated with the implementation of a portion of the challenged rule to a later rulemaking. No. 5:16-cv-00066-C, 2016 WL 3766121, at *38 (N.D. Tex. June 27, 2016). Here, NMFS completed a full and reasoned regulatory flexibility analysis.

vessel." 83 Fed. Reg. at 54,075, 85 Fed. Reg. at 44,016, *see also*, AR11568 ("Validation of vessel activity (or inactivity) is critical to determining compliance with logbook reporting requirements. Information on whether or not a vessel is in or out of port on a particular day can be matched with logbook records or hail out/hail in requirements to determine if vessel activity was accurately reported."). NMFS is entitled to reject alternatives that would not have achieved equivalent success in meeting the objectives of the applicable statutes. *Alenco*, 201 F.3d at 625; *see also*, *Ace Lobster Co. v. Evans*, 165 F. Supp. 2d 148, 185 (D. R. I. 2001) (agency need only discuss alternative and provide a reasonable explanation for their rejection) (citing 5 U.S.C. §§ 603(b)-(c); 604(a)(5)).

NMFS's consideration of the cost of the VMS devices was also reasonable. At the time the Final Rule was published NMFS had already received several vendor quotes for lower cost cellular-based location tracking devices, ranging between $150 and $800 in the year of implementation, and was actively testing those lower-cost devices with the reasonable anticipation that some would be available for use by the time the final rule was implemented.[10] 85 Fed. Reg. at 44,013, 44,015. NMFS also provided a reasoned explanation for its consideration of the estimated costs for a cellular data plan. NMFS assumed that most owners or operators "already have a basic smartphone and data plan in order to meet the needs of their businesses," noting that a data plan would only be required for some VMS devices, and that "[s]ome vessel owners and operators may be more or less affected than others . . . depending on their existing technology." *Id.* at 44,015. NMFS completed the requisite analysis and incorporated its findings into the Final Rule, reasonably relying on quotes from vendors with the anticipation that lower-cost cellular

---

[10] As anticipated, there are currently two cellular VMS units approved for use for Gulf of Mexico charter vessels: Faria FB eTerm-C and Woods Hole Group Nemo. *Approved Vessel Monitoring System (VMS) Units for Reporting in the Southeaster For-Hire Integrated Electronic Reporting Program*, NOAA Fisheries, https://www.fisheries.noaa.gov/southeast/rules-and-regulations/approved-vessel-monitoring-system-vms-units-reporting-southeast-hire-integrated (lasted visited Sept. 24, 2021).

devices would be available by the time the VMS portion of the rule would be implemented. Even

if costs ended up higher than anticipated, the sufficiency of a regulatory flexibility analysis under

the RFA should be scrutinized under a standard of reasonableness rather than one of mathematical

exactitude. *Associated Fisheries*, 127 F.3d at 114. Plaintiffs' argument that the regulatory

flexibility analysis relied on unrealistically low costs that would burden boats that are already only

marginally profitable is unfounded.[11] *Cf.* Pls.' Mem. at 41. In short, NMFS did everything that the

RFA required it to do. For all of these reasons, the Court should reject the Plaintiffs' RFA claims.

## IV.   The Court Should Reject Plaintiffs' Back-Door Attempt to Bring a Fifth Amendment Takings Claim.

Plaintiffs' Complaint, ECF No. 1, did not allege a Fifth Amendment takings claim. And

when Plaintiffs amended their complaint on June 9, 2021, they did not add a Fifth Amendment

takings claim.  *See* ECF No. 54 ¶¶ 29, 82 (asserting only a due process claim relating to purchase

of VMS device).[12] Instead of filing a motion for leave to amend their complaint a second time, as

required by Fed. R. Civ. P. 15(a)(2), Plaintiffs assert a takings claim for the first time in their

summary judgment memorandum. Pls.' Mem. at 18-19, 27-29. Plaintiffs may not amend their

Complaint through briefing to allege, for the first time, a takings claim. *See*, *Cutrera v. Bd. of*

*Supervisors of La. State Univ.*, 429 F.3d 108, 113 (5th Cir. 2005) (a claim raised in response to a

---

[11] Plaintiffs also fail to mention that fisherman who purchase an approved VMS unit can be reimbursed through the NMFS VMS re-imbursement program. 85 Fed. Reg. at 44,013. The rulemaking to allow reimbursement for approved cellular-devices was effective in August 2020. Vessel Monitoring System; Requirements for Type-Approval of Cellular Transceiver Unites, 85 Fed. Reg. 40,915 (July 8, 2020) (with the "Effective Date" August 7, 2020).

[12] By failing to raise any due process arguments in their opening brief, Plaintiffs have waived that claim. *Cinel v. Connick*, 15 F.3d 1338, 1345 (5th Cir. 1994) (Claims not raised in an initial brief are abandoned).

motion for summary judgment but which has not been raised in the complaint is not properly before the court); *see also Fisher v. Metro. Life Ins. Co.*, 895 F.2d 1073, 1078 (5th Cir. 1990).[13]

The Court should not allow Plaintiffs to side-step the requirement of seeking leave to file a second amended complaint and establishing why it is in the interest of justice to allow the amendment. Plaintiffs cannot satisfy that test with respect to the takings claim due to the futility of any proposed amendment. *See Forman v. Davis*, 371 U.S. 178, 182 (1962) (citing "futility of amendment" as one reason for denying a motion for leave to amend a complaint). Here, any motion for leave should be denied as futile because jurisdiction over the takings claim described in Plaintiffs' summary judgment memorandum lies exclusively with the United States Court of Federal Claims. Further, even if this Court could reach the merits of Plaintiffs' claim, which it cannot, there is no *per se* taking for two principal reasons. First, Plaintiffs identify no property interest which has been taken. Second, vessels become subject to the VMS requirement only when captains voluntarily apply for a limited access permit to which affords them the benefit of taking passengers for-hire fishing for federally managed reef fish and CMP species in the Gulf of Mexico EEZ. For the reasons discussed below, the Court should reject Plaintiffs' claim.

A.    **The Court Lacks Jurisdiction to Hear Plaintiffs' Fifth Amendment Damages Claims Against the United States.**

The United States' waiver of sovereign immunity for Fifth Amendment takings claims is contained in the Tucker Act and the Little Tucker Act. The Tucker Act provides in relevant part that "[t]he United States Court of Federal Claims shall have jurisdiction to render judgment upon

---

[13] Plaintiffs' assertion of a takings claim for the first instance in briefing is especially egregious because this Court has already permitted Plaintiffs to amend their operative complaint shortly before summary judgment briefing was set to begin. ECF No. 53. Plaintiffs have provided no justification for their undue delay. *S & W Enters. v. Southtrust Bank of Ala., NA*, 315 F.3d 533, 535-36 (5th Cir. 2003) (the burden is on the party seeking relief to show that the deadlines could not reasonably be met). For this reason alone, the Court should reject Plaintiffs' takings claim.

any claim against the United States founded . . . upon the Constitution . . . ." 28 U.S.C. §1491(a)(1).

Plaintiffs may proceed with a takings claim before this Court only if they seek money damages

(not equitable relief) and the monetary value of those damages is $10,000 or less. *See* 28 U.S.C.

§§ 1491(a)(1) (Tucker Act) (vesting exclusive jurisdiction for takings claims over $10,000 in the

Court of Federal Claims); *Roedler v. U.S. Dep't of Energy*, 255 F.3d 1347, 1351 (Fed. Cir. 2001).

Because the Tucker Act grants the Court of Federal Claims exclusive jurisdiction over non-tort

claims for damages against the United States seeking $10,000 or more, the district courts lacks

jurisdiction over such claims. 28 U.S.C. § 1491(a); *Wilkerson v. United States*, 67 F.3d 112, 118

(5th Cir. 1995); *Blanchard v. St. Paul Fire & Marine Ins. Co*., 341 F.2d 351, 358 (5th Cir. 1965).

Plaintiffs bear the burden of establishing that this Court has subject-matter jurisdiction over

its takings claims. They have not done so here. The Little Tucker Act, which is not identified in

the Complaint, only provides this Court with jurisdiction over takings claims seeking up to

$10,000. 28 U.S.C. § 1346(a)(2). Plaintiffs fail to include any allegations in its Complaint

establishing that its takings claims fall below this jurisdictional claim limit.[14] That Plaintiffs seek

only declaratory relief as opposed to specifying the extent of any damages does not allow them to

avoid the Court of Federal Claim's jurisdiction. "Equitable relief is not available to enjoin an

alleged taking of private property for a public use, duly authorized by law, when a suit for

compensation can be brought against the sovereign subsequent to the taking." *Ruckelshaus v.

Monsanto Co.*, 467 U.S. 986, 1016 (1984) (*citing Larson v. Domestic & Foreign Com. Corp*., 337

U.S. 682, 697, n.18 (1949)).   If Plaintiffs believe that a taking will occur once the VMS

requirement goes into effect, the proper forum for their claim would be the Court of Federal

Claims, not here. *Id.*, 467 U.S. at 1020. Alternatively, if the Court allows this claim to be

---

[14] Plaintiffs also fail to name the proper defendant for a Tucker Act case, which is the United States.
*See* 28 U.S.C. § 1346(a)(2).

considered based on the briefing, the Court should dismiss the claim, without prejudice, for lack of jurisdiction.

## B.        The VMS Requirement is Not a Per Se Taking

Although the Court need not and should not reach the merits of Plaintiffs' Fifth Amendment takings claim due to Plaintiffs' failure to plead a claim that falls within this Court's jurisdiction, if the Court reaches the merits, it should reject the claim.

In all Fifth Amendment takings cases, the first issue that must be addressed is whether the right or interest allegedly taking is a compensable or protected property interest within the meaning of the Fifth Amendment. *See Palmyra Pac. Seafoods, LLC v. United States*, 561 F.3d 1361, 1364 (Fed. Cir. 2009) ("First, in order to have a cause of action for a Fifth Amendment taking, the plaintiff must point to a protected property interest that is asserted to be the subject of the taking."). Here, Plaintiffs allege that the VMS requirements, which under the challenged rule is a condition of the permits that allow them to take paying passengers to fish for federally-managed species in the Gulf of Mexico, is a taking because it constitutes a permanent physical occupation of their vessels by the government. Pls.' Mem. at 27-28. But, as a matter of law, the ownership of a fishing vessel does not include a protected property right to fish in waters under the exclusive control of the United States. Although Plaintiffs have secured permits that allow them to fish in such waters, those permits confer no property rights. *See*, *Am. Pelagic Fishing Co. v. United States*, 379 F.3d 1363, 1379 (Fed. Cir. 2004) (there is no right to fish within the EEZ, nor does a permit to do so confer any property rights which are protected by the 5th Amendment); *see also*, *Conti v. United States*, 291 F.3d 1334, 1340-41 1344-45 (Fed. Cir. 2002) (there is no property right in the ability to use vessel and gear unencumbered by the terms of a permit issued under the MSA, even if all economic value is eliminated). As such, the VMS requirement, which is a condition of Plaintiffs' federally-issued permit, does not constitute a taking of any property right held by Plaintiffs.

21

In addition, contrary to Plaintiffs' argument (Pls.' Mem 21), the required installation of a VMS unit on their vessels as a condition of their permit is not a permanent physical occupation of property *by the government*. As Plaintiffs concede, the VMS devices are themselves the property of the charter boat operators. Pls.' Mem. at 23, n. 17. The present circumstances are also not like *Loretto v. Teleprompter Manhattan CATV Corp.*, which involved a New York law that required landlords to allow cable companies to "install its cable facilities upon [the] property." 458 U.S. 419, 421 (1982). There, the intrusion was the installation of a third-parties' property, the cable companies' equipment, which displaced the owner. Indeed, it was the "permanent occupation of ... space by a *stranger*," that severed the landlords' property interests, including the right to exclude others. *Id*. at 435-36 (emphasis added).

The voluntary participation in the permit program only underscores why a per se takings analysis is inappropriate. *See*, *Ruckelshaus*, 467 U.S. at 1007; *Yee v. City of Escondido,* 503 U.S. 519, 527-29 (1992) (A per se physical taking could not be maintained because the landowners had "voluntarily rented their land"). In *Ruckelshaus*, the Court considered a takings challenge to a statute that authorized the government to publicly disclose trade secrets it acquired from pesticide manufacturers as part of a registration process that was a prerequisite to selling pesticides. 467 U.S. at 990-91. The Court recognized that "the right to exclude others is central to the very definition of the property interest" in a trade secret, *id.* at 1011, but that because the manufacturers voluntarily submitted the data "in exchange for the economic advantages of a registration[, the submission] c[ould] hardly be called a taking." *Id*. at 987.[15] As recently affirmed by the Supreme

---

[15] For this reason, Plaintiffs' argument that the data generated by the VMS devices is a taking also fails. Pls.' Mem. at 29, n. 17. The information collected will be kept confidential and shall not be disclosed, except under limited circumstances specific in the MSA such as to the Council or Federal employees responsible for fishery management. 85 Fed. Reg. at 44,010. Location data would also be collected at a frequency which would "balance the need for spatial information with privacy concerns

Court, it is well established that the government may even "require property owners to cede a right of access as a condition of receiving certain benefits, without causing a taking." *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2079-80 (2021). Like the regulation at issue in *Monsanto*, VMS requirement is not a per se taking because it is triggered only through the voluntary choice to obtain a limited access permit and the benefits that come with it.[16] The VMS requirement does not "*require*[] [operators] to submit to [a] physical occupation" of their property, *Yee,* 503 U.S. at 527 (emphasis in original), but conditions their permit with regulations aimed to conserve and manage the fishery resources under the exclusive jurisdiction of the United States.

If the Court allows Plaintiffs to add a takings claim, and finds that it has jurisdiction over that claim, the Court should conclude that the VMS requirement—which applies only as a condition of the permit that allows Plaintiffs to use their for-hire charter vessels to fish for federally-managed species in the Gulf of Mexico—is not a taking of any property rights held by Plaintiffs and grant summary judgment in Federal Defendants' favor.

## VI.   The VMS requirement is constitutional under the Fourth Amendment

The VMS requirement does not constitute a search within the meaning of the Fourth Amendment.[17] A search is a governmental invasion of an individual's privacy, but the individual

---

of vessel operators as it would be sufficient to establish regions of fishing…but not exact fishing locations." AR04062.

[16] This underscores the absurdity of Plaintiffs' argument that VMS devices will decrease the market value of their vessels. Pls.' Mem. at 29.VMS devices are only required to remain affixed to the vessel as long as that vessel has a limited access permit to fish for Gulf reef and CMP species. If the vessel owner relinquishes the permit, the VMS unit may be removed. Moreover, deprivation of the right to obtain a profit from property is not itself sufficient to establish a taking. *Andrus v. Allard*, 444 U.S. 51, 66 (1979) (prohibition on the commercial sale of parts of protected birds was not a taking).

[17] Plaintiffs have assumed a heavy burden in choosing to file a facial challenge to the Final Rule rather than challenging the validity of specific enforcement actions that may be commenced by NMFS in the future. "[A] plaintiff can only succeed in a facial challenge by 'establish[ing] that no set of circumstances exists under which the Act would be valid,' i.e. that the law is unconstitutional in all of its applications." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)); *Assoc'd. Builders & Contractors of Tex.,*

must have a subjective expectation of privacy which society recognizes as objectively reasonable. *Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan, J., concurring).  Plaintiffs have not demonstrated that the VMS intrudes into a protected area, and so have failed to prove the requirement is a search under the Fourth Amendment.  *Carroll v. United States*, 267 U.S. 132, 146 (1925).  For this reason alone the Court should grant summary judgment in Defendants' favor on the Fourth Amendment claim.

But even if the Court disagrees, Plaintiffs' Fourth Amendment claim fails for two additional reasons.  First, the Supreme Court has consistently upheld warrantless administrative searches of "pervasively regulated" industries.  *New York v. Burger*, 482 U.S. 691, 701-02 (1987).  The fishing industry is one such industry.[18]  The VMS requirement is a reasonable extension of the significant federal interest to "conserve and manage the fishery resources found off the coasts of the United States" articulated in the MSA.  16 U.S.C. §§ 1801(b)(1), (3).  Alternatively, the

---

*Inc. v. Nat'l Lab. Rels. Bd.*, 826 F.3d 215, 220 (5th Cir. 2016) (Holding that plaintiffs mounting facial challenge to agency regulation must "establish that no set of circumstances exists under which the [Rule] would be valid.").

In *City of Los Angeles, California v. Patel*, the Supreme Court clarified that "when addressing a facial challenge to a statute authorizing warrantless searches, the proper focus of the constitutional inquiry is searches that the law actually authorizes, not those for which it is irrelevant," explaining that "[i]f exigency or a warrant justifies an officer's search" or if "the subject of a search has consented" then the search must proceed "irrespective of whether it is authorized by statute." 576 U.S. 409, 418-419 (2015). Certainly, there may be certain situations where plaintiffs are using their vessels for personal, rather than business, uses. However, because Plaintiffs chose to mount a facial challenge to the Final Rule, that there exists a hypothetical scenario in which the VMS is transmitting location data for these vessels while they are in personal use does not disturb the conclusion that their Fourth Amendment challenge cannot be sustained. *See, e.g., City of El Cenizo, Tex. v. Texas,* 890 F.3d 164, 187 (5th Cir. 2018) (finding that *Patel* did not overrule the standard for bringing facial challenges, but merely clarified the standard).

Because there are multiple situations in which application of the VMS requirement would be constitutional under the Fourth Amendment, this burden is not met.

[18] Plaintiffs' attempt to narrow the industry to solely charter vessels is unavailing. The applicable industry here is fishing.  Indeed, in this Court's order granting Plaintiff's motion for a class action, the Court made clear that the Final Rule regulates vessels "[i]n the world of *commercial passenger fishing*." ECF No. 48 at 3 (emphasis added).

VMS requirement passes constitutional muster under both the property-based approach of *United States v. Jones*, 565 U.S. 400 (2012) and the reasonable-expectations-of-privacy approach of *Carpenter v. United States*, 138 S. Ct. 2206 (2018).

**A.    The Fishing Industry is a "Pervasively Regulated" Industry**

Administrative inspections of "pervasively regulated" industries such as fishing are an established and well-delineated exception to the warrantless search prohibition of the Fourth Amendment. *Burger*, 482 U.S. at 702.

The Final Rule was promulgated under the MSA which expressly provides for warrantless searches of vessels.  16 U.S.C. § 1861(b)(1)(A)(ii), (vi) (authorizing any officer authorized to enforce that Act to "board, and search or inspect, any fishing vessel" and to "access . . . any data or information . . . including data from vessel monitoring systems" with or without a warrant.). Plaintiffs do not mention—let alone challenge the constitutionality of—this statutory provision. And courts have repeatedly upheld the constitutionality of warrantless searches pursuant to this authority.  *E.g., United States v. Kaiyo Maru No. 53*, 699 F.2d 989, 995 (9th Cir. 1983) (warrantless inspections authorized by MSA's predecessor, the Fishery Conservation and Management Act, do not offend the Fourth Amendment because a federal interest exists in protecting natural resources within fishery conservation zones); *Lovgren v. Byrne*, 787 F.2d 857 (3rd Cir. 1986) (upholding warrantless inspection of dock areas under the Fourth Amendment); *Gulf of Maine Trawlers v. United States*, 674 F. Supp. 927, 932 (D. Me. 1987) (warrantless search of vessels and seizure of fish was "reasonable and proper" under the Fourth Amendment).

In enacting the MSA, Congress was aware that "an important national asset was at stake and that strong measures were necessary [to preserve the asset]," *Kaiyo Maru No. 53*, 699 F.2d at 995.  As a result, the fishing industry is subject to numerous obligations: appropriate permits must

be obtained and permit fees paid; log books detailing information about catch and landings may be required; and the records must be open to inspection by NMFS. 16 U.S.C. § 1881; 50 C.F.R. Part 622.  In exchange, federally permitted fishing vessels have the exclusive right to take paying passengers to fish for certain species in the Gulf of Mexico EEZ. 50 C.F.R. §§ 622.20(b), 622.370(b), and 622.373. Indeed, the regulatory scheme puts individuals in the industry firmly on notice that periodic inspections will take place and that no reasonable expectation of privacy exists in areas where the inspections occur. *Donovan v. Dewey*, 452 U.S. 594, 606 (1981).

Plaintiffs would have this Court believe that because the Supreme Court refused to apply the "pervasively regulated" doctrine to the hotel industry in *City of Los Angeles v. Patel*, 576 U.S. 409 (2015) that the doctrine no longer applies to the fishing industry.  This argument fails.

First, although predating *Patel*, there is a long history of courts treating fishing vessels engaged in commerce having a lowered expectation of privacy under the Fourth Amendment. In *Lovgren v. Byrne*, the Third Circuit held that "[t]he expectation of privacy that the owner of commercial property enjoys in such property differs significantly from the sanctity accorded an individual's home."  787 F.2d at 865 (quoting *Dewey*, 452 U.S. at 598-99). In addition, "one who is engaged in an industry that is pervasively regulated by the government or that has been historically subject to such close supervision is ordinarily held to be on notice that periodic inspections will occur and, accordingly has no reasonable expectations of privacy in the areas where he knows those inspections will occur."  *Id.*  Likewise, the Ninth Circuit has frequently held that the fishing industry is closely regulated. *See United States v. Raub*, 637 F.2d 1205, 1209 (9th Cir. 1980) (salmon fishing is a closely regulated industry due in part to its "long history" of statutes and treaties, as well as the federal government's promulgation of "highly detailed regulations which specify when, where, and how salmon may be fished");  *Balelo v. Baldrige*, 724 F.2d 753,

765 (9th Cir. 1984) (commercial fishing was a closely regulated industry because it is governed by regulations that involve "a comprehensive and predictable governmental presence."). In contrast, the hotel industry in *Patel* has long been afforded Fourth Amendment protections. *See, e.g., Minnesota v. Olson*, 495 U.S. 91, 99 (1990) (including guest in a "hotel room" as someone with a reasonable expectation of privacy); *Stoner v. California*, 376 U.S. 483, 490 (1964) ("[A] guest in a hotel room is entitled to constitutional protection against unreasonable searches and seizures.").

Second, while the Supreme Court has expressly applied the "pervasively regulated" doctrine to four industries this does not mean the doctrine is limited to those four industries. This is evidenced by the fact that even after *Patel* many courts have extended the "closely regulated" industry doctrine to other industries.[19] *See, e.g., Calzone v. Olson*, 931 F.3d 722, 726 (8th Cir. 2019) (dump trucks); *Liberty Coins, LLC v. Goodman*, 880 F.3d 274, 282 (6th Cir. 2018) (precious metals); *Owner-Operator Indep. Drivers Ass'n, Inc. v. U.S. Dep't of Transp.*, 840 F.3d 879, 894-95 (7th Cir. 2016) (commercial trucking); *Rivera-Corraliza v. Morales*, 794 F.3d 208, 219 (1st Cir. 2015) (adult entertainment games used for gambling); *Killgore v. City of S. El Monte*, 3 F.4th 1186, 1190-92 (9th Cir. 2021) (massage parlors); *Zadeh v. Robinson*, 928 F.3d 457, 464-65 (5th

---

[19] *Patel* does not limit the businesses that may qualify as closely regulated to only those that pose an "inherent danger" to the public—it simply recognized that the industries the Supreme Court has deemed closely regulated in the past involved "a clear and significant risk to the public welfare." 576 U.S at 424 & n.5; *cf. Zadeh v. Robinson*, 928 F.3d 457, 465 (5th Cir. 2019) (considering "whether the industry would pose a threat to the public welfare if left unregulated"), cert. denied, 141 S. Ct. 110, (2020). Unlike the operation of a hotel, which the Supreme Court determined contained "nothing inherent [that] poses a clear and significant risk to the public welfare," *Patel*, 576 U.S. at 424, the operation of a fishing vessel with paying passengers does involve a safety risk, which is why there are United States Coast Guard regulations setting forth requirements for these vessels and their operators. *See generally* 46 U.S.C. Chapter I, Subchapter B, Part 11 (requirements for officer endorsements), Subchapter C, Parts 24 and 25 (uninspected vessels), and Subchapter H (passenger vessels); *see also* 16 U.S.C. § 1801(a) (congressional findings of MSA discussing dangers of overfishing fishery resources without a national program regulating the conservation and management of those resources)

Cir. 2020) (Considering factors including history of warrantless searches in the industry, how extensive the regulatory scheme is, and whether other states have similar schemes, in assuming that the medical profession is closely regulated).

Having established that commercial fishing is a pervasively regulated industry,[20] the VMS requirement must also be reasonable under the Fourth Amendment.  Under *Burger*, a warrantless inspection of a commercial business in a "closely regulated" industry is reasonable under the Fourth Amendment provided three conditions are met: (1) "there must be a 'substantial' government interest that informs the regulatory scheme pursuant to which the inspection is made"; (2) "the warrantless inspections must be 'necessary to further [the] regulatory scheme'"; and (3) "the statute's inspection program, in terms of the certainty and regularity of its application, [must] provid[e] a constitutionally adequate substitute for a warrant." 482 U.S. at 702-03 (alterations in original).  Each of these requirements is met here.

The VMS requirement extends the MSA's well-reasoned regulatory scheme—which specifically provides for warrantless inspections of fishing vessels and warrantless access to data from vessel monitoring systems—to advance Congress' goal of preventing the depletion of a valuable natural resource by ensuring compliance with conservation and management objectives based on reliable data.  The VMS requirement "best balances the need to collect and report timely information with the need to minimize the cost and time burden to the industry," as it is "an additional mechanism that verifies vessel activity" and "allow[s] NMFS to independently determine whether the vessel leaves the dock."  85 Fed. Reg. at 44,012.  NMFS's ability to

---

[20] Plaintiffs argue that the VMS requirement fails because it does not allow plaintiffs an opportunity for precompliance review. Pls.' Mem. at 23.  But the *Patel* Court analyzed the ordinance in that case under the general administrative search exception to the warrant requirement after holding hotels are not "closely regulated." *Patel*, 576 U.S. at 424-26. Because the fishing industry is "closely regulated," the applicable test is the *Burger* factors, which do not require precompliance review. *See id.*

independently validate that a trip was taken is a "crucial component of understanding what the total landings are." AR05336. If NMFS were not able to use the VMS the alternative to validate such a trip would be to require plaintiffs to submit "no fishing" reports and to increase staffing to a level infeasible with current funding.

The certainty and regularity of the VMS requirement provides a constitutionally adequate substitute for a warrant. First, it applies only to those owners and operators of charter vessels who choose to take paying passengers out to fish for federally regulated species—not to "ordinary citizen[s]." Indeed, in this respect, the MSA's regulatory scheme differs sharply from the regulatory schemes in cases like *Tarabochia v. Adkins*, where the Ninth Circuit found that a statute applicable to "all persons" that allowed for the inspection of an automobile containing fish or wildlife "in any location, even if hundreds of miles from the closest fishing grounds or commercial fishing establishment" did not provide a constitutionally adequate substitute for a warrant. 766 F.3d 1115, 1123-24 (9th Cir. 2014). Second, the VMS requirement is specific to the locations of the fishing vessels instead of the persons on the fishing vessel, and permit holders know they must comply with NMFS's regulations and are on notice that transmitting the vessel location via VMS is part of the cost of doing business in this closely regulated industry.

Because the VMS requirement is necessary to further the MSA's design, it is reasonable under the Fourth Amendment and Plaintiffs' claim fails.

### B.   Under either the property-based approach of *Jones* or the reasonable expectation of privacy approach of *Carpenter*, the VMS requirement is constitutional.

Even if fishing were not a pervasively regulated industry, the VMS requirement still passes Constitutional muster. Government conduct may constitute a Fourth Amendment "search" in one of two ways. First, under the "property based approach," the government "searches" property

when it "physically occupie[s] [the] property for the purpose of obtaining information." *Jones*, 565 U.S. at 404-06.  Second, under *Katz* and its progeny, government conduct may constitute a search where the government does not intrude upon a person's reasonable expectation of privacy. 389 U.S. at 353.  The VMS requirement survives Fourth Amendment muster under both approaches.

1. **The VMS requirement is Constitutional under the property-based approach articulated in** *United States v. Jones*

The VMS requirement is consistent with *Jones*. There, the Court held "that the Government's installation of a GPS device on a target's vehicle, and its use of that device to monitor the vehicle's movements, constitute[d] a 'search'" under the Fourth Amendment. *Jones*, 565 U.S. at 404.  The Court acknowledged that the government's information-gathering intrusion in a space that "is not one of those protected areas," though technically trespass at common law, "is of no Fourth Amendment significance." *Id.* at 411.  Importantly, under the property-based approach, the Fourth Amendment's protections are strictly limited to "persons, houses, papers, and effects," *id.* at 411 n.8, and "[p]rivate commercial property is not one of the enumerated items that the Fourth Amendment protects," *Patel v. City of Montclair*, 798 F.3d 895, 898 (9th Cir. 2015).

*Jones* does not bar the VMS requirement.  Even after *Jones*, individuals operating those vessels on public waterways have a significantly reduced expectation of privacy in the location of their vessels. *Cf. Elkins v. Elenz*, No. 8:11-cv-2817-T-23AEP, 2012 WL 2952435 (M.D. Fla. July 19, 2012) (In case involving alleged aerial surveillance, reasoning that "under *Jones* comprehensive visual observation in public remains broadly permissible"), *aff'd*, 516 F. App'x 825 (11th Cir. 2013); *United States v. DSD Shipping, A.S.*,CRIMINAL No. 15-00102-CG-B, 2015 WL 5164306 (S.D. Ala. Sept. 2, 2015) (Holding that Coast Guard's warrantless search of the common areas of an oil tanker did not violate the 4th amendment); *United States v. Perez*, No. 8:20-cr-83-T-36JSS, 2020 WL 9554484 (M.D. Fla. Nov. 3, 2020) (Coast Guard's visual aerial

surveillance and subsequent warrantless search of boat did not violate Fourth Amendment). This reflects the long-recognized governmental interest in regulating commerce on the open ocean. *See United States v. Vilches-Navarrete*, 523 F.3d 1, 13 (1st Cir. 2008) ("[T]he circumstances and exigencies of the maritime setting afford people on a vessel a lesser expectation of privacy than in their homes, obviating the usual fourth amendment requirements of a warrant." (citation omitted)) ; *United States v. Soto*, 988 F.2d 1548, 1553 (10th Cir. 1993) (reduced privacy interest aboard ships). Plaintiffs have agreed to comply with the requirements of their permits—one of the terms of which is GPS monitoring—in exchange for the benefit of a federal permit that allows them the exclusive right to take paying passengers to fish for federally regulated species. The permit holders subject to the VMS requirement are responsible for selecting, procuring and installing a NMFS-approved VMS device on their vessels. The VMS requirement is permissible under the property-based approach of *Jones*.

   2.   **The VMS requirement is Constitutional under the reasonable-expectation-of-privacy approach of Carpenter v. United States**

   Plaintiffs attempt to rely on *Carpenter v. United States*, 138 S. Ct. 2206 (2018) to undermine the VMS requirement's consistency with *Katz* is misguided. *Carpenter's* holding is explicitly limited to the warrantless collection of cell site location information of an individual and does not extend to the VMS's collection of location data of a for-hire fishing vessel.

   In *Carpenter*, the Supreme Court held that the government's acquisition of historical cell-site location information created and maintained by a cell-service provider is a Fourth Amendment search. *Id.* at 2217 & 2217 n.3. *Carpenter* stressed that its holding "is a narrow one," *id.* at 2220, with specific consideration given to "the unique nature of cell phone location records," which provide "a detailed and comprehensive record of the person's [physical] movements" resulting in "near perfect surveillance, as if [the government] had attached an ankle monitor to the phone's

user." *Id.* at 2217-2218; *see id.* at 2220 (describing information in *Carpenter* as "a detailed chronicle of a person's physical presence compiled every day, every moment, over several years"). The *Carpenter* court reasoned that because a cell phone "faithfully follows its owner beyond public thoroughfares and into private" locations, government examination of [cell site location information] reveals potentially sensitive, private information about an individual, such as their visits to "private residences, doctor's offices, political headquarters, and other potentially revealing locales." *Id.* at 2218.

*Carpenter*'s focus on cell phones as a ubiquitous feature of daily life and an ever-present feature on an individual's person was central to it holding, and makes it is wholly distinguishable from what is at issue here: the location coordinates of for-hire charter vessels on public waterways. Ostensibly, Plaintiffs use their charter vessels with less frequency than the ordinary American uses their cell phone. *Compare with id.* (Noting that "nearly three-quarters of smart phone users report being within five feet of their phones most of the time, with 12% admitting that they even use their phones in the shower"). And Plaintiffs have provided no evidence that they use their charter vessels to visit private residences, doctor's offices, or other "potentially revealing locales." *Id.* Saliently, the *Carpenter* court made a point to differentiate location data from a cell phone from location data collected from a car, noting that a car "has little capacity for escaping public scrutiny." *Id.* (internal quotation marks and citations omitted). These charter vessels have even less "capacity for escaping public scrutiny" than a car.

Importantly, *Carpenter* did not "disturb the application of . . . [*United States v. Miller*, 425 U.S. 435, 443 (1976)]" to other types of information. 138 S. Ct. 2220. In *Miller*, the Court held that law enforcement's acquisition of banking records did not impair any Fourth Amendment interests as the defendant could "assert neither ownership nor possession" of the records, which

were "the business records of the banks." 425 U.S. at 440. The Court explained that individuals lack a "legitimate 'expectation of privacy'" in documents that "contain only information voluntarily conveyed to the banks and exposed to their employees in the ordinary course of business." *Id.* at 442 (citation omitted). That is, if an individual has conveyed information to a third party or to the public at large, "even if the information is revealed on the assumption that it will be used only for a limited purpose," the government will generally not be required to obtain a warrant before obtaining the information. *Id.* at 443. Here, "the nature of the particular [information] sought," *Carpenter*, 138 S. Ct. at 2219 (citation omitted)—namely, the location of for-hire charter vessels—is more like the business records at issue in *Miller* than the cell phone location data in *Carpenter*. Plaintiffs are owners and operators of charter vessels which are, by their very definition, are used to take third-party customers to specific fishing locations. These transiting routes and fishing locations are "exposed" to customers "in the ordinary course of business." "What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." *Katz*, 389 U.S. at 351.

Moreover, Plaintiffs do not take third-party passengers to fish in areas where Plaintiffs enjoy a reasonable expectation of privacy. These fishing locations are within public waterways. The Supreme Court has repeatedly instructed that "the special protection accorded by the Fourth Amendment to the people in their 'persons, houses, papers and effects,' is not extended to the open fields." *Hester v. United States*, 265 U.S. 57, 59 (1924). This proposition is the rule because "open fields do not provide the setting for those intimate activities that the Amendment is intended to shelter from government interference or surveillance." *Oliver v. United States* 466 U.S. 170, 178-79 (1984); *accord United States v. Taylor*, 458 F.3d 1201, 1208 (11th Cir. 2006) (no reasonable

expectation of privacy in an open field).  The Supreme Court explicitly reaffirmed the "open field"

doctrine in *Jones*. 565 U.S. at 411 n.8 (internal quotation marks and citation omitted).

      The Supreme Court has explained that "[a]n open field need be neither 'open' nor a 'field'

as those terms are used in common speech." *Oliver*, 466 U.S. 180 n.11; *see also Dow Chem. Co.

v. United States*, 476 U.S. 227, 239 (1986) (holding that the open areas of an industrial plant are

"open field[s]"). Rather, in determining whether an area is an open field, and thus beyond the

Fourth Amendment's reach, courts examine four factors: (1) the proximity of the area to the home;

(2) whether the area is within the bounds of an enclosure surrounding the home; (3) the nature of

the uses to which the area is put; and (4) the steps taken to shield the area from the public eye.

*United States v. Dunn*, 480 U.S. 294, 301 (1987).

      The location of the charter vessels on public waterways falls squarely under the open fields

doctrine.  Plaintiffs do not contend that their charter vessels are or are near their homes, and the

various fishing locations are in no proximity to their homes.  *Compare with United States v.

Whitmire*, 595 F.2d 1303, 1312 (5th Cir. 1979) (high levels of privacy might be accorded to a

houseboat or a "crew's living quarters on tanker that travels for months," but "it is difficult to see

that a crew member might legitimately claim privacy . . . in the hold of a cargo vessel available for

hire"); *United States v. Whitted*, 541 F.3d 480, 489 (3d Cir. 2008) ("Individuals have a reasonable

and high expectation of privacy in their living and sleeping quarters aboard ships, even at national

borders, which merits Fourth Amendment protection.").  These charter vessels are used to conduct

a business in which members of the public access the vessels and are transported to fishing areas.

This does "not provide the setting for those intimate activities that the Amendment is intended to

shelter from government interference or surveillance." *Oliver*, 466 U.S. at 179.

In determining the reasonableness of the search, courts must carefully balance "governmental and private interests." *New Jersey v. T.L.O.*, 469 U.S. 325, 341 (1985).  The VMS requirement is "an additional mechanism that verifies vessel activity" and "allow[s] NMFS to independently determine whether the vessel leaves the dock."  85 Fed. Reg. at 44,012.  The alternative to validate such a trip would be to require plaintiffs to submit "no fishing" reports and to increase staffing to a level infeasible with current funding.  But at least one commenter said that "that "the bulk of charter for hire boats don't report directly to [the] National Marine Fisheries Services if at all . . . Unfortunately we have many charter for hire operators that don't want to be bothered with self reporting." AR8198.  On the other hand, Plaintiffs use their vessels to conduct a business in which members of the public enter the vessels in ways that they might not be able to enter "a home, an office, or commercial structure."  *Oliver*, 466 U.S. at 179.  For all the reasons set forth above, the VMS requirement passes Fourth Amendment muster.

## CONCLUSION

The VMS requirement is firmly within constitutional and statutory boundaries.  The Court should deny Plaintiffs' motion for summary judgment and grant Defendants' cross-motion.

Dated: September 24, 2021

<div style="margin-left:40%">

Respectfully submitted,
TODD KIM
Assistant Attorney General
U.S. Department of Justice
Environment & Natural Resources Division

*/s/ Shampa A. Panda*
SHAMPA A. PANDA
Trial Attorney (CA Bar No. 316218)
Wildlife & Marine Resources Section
Ben Franklin Station, P.O. Box 7611
Washington, DC 20044-7611
Tel: (202) 305-0431
shampa.panda@usdoj.gov

</div>

NICOLE M. SMITH
Trial Attorney (CA Bar No. 303629)
Wildlife & Marine Resources Section
Ben Franklin Station, P.O. Box 7611
Washington, DC 20044-7611
Tel: (202) 305-0368
Nicole.M.Smith@usdoj.gov

ELIZABETH CHICKERING
Assistant United States Attorney
Eastern District of Louisiana
650 Poydras Street, Suite 1600
New Orleans, LA 70130
Tel: (504) 680-3180
Elizabeth.Chickering@usdoj.gov

*Of Counsel:*

MARA LEVY
Attorney-Advisor
Office of the General Counsel
National Oceanic and Atmospheric
Administration
U.S. Department of Commerce
263 13th Avenue South
St. Petersburg, FL 33701
Telephone: (727) 824-5302
mara.levy@noaa.gov

*Attorneys for Federal Defendants*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on September 24, 2021, I electronically filed the foregoing document

with the Clerk of Court using the CM/ECF system, which will send electronic notification of

such filing to all counsel of record.

<div style="margin-left: 50%;">

*/s/ Shampa A. Panda*
SHAMPA A. PANDA
Trial Attorney (CA Bar No. 316218)
Wildlife & Marine Resources Section
Ben Franklin Station, P.O. Box 7611
Washington, DC 20044-7611
Tel: (202) 305-0431
shampa.panda@usdoj.gov
*Attorney for Federal Defendants*

</div>