## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**MEXICAN GULF**                                          **CIVIL ACTION**
**FISHING COMPANY, ET AL.,**
   **Plaintiffs**

**VERSUS**                                                **NO.  20-2312**

**U.S. DEPARTMENT OF**
**COMMERCE, ET AL.,**                                     **SECTION: "E" (1)**
   **Defendants**

### ORDER AND REASONS

Before the Court are cross motions for summary judgment.[1] Plaintiffs Billy Wells; Mexican Gulf Shipping Co.; Allen Walburn; A&B Charters, Inc.; Kraig Dafcik; Joseph Dobin; Joey D. Charters; Frank Ventimiglia; Ventimiglia Charters; Jim Rinckey; and Fishing Charters of Naples (collectively, "Plaintiffs") filed a motion for summary judgment.[2] Defendants the U.S. Department of Commerce, the National Oceanic and Atmospheric Administration, the National Marine Fisheries Service, and their respective heads in their official capacities (collectively, the "Government") have filed a combined opposition and cross motion for summary judgment.[3] Plaintiffs filed a combined opposition to the Government's motion and reply in support of their own motion.[4] The Government filed a reply in support of their motion.[5] Having considered the briefs, the record, and the applicable law, the Court now issues its ruling.

---

[1] R. Docs. 73, 79.
[2] R. Doc. 73.
[3] R. Doc. 79.
[4] R. Doc. 86.
[5] R. Doc. 87.

## BACKGROUND

Plaintiffs are a group of charter boat captains and owners who take clients fishing in the Gulf of Mexico.[6] Defendants are various federal government agencies and officials, including the United States Department of Commerce ("USDOC"), the National Oceanic and Atmospheric Administration ("NOAA"), and the National Marine Fisheries Service ("NMFS").[7] USDOC is the primary agency responsible for domestic marine fisheries in federal waters and has delegated this responsibility to NOAA.[8] NOAA has subdelegated those responsibilities to NMFS.[9]

On July 21, 2020, the Government published a Final Rule requiring Gulf for-hire vessel owners and operators to submit electronic fishing reports "prior to removing any fish from the vessel" or "[i]f no fish were retained by any person on the vessel during a trip, . . . within 30 minutes of the completion of the trip" and to submit the fishing report "via NMFS approved hardware and software, as posted on the NMFS Southeast Region website."[10] These reports must contain "all fish harvested and discarded, and any other information requested."[11] While the regulatory text does not define this "other information," the preamble in the Final Rule explains NMFS will require "information about the permit holder, vessel, location fished, fishing effort, discards, and socio-economic data," specifically including "five economic values per trip: The charter fee, the fuel price and estimated amount of fuel used, number of paying passengers, and the

---

[6] R. Doc. 54 at 2.

[7] R. Doc. 54 at ¶¶ 19-24. A lawsuit against the head of an agency in his or her official capacity is a suit against the agency. *See* 5. U.S.C. § 702; *Simmat v. U.S. Bureau of Prisons*, 413 F.3d 1225, 1231-33 (10th Cir. 2005).

[8] R. Doc. 54 at ¶¶ 21, 23.

[9] *Id.* at ¶ 25.

[10] 50 C.F.R. § 622.26(b)(1)-(2) (2021) (or those with a charter vessel permit for Gulf reef fish); *see also id.* § 622.374(b)(1)(i), (2) (same for those with a charter vessel permit for Gulf coastal migratory pelagic fish).

[11] *Id.* § 622.26(b)(1); *see also id.* § 622.374(b)(1)(i).

number of crew for each trip."[12] The Final Rule also requires affected vessels to have "NMFS–approved hardware and software with a minimum capability of archiving GPS locations" that "must be permanently affixed to the vessel and have uninterrupted operation."[13] Affected vessels "must allow NMFS, the U.S. Coast Guard, and their authorized officers and designees access to the vessel's position data."[14] On August 20, 2020, Plaintiffs filed this action for declaratory relief voiding the Final Rule and injunctive relief enjoining the Government from enforcing the challenged portions of the Final Rule.[15] Plaintiffs challenge the inclusion of "other information" unspecified in the regulatory text—including the five socio-economic values—in the electronic reporting, which took effect on January 5, 2021.[16] Plaintiffs also challenge the mandatory tracking, whose effective date was delayed until March 1, 2022.[17]

On June 2, 2021, the Court certified a class action for Gulf For-hire vessel charter boat owners and operators who are permitted to fish by the Fishery Management Councils of the Gulf of Mexico and South Atlantic and are harmed by the Final Rule.[18] The parties have now filed cross motions for summary judgment on all claims.[19]

## **LEGAL STANDARD**

When presented with a motion for summary judgment, a court normally considers whether the record, "'viewed in the light most favorable to the non-moving party,' evinces

---

[12] Fisheries of the Caribbean, Gulf of Mexico, and South Atlantic; Electronic Reporting for Federally Permitted Charter Vessels and Headboats in Gulf of Mexico Fisheries, 85 Fed. Reg. 44,005, 44,005, 44,0011 (July 21, 2020) (to be codified at 50 C.F.R. pt. 622).
[13] 50 C.F.R. § 622.26(b)(5)(i); *see also id.* § 622.374(b)(5)(ii).
[14] *Id.* § 622.26(b)(5)(iii); *see also id.* § 622.374(b)(5)(v).
[15] R. Doc. 1 at ¶ 114.
[16] 85 Fed.Reg. 44,005.
[17] Fisheries of the Caribbean, Gulf of Mexico, and South Atlantic; Electronic Reporting for Federally Permitted Charter Vessels and Headboats in Gulf of Mexico Fisheries, 86 Fed. Reg. 60,374, 60,374 (Nov. 2, 2021).
[18] R. Doc. 48.
[19] R. Docs. 73, 79.

a genuine issue of material fact," and "[o]nly if the court answers the inquiry in the negative will the moving party be entitled to judgment as a matter of law."[20] This formula adjusts, however, when it arises in the context of judicial review of an administrative agency's decision.[21] In such cases, the "motion for summary judgment stands in a somewhat unusual light, in that the administrative record proves the complete factual predicate for the court's review."[22] Therefore, the movant's burden becomes "similar to his ultimate burden on the merits."[23]

Nevertheless, summary judgment "remains 'an appropriate procedure for resolving a challenge to a federal agency's administrative decision when review is based on the administrative record.'"[24] When reviewing an administrative agency's decision on summary judgment, the district court must "determine whether as a matter of law, evidence in the administrative record permitted the agency to make the decision it did, and summary judgment is an appropriate mechanism for deciding the legal question of whether an agency could reasonably have found the facts as it did."[25] Under the Administrative Procedure Act ("APA"), a court will set aside or otherwise disturb non-adjudicatory agency action if the party pursuing judicial review shows that the agency

---

[20] *Town of Abita Springs v. U.S. Army Corps of Eng'rs*, 153 F. Supp. 3d 894, 903 (E.D. La. 2015) (quoting *Tex. Comm. on Nat. Res. v. Van Winkle*, 197 F. Supp. 2d 586, 595 (N.D. Tex. 2002)); *see also* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24, (1986); *Hill v. London, Stetelman, & Kirkwood, Inc.*, 906 F.2d 204, 207 (5th Cir. 1990); *Atchafalaya Basinkeeper v. Bostick*, No. 14-649, 2015 WL 3824318, at *6 (E.D. La. June 19, 2015).

[21] *Abita Springs*, 153 F. Supp. 3d at 903; *see also Atchafalaya Basinkeeper*, 2015 WL 3824318, at *6.

[22] *Abita Springs*, 153 F. Supp. 3d at 903 (quoting *Van Winkle*, 197 F. Supp. 2d at 595); *see also Atchafalaya Basinkeeper*, 2015 WL 3824318, at *6; *Piedmont Env't Council v. U.S. Dep't of Transp.*, 159 F. Supp. 2d 260, 268 (W.D. Va. 2001).

[23] *Abita Springs*, 153 F. Supp. 3d at 903 (quoting *Van Winkle*, 197 F. Supp. 2d at 595); *see also Atchafalaya Basinkeeper*, 2015 WL 3824318, at *6.

[24] *Abita Springs*, 153 F. Supp. 3d at 903 (quoting *Fund for Animals v. Babbitt*, 903 F. Supp. 96, 105 (D.D.C. 1995)); *see also Atchafalaya Basinkeeper*, 2015 WL 3824318, at *6.

[25] *Abita Springs*, 153 F. Supp. 3d at 903 (quoting *Sierra Club v. Dombeck*, 161 F. Supp. 2d 1052, 1064 (D. Ariz. 2001)) (citing *City of S.F. v. United States*, 130 F.3d 873, 877 (9th Cir.1997)); *see also Atchafalaya Basinkeeper*, 2015 WL 3824318, at *6; *Shell Offshore Inc. v. Babbitt*, 238 F.3d 622, 627 (5th Cir. 2001) (applying the standard of the administrative procedure act in a motion for summary judgment).

"action, findings, and conclusions" are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;" "contrary to constitutional right, power, privilege, or immunity;" "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;" or "without observance of procedure required by law," among other reasons not implicated in this case.[26] To find an agency action arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, "the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency."[27] "The burden of proving that an agency decision was arbitrary or capricious [or made without proper procedures] rests with the party seeking to overturn the agency decision."[28]

## UNDISPUTED MATERIAL FACTS

The facts of this case by and large come from the administrative record, which the Government has filed into the Court's record in its entirety.[29] The parties do not dispute the facts contained in the administrative record. Any other factual disputes are noted below.

---

[26] 5 U.S.C. § 706(2); *see also Abita Springs*, 153 F. Supp. 3d at 903-04 (stating only relevant factors); *Atchafalaya Basinkeeper*, 2015 WL 3824318, at *7 (same). The Magnuson-Stevens Fishery Conservation and Management Act, under which the current regulations were promulgated, limits judicial review to these areas. 16 U.S.C. § 1855(f)(B).

[27] *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971) (citations omitted); *see also Abita Springs*, 153 F. Supp. 3d at 904 (quoting *Citizens to Preserve Overton Park*, 401 U.S. at 416) (citing *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)); *Atchafalaya Basinkeeper*, 2015 WL 3824318, at *7.

[28] *Abita Springs*, 153 F. Supp. 3d at 904 (alteration in original) (quoting *Van Winkle*, 197 F. Supp. 2d at 596); *see also Atchafalaya Basinkeeper*, 2015 WL 3824318, at *7.

[29] R. Docs. 62, 63, 64, 65, 66, 67, 68, 69, 70.

## I.   Statutory Background

The Magnuson-Stevens Fishery Conservation and Management Act ("MSA") establishes a national program for conservation and management of fishery resources with federal jurisdiction over such resources within the exclusive economic zone, which extends from the seaward boundary of each coastal State out to 200 nautical miles.[30]   Key purposes of the MSA are to "conserve and manage the fishery resources found off the coasts of the United States" and "promote domestic commercial and recreational fishing under sound conservation and management principles."[31] Congress has recognized that "[t]he collection of reliable data is essential to the effective conservation, management, and scientific understanding of the fishery resources of the United States."[32]

The NMFS, acting under authority delegated from the Secretary of Commerce, is responsible for managing fisheries pursuant to the MSA. Regulation of fisheries is accomplished through fishery management plans and amendments to those plans (hereinafter, collectively referred to as "FMPs") as well as implementing regulations.[33] The MSA sets forth required provisions for FMPs, including that they must contain measures "necessary and appropriate for the conservation and management of the fishery, to prevent overfishing and rebuild overfished stocks, and to protect, restore, and promote the long-term health and stability of the fishery."[34] To address overfishing, FMPs must establish mechanisms for annual catch limits and accountability measures.[35] The

---

[30] 16 U.S.C. §§ 1801(a)(6), 1802(11), 1811(a).

[31] *Id.* § 1801(b)(1), (3).

[32] *Id.* § 1801(a)(8).

[33] *See N.C. Fisheries Ass'n v. Gutierrez*, 550 F.3d 16, 17 (D.C. Cir. 2008) (noting that FMPs "do not themselves have any regulatory effect – implementing regulations must also be enacted in order to effectuate them"); *Gulf Restoration Network, Inc. v. Nat'l Marine Fisheries, Serv.*, 730 F. Supp. 2d 157, 166, 173 (D.D.C. 2010) (same).

[34] 16 U.S.C. § 1853(a)(1)(A).

[35] *Id.* § 1853(a)(15); *see also* 50 C.F.R. § 600.310(e)(2)(i)(B)-(C) (defining overfishing).

MSA expressly authorizes any FMP to "require the use of specified types and quantities of fishing gear, fishing vessels or equipment for such vessels, including devices which may be required to facilitate enforcement provisions of this [Act]."[36] FMPs and their implementing regulations must be consistent with ten National Standards as well as any other applicable law.[37] National Standard 1 requires that "[c]onservation and management measures shall prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery for the United States fishing industry."[38] National Standard 2 requires that measures be based on the "best scientific information available."[39] National Standard 8 requires that "[c]onservation and management measures shall, consistent with the conservation requirements of this [Act] (including the prevention of overfishing and rebuilding of overfished stocks), take into account the importance of fishery resources to fishing communities by utilizing economic and social data that meet the requirements of [National Standard 2], in order to (A) provide for the sustained participation of such communities, and (B) to the extent practicable, minimize adverse economic impacts on such communities."[40]

To assist in fishery management, the MSA established eight Regional Fishery Management Councils, each of which is granted authority over a specific geographic region within the exclusive economic zone and is composed of members who represent the interests of the states included in that region.[41] Each Council is required to prepare

---

[36] 16 U.S.C. § 1853(b)(4).
[37] *Id.* § 1851(a). Advisory guidelines for the National Standards are set forth at 50 C.F.R. §§ 600.305 *et seq.* These guidelines do not have the force and effect of law. 16 U.S.C. § 1851(b); *see Tutein v. Daley*, 43 F. Supp. 2d 113, 121–125 (D. Mass. 1999).
[38] 16 U.S.C. § 1851(a)(1).
[39] *Id.* § 1851(a)(2).
[40] *Id.* § 1851(a)(8).
[41] *Id.* § 1852(a); *see C&W Fish Co. v. Fox*, 931 F.2d 1556, 1557-58 (D.C. Cir. 1991).

and submit to NMFS an FMP "for each fishery under its authority that requires conservation and management"—and any amendments thereto that become necessary over time—[42]as well as proposed regulations that the Council "deems necessary or appropriate" to implement the FMP.[43] Councils cannot promulgate regulations themselves, and they are not considered federal agencies for purposes of the APA.[44] When a Council transmits an FMP to NMFS, NMFS publishes a notice of availability in the Federal Register announcing a 60-day comment period.[45] Under a process outlined in the MSA, NMFS reviews the Council's proposed regulations for consistency with the FMP and applicable law, and if they are consistent, then publishes proposed rules, solicits public comment, and promulgates final rules.[46]

## II.     Gulf Council FMP Amendment

Between 2014 and 2017, the Gulf of Mexico Fishery Management Council ("Gulf Council") prepared an amendment to the Fishery Management Plans for Reef Fish Resources of the Gulf of Mexico and Coastal Migratory Pelagic Resources in the Gulf of Mexico and Atlantic Region.[47] The amendment modifies reporting requirements for vessels issued Gulf of Mexico charter vessel/headboat permits.[48]

---

[42] 16 U.S.C. § 1852(h)(1). Councils develop FMPs through a public process that includes notice of meetings of Councils, scientific and statistical committees that provide ongoing scientific advice for fishery management decisions, and advisory panels; opportunity for interested persons to submit oral and written statements during those meetings; and public hearings. *Id*. § 1852(h)(3), (i)(2).

[43] *Id*. 1853(c).

[44] *See, e.g.*, *Gen. Category Scallop Fishermen v. Sec'y, U.S. Dep't of Com.*, 635 F.3d 106, 112 n.15 (3d Cir. 2011) (citing *J.H. Miles & Co., Inc. v. Brown*, 910 F. Supp. 1138, 1159 (E.D. Va. 1995)); *Anglers Conservation Network v. Pritzker*, 809 F.3d 664, 667 (D.C. Cir. 2016); *Flaherty v. Ross*, 373 F. Supp. 3d 97, 101 (D.D.C. 2019).

[45] 16 U.S.C. § 1854(a)(1)(B).

[46] *Id*. § 1854(b).

[47] R. Doc. 64-2 at 176 (Jan. 2016 draft amendment); R. Doc. 66-3 at 42 (May 2017 final amendment).

[48] *See* R. Doc. 66-3 at 42.

The Gulf Council relied in part on recommendations from the Gulf Council Data Collection Technical Committee.[49] The Committee supported a "for-hire census program with trip level reporting of catch and effort."[50] The Committee considered the fact that the recommended program would include trip notification and submission of catch information prior to returning to the dock.[51] Under the amendment, location data is to be collected passively through a device (*e.g.*, GPS-enabled tablet or equivalent) with a ping frequency of approximately 30 minutes, which the Committee believes will balance the need for spatial information with the privacy concerns of vessel operators as it will be sufficient to establish regions of fishing (and depths) but not exact fishing locations.[52] Location data may be archived and transmitted later or enhanced with real-time location capability.[53] The proposed program will be integrated into existing dockside validation programs.[54]

The Gulf Council found that "[a]ccurate information about catch, effort, and discards is necessary to achieve [optimum yield] from federally managed fish stocks," and recognized that improved data reporting for Gulf fisheries could "reduce the likelihood that annual catch limits are exceeded and accountability measures are triggered."[55] The Gulf Council also found that the collection of additional data elements using electronic reporting could "improve estimates of bycatch and discard mortality rates."[56] The Gulf Council imposed three requirements to aid in validation and compliance: reporting of

---

[49] *See, e.g.*, *id.* at 173-84 (including a report from the Committee as an appendix in the amendment); *compare id.* at 76 (including a graph from a report by the Committee in the amendment), *with* R. Doc. 64-2 at 172 (the original graph in a Committee report).
[50] R. Doc. 64-2 at 175.
[51] *Id.*
[52] *Id.*
[53] *Id.*
[54] *Id.*
[55] R. Doc. 66-3 at 56-57.
[56] *Id.*

logbook prior to offload of fish, vessel monitoring system (VMS) or archival GPS system permanently affixed to the vessel, and declaration (hail-out) with return time and location via approved software.[57]

### III.    Notice of Proposed Rulemaking

On May 23, 2017, the Gulf Council transmitted the amendment to NMFS for implementation according to the MSA's procedures.[58] On June 21, 2018, NMFS published a notice of availability in the Federal Register describing the amendment and providing notice that NMFS would evaluate the amendment for consistency with the FMPs, the MSA, and other applicable laws.[59] In the notice of availability, NMFS sought public comments on the amendment though August 20, 2018, which would be considered in the decision whether to approve the amendment and addressed in the Final Rule.[60] On September 19, 2018, NMFS notified the Gulf Council of the amendment's approval.[61]

On October 26, 2018, NMFS published a notice of proposed rulemaking implementing the amendment and proposing to collect information from "for-hire" charter boats and headboats in the Gulf of Mexico.[62] The proposed rule would have first required charter boats to "submit an electronic fishing report for each trip before offloading fish from the vessel, or within 30 minutes after the end of each trip if no fish were landed."[63] The fishing report must be sent electronically to the Science and Research

---

[57] R. Doc. 70-2 at 176.
[58] R. Doc. 66-3 at 40.
[59] Fisheries of the Caribbean, Gulf of Mexico, and South Atlantic; Electronic Reporting for Federally Permitted Charter Vessels and Headboats in Gulf of Mexico Fisheries, 83 Fed. Reg. 28,797 (proposed June 21, 2018) (to be codified at 50 C.F.R. pt. 622).
[60] *Id.* at 28,800.
[61] R. Doc. 67-1 at 19.
[62] Fisheries of the Caribbean, Gulf of Mexico, and South Atlantic; Electronic Reporting for Federally Permitted Charter Vessels and Headboats in Gulf of Mexico Fisheries, 83 Fed. Reg. 54,069 (proposed Oct. 26, 2008) (to be codified at 50 C.F.R. pt. 622).
[63] *Id.* at 54,071.

Director (SRD) of NMFS's Southeast Fisheries Sciences Center.[64] The proposed regulatory text stated that the report must contain information regarding "all fish harvested and discarded, and any other information requested by the SRD," but did not specify what "other information" means.[65] However, the notice of proposed rulemaking stated that fishing reports must include information regarding "any species that were caught or harvested, . . . as well as information about the permit holder, vessel, location fished, fishing effort, discards, and socio-economic data."[66]

The proposed rule also would have required charter boats to "have NMFS-approved hardware and software with GPS capabilities that, at a minimum, archive vessel position data during a trip for subsequent transmission to NMFS, which could include sending data through a cellular or satellite-based service"[67] The vessel's location tracking device "would have to be permanently affixed to the vessel" and "have uninterrupted power, unless the owner or operator applies for and is granted a power-down exemption."[68] Finally, the proposed rule also would have required "an owner or operator of a federally permitted charter vessel or headboat to submit a trip notification to NMFS before departing for any trip," indicating "whether the vessel is departing on a for-hire trip or another type of trip" and, if it was a for-hire trip, "the expected trip completion date, time, and landing location."[69]

The notice of proposed rulemaking contained initial regulatory flexibility analysis under the Regulatory Flexibility Act.[70] The notice of proposed rulemaking provided for a

---

[64] *Id.* at 54,076-77.
[65] *Id.*
[66] *Id.* at 54,071.
[67] *Id.*
[68] *Id.*
[69] *Id.*
[70] *Id.* at 54,072-75.

public-comment period through November 26, 2018, which was extended to January 9, 2019.[71]

## IV.    Final Rule

On July 21, 2020, NMFS published the Final Rule, which adopted the electronic-fishing-report and tracking requirements as proposed.[72] Owners or operators of charter vessels are subject to the Final Rule only if they have a limited-access permit for Gulf reef fish or coastal migratory pelagic fish.[73] The Final Rule contains three components. First, the final rule requires a Gulf for-hire vessel owner or operator to notify NMFS prior to departing for any trip and declare whether they are departing on a for-hire trip or on another trip type.[74] Second, an owner or operator of a vessel with a Federal charter vessel/headboat permit for Gulf reef fish or Gulf coastal migratory pelagic species must submit an electronic fishing report (also referred to as a logbook), via NMFS-approved hardware and software, for each fishing trip before offloading fish from that fishing trip.[75] Third, the final rule requires that a Gulf for-hire vessel owner or operator use NMFS-approved hardware and software with global positioning system location capabilities that, at a minimum, archive vessel position data during a trip for subsequent transmission to NMFS.[76]

---

[71] *Id.* at 54,069; Fisheries of the Caribbean, Gulf of Mexico, and South Atlantic; Electronic Reporting for Federally Permitted Charter Vessels and Headboats in Gulf of Mexico Fisheries, 83 Fed. Reg. 58,522 (Nov. 20, 2018).
[72] 85 Fed. Reg. 44,005.
[73] *Id.* at 44,005. Limited-access permits allow the owners and operators of these vessels to take passengers for-hire fishing for federally managed reef fish and coastal migratory pelagic species in the Gulf of Mexico exclusive economic zone. 50 C.F.R. §§ 622.20(b), 622.370(b), 622.373.
[74] 85 Fed. Reg. at 44,006.
[75] *Id.* at 44,005-06.
[76] *Id.* at 44,006-07.

### A. Hail-Out Requirement

First, the Final Rule requires owners or operators of a vessel for which a charter vessel/headboat permit for Gulf reef fish or coastal migratory pelagic fish has been issued to notify NMFS before it departs for a trip and declare whether the vessel will be operating as a charter vessel or headboat, or another type of trip.[77] The trip declaration aids port agents in knowing when and where a trip will end for sampling.[78] NMFS expects the trip declaration requirement to make it easier to track landings in a timely manner and reduce uncertainty in the data.[79]

### B. Electronic Reporting Requirement

Second, if the vessel is operating as a charter vessel or headboat, then an electronic fishing report must be submitted prior to removing any fish from the vessel, or, if no fish are landed, within 30 minutes of arriving at the dock.[80] As in the proposed rule, the Final Rule stated the "electronic fishing report must include any species that were caught or harvested in or from any area . . . as well as information about the permit holder, vessel, location fished, fishing effort, discards, and socio-economic data"; however, the Final Rule further explained, in response to a comment, that "NMFS will require the reporting of five economic values per trip: The charter fee, the fuel price and estimated amount of fuel used, number of paying passengers, and the number of crew for each trip."[81]

Some commenters objected to "reporting of economic information" in electronic fishing reports.[82] These commenters claimed that "[r]equiring operators to submit their

---

[77] *Id.* at 44,006.
[78] *Id.* at 44,009.
[79] *Id.* at 44,010.
[80] *Id.* at 44,006.
[81] *Id.* at 44,005, 44,011.
[82] *Id.* at 44,011.

financial information leads to a lack of buy-in and trust among participants" and that commenters preferred "other methods to collect this information such as surveying websites, directly surveying permit holders, or simply asking the question on a random basis rather than for every trip."[83] NMFS responded that the collection of economic information in the trip reports will "improve the best scientific information available for regulatory decision-making; will increase the accuracy of economic impacts and value estimates specific to the for-hire industry; and will support further value-added research efforts and programs aimed at increasing net benefits to fishery stakeholders and the U.S. economy."[84] NMFS also found the information proposed for collection "will help generate estimates of lost revenue when a disaster occurs (e.g., hurricane, oil spill)."[85] NMFS uses information on catch and fishing effort to conduct stock assessment.[86] NMFS determined that collecting economic data directly from vessel owners and operators was both necessary to management and conservation of the fishery and superior to other data sources.[87]

### C. Tracking Requirement

Third, each permitted vessel must be equipped with NMFS-approved hardware and software with a minimum capability of archiving GPS locations (*i.e.*, satellite or cellular VMS) once per hour, 24 hours a day, every day of the year.[88] Cellular-based systems collect and store data while a vessel is not within range of a cellular signal and

---

[83] *Id.*
[84] *Id.*
[85] *Id.*
[86] *See, e.g.*, 85 Fed. Reg. at 44,009-11; *Stock Assessment Model Descriptions*, NOAA Fisheries, https://www.fisheries.noaa.gov/ insight/stock-assessment-model-descriptions#stock-assessment-models (last visited February 28, 2022).
[87] 85 Fed. Reg. at 44,011.
[88] *Id.* at 44,006-07.

then transmit the data when the vessel is within cellular range.[89] Satellite-based systems transmit data as they are collected.[90] Permit holders are responsible for purchasing the VMS units.[91] The NMFS Southeast Regional Office posts all approved vessel location tracking hardware and software for the Gulf for-hire reporting program, including vessel monitoring system units approved by the NMFS Office of Law Enforcement, on the website for the Gulf for-hire reporting program.[92] The Final Rule has two exceptions for the GPS monitoring: (1) an in-port exemption that allows the location data to be transmitted every four hours when the vessel is docked; and (2) a power-down exemption that allows for location data transmission requirements to be suspended when the vessel is out of the water for more than 72 hours.[93]

Several commenters objected to the GPS requirement, raising Fourth Amendment concerns:

> Providing all confidential transiting details is a violation of our 4th Amendment right to privacy and not necessary to manage the fishery. Such details are considered confidential by NOAA and utilized by other agencies not associated with management of the fishery. This is a dangerous precedent. Fish have tails, they move and with the climatic shift and movement of our fish into new areas over the last several years utilizing such historical data for fishery management purposes is flawed and can be misused to deny us access to the fishery. Therefore, to require detailed GPS data for vessels utilized by the for hire community is not necessary for fishery management purposes, flawed if used for fishery management purposes due to the climatic shift of our stocks and is also a violation of our 4th Amendment rights.[94]

---

[89] *Id.* at 44,007.

[90] *Id.*

[91] *Id.*

[92] Fisheries of the Caribbean, Gulf of Mexico, and South Atlantic; Electronic Reporting for Federally Permitted Charter Vessels and Headboats in Gulf of Mexico Fisheries, 86 Fed. Reg. 51,014, 51,015 (Sept. 14, 2021); *see also Approved Vessel Monitoring System (VMS) Units for Reporting in the Southeast For-Hire Integrated Electronic Reporting Program*, NOAA Fisheries, https://www.fisheries.noaa.gov/southeast/rules-and-regulations/approved-vessel-monitoring-system-vms-units-reporting-southeast-hire-integrated (Nov. 12, 2021).

[93] 85 Fed. Reg. at 44,020.

[94] R. Doc. 67-4 at 7-8; *see also* R. Doc. 68-2 at 21-22 (same language); R. Doc. 70-3 at 27-28 (same language); R. Doc. 67-4 at 20-21 (substantially similar language).

NMFS did not directly address the Fourth Amendment, but it did respond to the concern over "how NMFS will protect data that are being reported, and prevent misuse by staff or public distribution":

> NMFS will protect these data in accordance with applicable law. For example, under section 402(b)(1) of the Magnuson-Stevens Act, the data submitted to NMFS under the Gulf For-hire Reporting Amendment shall be confidential and shall not be disclosed, except under the limited circumstances specified in the Magnuson-Stevens Act, such as to Council or Federal employees who are responsible for fishery management. As noted in 50 CFR 600.415(e), anyone "having access to these data are prohibited from unauthorized use or disclosure and are subject to the provisions of 18 U.S.C. 1905, 16 U.S.C. 1857, and NOAA/NMFS internal procedures, including NAO 216-100." Additionally, all data reported through the Gulf for-hire reporting program will be collected through software that meets standards set out by NMFS, including data confidentiality and protection of personal information online, and will be treated as confidential in accordance with NOAA Administrative Order 216-100, Protection of Confidential Fisheries Statistics. The release of data in aggregate or summary form that does not directly or indirectly disclose the identity or business of any person who submits the information is authorized under section 402(b)(3) of the Magnuson-Stevens Act.[95]

Other commenters expressed concerns that 24-hour GPS surveillance was unnecessary and unduly burdensome;[96] that it was unnecessary and inappropriate to subject charters boats to the same tracking requirements as commercial fishing vessels;[97] and that the financial cost of purchasing, installing, and operating GPS-tracking VMS

---

[95] 85 Fed. Reg. at 44,010.

[96] R. Doc. 67-2 at 20 ("Putting gps and reporting restrictions on charter boat operators will not give usable information that cannot be gained from current reporting); R. Doc. 67-4 at 10-11, 17, 19 ("We are strongly opposed to any type of GPS monitoring system which tracks a vessel each hour which only adds additional costs and safety concerns when operating."); *id.* at 12 ("Tracking does not provide any additional data that would be provided by filling out a vessel trip report.").

[97] R. Doc. 67-4 at 4 ("I can see how this works on commercial offshore vessels where their trips are usually 3-5 days—however, we do mostly 4.5-hour trips."); *id.* at 5-6 (same); *id.* at 11, 17, 19, 22 ("Common sense should be used here and not treat … charter boats similar to large commercial fishing vessels[.]"); R. Doc. 68-1 at 1 ("Your proposal would treat [charter boats] like larger commercial fishing enterprises with greater compliance resources.").

devices was too high.[98] Regarding the necessity of the GPS requirement, NMFS responded:

> The Gulf for-hire reporting program is designed to both monitor for-hire landings to determine in-season closures and post-season quota adjustments, and to enhance data collection efforts to provide for better fisheries management, such as through more data-rich stock assessments. As such, collection of these data is not a research tool but a management tool for the reef fish and CMP fisheries, and responsibility for the program is appropriately shared by NMFS and the fishermen. The fishermen are required to have the necessary equipment and report in a timely manner as conditions of their Federal for-hire permits because they possess the information that the Gulf Council and NMFS need to improve management. NMFS is responsible for performing quality control, validating the reports, and using the data, as appropriate, to help achieve various management objectives.
>
> . . . .
>
> The Gulf Council chose to require a trip declaration and vessel location tracking device to validate effort (fishing trips). These requirements will allow NMFS to determine when a fishing trip was taken, and the length of that trip.
>
> . . . .
>
> [R]equiring each Gulf for-hire vessel be equipped, at a minimum, with archivable vessel location tracking (cellular VMS) best balances the need to collect and report timely information with the need to minimize the cost and time burden to the industry. The vessel location tracking system is an additional mechanism that verifies vessel activity without a report having to be completed by the vessel operators. The vessel location tracking system will allow NMFS to independently determine whether the vessel leaves the dock. This will help validate effort and aid with enforcement of the reporting requirements.[99]

NMFS also provided further information about the cost of the tracking requirement, including reimbursements available from NMFS:

---

[98] R. Doc. 68-1 at 1 ("GPS monitoring systems will only add additional costs and work burdens to charter/headboat operators with limited financial and personnel resources."); R. Doc. 68-2 at 16 ("It's extremely alarming that there is no mention of a price for the device (several thousand dollars) or monthly fee for the GPS tracking device that would be required to have my boat tracked on my dime").

[99] 85 Fed. Reg. at 44,009, 44,012.

NMFS is currently testing six cellular-based units that range in purchase price from $150 to $800. The monthly service fee for these units range from $10 to $40 per month. The unit vendor determines these costs. The NMFS VMS re-imbursement program is available to fishermen for the purchase of approved satellite-based VMS units, and NMFS OLE is undergoing rulemaking that would also make reimbursement available for cellular-based VMS units. Satellite-based VMS that are currently approved for the commercial Gulf reef fish program cost approximately $3,000 per unit. Monthly service fees, which NMFS expects to range from approximately $40 to $75, will be the responsibility of the fisherman.

. . . .

NMFS understands there will be additional costs to vessel operators to pay for data collection. NMFS also acknowledges that charter and headboat businesses may have substantial loan payments and other operating costs, such as insurance, overhead, maintenance, and trip costs (e.g., fuel, labor, supplies, etc.), that affect both their net income and cash flow. . . . According to the best scientific information available, which includes a 2012 study published by the Center for Natural Resource Economics and Policy, Louisiana State University, average monthly cash outflows (fixed and variable costs) for charter and headboat businesses are estimated to be approximately $5,171 (2018 dollars) and $15,758, respectively. In comparison to existing costs, NMFS believes the ongoing monthly fee (estimated at $10 to $40 per month) would not materially alter cash flows, profits, or the solvency of for-hire businesses.[100]

NMFS explained how it came to these cost estimates:

[E]xamples of costs borne by the for-hire fleet may include the purchase and installation costs of the approved hardware units and associated service charges. In the proposed rule, NMFS presented cost estimates to the for-hire industry for several general options including a tablet-based system, a handheld GPS, and a smartphone-based system, where the smartphone is hardwired to a vessel's GPS. These cost estimates have been updated since the proposed rule published and are now based on vendor quotes for six different cellular-based location tracking devices selected for testing by NMFS. If a vessel does not already have an approved type of hardware (e.g., an approved VMS unit), the estimated startup costs for each affected vessel will range from $150 to $800 in the year of implementation. At the top end of this range, these costs are equivalent to 1 percent of average annual headboat net income and 3.1 percent of average annual charter vessel net income. The recurring monthly cost per vessel to use the location tracking device is estimated to be $10 to $40. On an annual basis, these reoccurring

---

[100] *Id.* at 44,013. The rule extending the reimbursement program to cellular VMS units came into effect August 7, 2020. Vessel Monitoring Systems; Requirements for Type-Approval of Cellular Transceiver Units, 85 Fed. Reg. 40,915 (July 8, 2020) (to be codified at 50 C.F.R. pt. 600).

charges will be equivalent to up to 0.6 percent of average annual headboat net income and 1.8 percent of average annual charter vessel net income. Some of the cellular-based location tracking devices will allow users to enter and transmit electronic fishing reports in addition to recording and transmitting GPS coordinates. Other devices will only be capable of recording and transmitting GPS coordinates. Therefore, depending on the location tracking device selected for use, a separate mobile device, such as a smartphone, and wireless service plan may be required to submit fishing reports. Some vessel owners and operators may be more or less affected than others by this final rule depending on their existing technology assets and data service plans at the time of implementation, the location tracking device that they select, and the availability of wireless service coverage at their port of landing. For the affected vessels that currently do not have any wireless carrier contract and who select a location tracking device that does not support fishing report submission, the estimated additional cost for an unlimited data plan will range from approximately $60 to $85 per month. This is an upper bound estimate based on advertised rates from four major wireless service providers in 2019 and cheaper plans may be available. A basic smartphone may be purchased for as low as $100 and some providers bundle free phones with their service plans. NMFS assumes that most owners or operators of for-hire vessels already have a basic smartphone and data plan in order to meet the needs of their businesses. NMFS also assumes that owners and operators of for-hire vessels will choose a combination of technology that best satisfies their profit maximization strategies, while meeting the requirements of this final rule.[101]

Finally, NMFS explained the alternatives considered before settling on the current tracking requirement, including the alternative of not requiring GPS tracking:

The first alternative, the no-action alternative, would not change current reporting requirements for for-hire vessels. Therefore, it would not be expected to result in any direct economic effects on any small entities. This alternative was not selected by the Gulf Council because there is currently no reporting platform for charter vessels, and therefore, no means by which charter vessels would be able to submit electronic reports. Additionally, this alternative would not allow for the same level of trip validation, because it would not require GPS unit hardware to be permanently affixed to the vessel.

The second alternative and two options were selected as preferred and require charter vessel and headboat owners or operators to submit fishing reports via NMFS-approved hardware and software. Under this preferred alternative and options, a for-hire vessel owner or operator is also required to use NMFS-approved hardware and software with GPS location

---

[101] 85 Fed. Reg. at 44,015.

capabilities that, at a minimum, archive vessel position data during a trip. The cellular or satellite VMS needs to be permanently affixed to the vessel.

The third alternative would require for-hire vessel owners or operators to submit fishing reports via NMFS-approved hardware and software with GPS location capabilities that, at a minimum, provide real-time vessel position data to NMFS. The cellular or satellite VMS would need to be permanently affixed to the vessel. The third alternative contained two options. The first and second options would require federally permitted charter vessels and headboats, respectively, to comply with the hardware and software requirements of the third alternative. The startup costs, as presented in the proposed rule, for each affected for-hire vessel under the third alternative and two options were estimated to be approximately $300 in the year of implementation. The recurring annual service cost associated with the transmission of real-time location data in subsequent years was estimated to be approximately $200 per vessel. Since the proposed rule published, NMFS has received several vendor price quotes and has updated the technology cost estimates associated with this final rule. Therefore, NMFS cannot make a direct comparison with the hypothetical cost estimates of this alternative. In the proposed rule, the recurring costs for this alternative were estimated to be higher than for the preferred alternative. If comparable cost estimates were available, NMFS assumes the third alternative, which would require real-time transmission of GPS location coordinates (satellite VMS), would still be more expensive than the archival GPS units (cellular VMS) allowed by this final rule. As discussed earlier, depending on the device that is used for location tracking, a separate mobile device, such as a smartphone, and wireless service plan would potentially be required to submit electronic fishing reports as well. This could result in an additional expense in the range of $60 to $85 per month. The third alternative was not selected by the Gulf Council because it was expected to result in higher costs to industry.

The fourth alternative would require for-hire vessel owners or operators to submit fishing reports via NMFS-approved hardware and software that provide real-time vessel position data to NMFS via satellite VMS. The antenna and junction box would need to be permanently affixed to the vessel. The fourth alternative contained two options. The first and second options would require federally permitted charter vessels and headboats, respectively, to comply with the hardware and software requirements of the fourth alternative. The estimated startup costs for each affected vessel to purchase, install, and operate a satellite VMS unit would range from $2,500 to $4,400 in the year of implementation. This would be equivalent to approximately 10 to 17 percent of average annual charter vessel net income and 3 to 6 percent of average annual headboat net income. The recurring annual cost associated with maintaining and operating satellite VMS hardware and software in subsequent years was estimated to be approximately $750 per vessel. The fourth alternative was not selected by

20

the Council, because the estimated startup and recurring costs to the industry were much higher than those of the preferred alternative.[102]

The Final Rule conducted a regulatory flexibility analysis of the economic impact on charter boat operators, all of whom were recognized to be small businesses under the Regulatory Flexibility Act.[103]

## LAW AND ANALYSIS

### I.     Challenges to the Electronic Reporting Requirement

### A. The Reporting of Five Specific Socio-economic Factors Is a Logical Outgrowth of the Proposed Rule.

Under the APA, an agency must publish notice of the legal authority for a proposed rule and of the rule's substance or subject matter, and the agency must also provide an opportunity for interested persons to participate in the rulemaking.[104] Notice suffices if the final rule "is a 'logical outgrowth' of the proposed rule, meaning the notice must 'adequately frame the subjects for discussion' such that 'the affected party "should have anticipated" the agency's final course in light of the initial notice.'"[105] "If a party 'should have anticipated' that course, it 'reasonably should have filed [its] comments on the subject during the notice-and-comment period.'"[106] "The objective is fair notice."[107]

In this case, Plaintiffs complain they had no notice of NMFS's intention to require reporting of the charter fee, the fuel price and estimated amount of fuel used, number of paying passengers, and the number of crew for each trip.[108] The proposed regulatory text

---

[102] *Id.* at 44,016-17.
[103] *Id.* at 44,014-17.
[104] 5 U.S.C. § 553(b)(2)-(3), (c); *see also Huawei Techns. USA, Inc. v. FCC*, 2 F.4th 421, 447 (5th Cir. 2021).
[105] *Huawei Techns.*, 2 F.4th at 447 (quoting *Nat'l Lifeline Ass'n v. FCC*, 921 F.3d 1102, 1115 (D.C. Cir. 2019)); *see also Am. Coke & Coal Chems. Inst. v. EPA*, 452 F.3d 930, 938 (D.C. Cir. 2006).
[106] *Huawei Techns.*, 2 F.4th at 447 (alteration in original) (quoting *Tex. Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*, 989 F.3d 368, 381 (5th Cir. 2021)).
[107] *Tex. Ass'n of Mfrs.*, 989 F.3d at 381.
[108] R. Doc. 73-1 at 32-34.

in the notice of proposed rulemaking stated that the report must contain information regarding "all fish harvested and discarded, and any other information requested by the SRD."[109] The proposed regulatory text did not specify what "other information" means.[110] However, the preamble in the notice of proposed rulemaking stated that fishing reports must include information regarding "any species that were caught or harvested, . . . as well as information about the permit holder, vessel, location fished, fishing effort, discards, and socio-economic data."[111]  The notice of proposed rulemaking did not specifically state what socio-economic data the report would request.[112] In the Final Rule, the relevant regulatory text is identical to the proposed regulatory text, including "other information" in the reporting requirement but not specifying what that information would be.[113] Similarly, as in the notice of proposed rulemaking, the preamble to the regulatory text in the Final Rule stated the "electronic fishing report must include any species that were caught or harvested in or from any area . . . as well as information about the permit holder, vessel, location fished, fishing effort, discards, and socio-economic data"; however, the Final Rule further explained, in response to a comment, that "NMFS will require the reporting of five economic values per trip: The charter fee, the fuel price and estimated amount of fuel used, number of paying passengers, and the number of crew for each trip."[114]

Plaintiffs argue the inclusion of these five economic values violates the APA's notice and comment requirement because nothing in the notice of proposed rulemaking

---

[109] 83 Fed. Reg. at 54,076-77.
[110] *See id.*
[111] *Id.* at 54,071.
[112] *See id.*
[113] 85 Fed. Reg. at 44,017, 44,019.
[114] *Id.* at 44,005, 44,011.

provided notice that reporting of these values would be required.[115]  They argue these five economic values do not fit the definition of "socio-economic data" to qualify as a logical outgrowth of the proposed rule.[116] The Government argues the Final Rule maintains the same text as the notice of proposed rulemaking and merely adds additional details that Plaintiffs should have anticipated.[117]

"[N]otice need not specifically identify 'every precise proposal which [the agency] may ultimately adopt as a rule.'"[118] For example, in *United Steelworkers of America, AFL-CIO-CLC v/ Schuylkill Metals Corp*., the Fifth Circuit held that a final rule, which did not define the word "earnings," could logically include "premium payments" for purposes of the APA's notice and comment requirement, even though it was not specified in notice of proposed rulemaking.[119] In that case, the agency had promulgated a rule requiring employers to continue to pay certain benefits to employees either let go or transferred due to lead exposure.[120] Specifically, the final rule provided "the employer shall maintain the *earnings*, seniority rights and other employment rights and benefits of an employee."[121] After the final rule came into effect, the agency attempted to enforce the final rule against employers who were not providing transferred employees "premium payments," such as

---

[115] R. Doc. 73-1 at 32-34.

[116] *Id*. at 33-34; R. Doc. 86 at 39-40.

[117] R. Doc. 79-1 at 22-23; R. Doc. 87 at 12-13. The Government also argues the logical outgrowth test is not applicable because "[t]he final rule did not change the proposed requirement, but merely provided more detail about the five specific questions." R. Doc. 79-1 at 21-22. However, as the Government admits, the Final Rule contained new information in the form of these additional details. If there is a change between the notice of proposed rulemaking and the Final Rule, that change must be a logical outgrowth. *See Huawei Techns.*, 2 F.4th at 447-48 (examining requirements that appeared for the first time in the final rule); *Tex. Ass'n of Mfrs*., 989 F.3d at 381-82 (applying the logical outgrowth test when the stated "justification" for a rule changed); *Am. Coke & Coal Chems. Inst*., 452 F.3d at 938-39 (emphasis added) (noting the logical outgrowth test examines whether parties could anticipate "the *change* was possible").

[118] *United Steelworkers of Am., AFL-CIO-CLC v. Schuylkill Metals Corp*., 828 F.2d 314, 318 (5th Cir. 1987) (second alteration in original); *see also Chem. Mfrs, Ass'n v. EPA*, 870 F.2d 177, 203 (5th Cir. 1989) (same).

[119] *United Steelworkers*, 828 F.2d at 317-18.

[120] *Id*. at 316-17.

[121] *Id*. at 316 (emphasis added) (quoting 29 C.F.R. § 1910.1025(k)(2)(ii) (1987))

overtime pay, production bonuses, and shift differential.[122] The agency maintained these premiums were covered under the term "earnings" in the final rule, but the employers argued there was no notice during the rulemaking that earnings could include premium payments.[123] The notice of proposed rulemaking stated employers should pay benefits that "would maintain the rate of pay, seniority and other rights of an employee" and asked for comments on the extent of these benefits.[124] Although neither "earnings" nor a definition of "earnings" was included in the notice, the Fifth Circuit held that the notice's "descriptions more than adequately sufficed to apprise fairly an interested party that there was an issue regarding the breadth of . . . benefits," and the agency's request for comments helped further put the parties on notice of the issue.[125] "[I]t certainly was not necessary," the court reasoned, "that the Secretary spell out with particularity the proposed meaning of . . . benefits or 'earnings.'"[126]

The Fifth Circuit also noted that "the comments received reflected . . . an understanding" among interested parties that the scope of benefits was in dispute.[127] The agency received one comment that "precisely" addressed the issue,[128] asking the agency to enumerate the exact forms of compensation "earnings" covered.[129] Other comments advocated more generally for a broad definition of "earnings."[130] The court reasoned these comments further showed "it was readily apparent to interested parties that the scope of

---

[122] *Id.* at 317.
[123] *Id.*
[124] *Id.* at 318 (quoting Exposure to Lead, 42 Fed. Reg. 46,547, 46548 (proposed Sept. 16, 1977) (to be codified at 29 C.F.R. pt. 1910)).
[125] *Id.*
[126] *Id.*
[127] *Id.*
[128] *Id.* (citing Occupational Exposure to Lead, 43 Fed. Reg. 54,354, 54,466 (Nov. 21, 1978) (to be codified at 29 C.F.R. pt. 1910)).
[129] 43 Fed. Reg. at 54,466.
[130] *United Steelworkers*, 828 F.2d at 318.

. . . benefits was in dispute," and the broad, "comprehensive definition of 'earnings' [included in the final rule] was a logical outgrowth of the rulemaking proceeding."[131]

Courts have also found materials referenced in notices of proposed rulemaking may provide further notice of details not specifically laid out in the notice of proposed rulemaking itself.[132] For example, in *American Coke and Coal Chemicals Institute v. EPA*, the D.C. Circuit held that information provided in the agency's development document accompanying the notice of proposed rulemaking could help "put parties on notice" of changes the agency might make in the final rule.[133] The final rule differed in two relevant ways from the notice of proposed rulemaking. First, the final rule changed the datasets the agency relied on to create a chemical limit: specifically, the final rule added datasets ES01, ES02, and ISM54 and removed dataset ESE03.[134] Regarding the dataset the agency ultimately removed, ESE03, the court noted that "the Proposed Development Document accompanying the [notice of proposed rulemaking] [stated] that the model facilities 'had to demonstrate good operation of the treatment component.'"[135] Therefore, "[a]lthough the preamble in the [notice of proposed rulemaking] did not state that [agency] intended to reconsider the use of data from episode ESE03, nor that the ESE03 site would be reviewed for compliance with the general criteria of 'good operation,'" the development document provided "notice that data deriving from any plants that failed to demonstrate 'good operation' would not be considered sources of information."[136] This development

---

[131] *Id.*

[132] *See, e.g.*, *Am. Coke & Coal Chems. Inst.*, 452 F.3d at 939, 941; *cf. United Steelworkers*, 828 F.2d at 318 ("Additionally, the evidence received and cited in the rulemaking history demonstrates that a comprehensive definition of "earnings" was a logical outgrowth of the rulemaking proceedings.").

[133] *Am. Coke*, 452 F.3d at 939, 941.

[134] *Id.* at 938.

[135] *Id.* at 939.

[136] *Id.*

document was not included in the Federal Register with the notice of proposed rulemaking, but the notice referenced the development document several times.[137] Similarly, regarding the additional datasets, ES01, ES02, and ISM54, the court noted the agency stated in the proposed development document that it "might reconsider the exclusion of the naphthalene sampling data from sampling episode ESE01 and ESE02 and self-monitoring episode ISM54."[138]

The second change the D.C. Circuit considered in *American Coke* was the use of a median flow rate to set standards in the notice of proposed rulemaking to the use a flow rate from the "best performing mills" in the final rule.[139] The court again looked to the proposed development document, noting that "the Proposed Development Document put parties on notice that EPA's flow rate would be based upon 'better performing mills.'"[140] The development document thus "put commentators on notice that EPA was considering an alternative to the 'industry median.'"[141]

In this case, the notice of proposed rulemaking and the Final Rule consistently explained the rule would require the reporting of "socio-economic data."[142] "Socio-economic" is defined by *Merriam-Webster* to be "of, relating to, or involving a combination of social and economic factors."[143] Similarly, the *Oxford English Dictionary* defines "socio-economic" as "[s]ocial and economic; that derives from or is concerned

---

[137] *See generally* Effluent Limitations Guidelines, Pretreatment Standards, and New Source Performance Standards for the Iron and Steel Manufacturing Point Source Category, 65 Fed. Reg. 81,964 (proposed Dec. 27, 2000) (to be codified at 40 C.F.R. pt. 420).
[138] *Am. Coke*, 452 F.3d at 939.
[139] *Id.* at 940.
[140] *Id.* at 941.
[141] *Id.*
[142] *Compare* 83 Fed. Reg. at 54,076-77, *with* 85 Fed. Reg. at 44,005.
[143] *Socioeconomic*, Merriam-Webster, https://www.merriam-webster.com/dictionary/socio-economic (last visited Feb. 28, 2022).

with the interaction of social and economic factors."[144] By definition, "socio-economic" includes economic factors. Many examples of the word in the above dictionaries refer to a person's socioeconomic background or status,[145] which calls to mind a person's income, occupation, and standard of living—all related to economic issues.

Although Plaintiffs argue "socio-economic" is too broad a word to put anyone on notice of the required economic reporting, this case is similar to *United Steelworkers*, which concerned the definition of "earnings"—a word the Fifth Circuit described as more "a term of art that has no natural, immutable meaning."[146] Although the notice of proposed rulemaking did not include the word "earnings" or attempt to define its scope, the Fifth Circuit held that the notice's broad descriptions of "rate of pay" and "other rights" "more than adequately sufficed to apprise fairly an interested party that there was an issue regarding the breadth of . . . benefits."[147] Although "socio-economic" may be broad, as the Fifth Circuit stated, "it certainly was not necessary that the [NMFS] spell out with particularity the proposed meaning of" the word.[148]

Furthermore, as in *United Steelworkers*, the NMFS sought comments on the scope of the electronic reporting requirement, asking "whether this proposed collection of information is necessary for the proper performance of the functions of the agency, including whether the information will have practical utility."[149] The comments submitted to NMFS in response to the notice of proposed rulemaking show that interested parties understood the potential scope of "socio-economic" data reporting and were able to have

---

[144] *Socio-economic*, Oxford English Dictionary, https://www.oed.com/view/Entry/183786?rskey=xLd96E&result=1&isAdvanced=false#eid (last visited Feb. 28, 2022).
[145] *See, e.g.*, *id.*
[146] *United Steelworkers*, 828 F.2d at 320.
[147] *Id.* at 318.
[148] *See id.* at 318.
[149] 83 Fed. Reg. at 54,076.

their voices heard. Adam Miller commented, "I agree with Electronic Log Books, Just [sic] not all the information about expenses and profits."[150] Plaintiffs speculate that Mr. Miller only knew about the economic data reporting because he attended a meeting of the Gulf Council Data Collection Technical Committee discussing the range of possible reporting requirements.[151] However, even assuming that were true, Mr. Miller was not the only commenter on these issues, and these other commenters do not appear on the Committee attendance records. The Ocean Conservancy commented that fishermen should be able to "retrieve information from their fishing trips such as . . . economic data."[152] Marit Bruesing, in summarizing the electronic reporting requirement, noted that the reporting includes "how many passengers."[153] Other commenters had more generalized concerns that touched on the categories of economic data.[154] Comments also were submitted in response to the notice of availability published after NMFS first received the amendment from the Gulf Council. The notice of availability contained an identical explanation of the collection of "socio-economic data" as in the notice of proposed rulemaking.[155] These comments to the notice of availability were considered both in NMFS's decision to approve the amendment and in crafting the Final Rule.[156] Michael Irwin commented,

> The amount I charge someone to go fishing on my vessel has nothing to do with the fishery as a whole or how much I paid for fuel. Let us try and make a living without prying into our personal business. Stick with fish populations and do away with the economists.[157]

---

[150] R. Doc. 68-3 at 13.

[151] R. Doc. 73-1 at 33 (citing R. Doc. 66-2 at 176 (listing attendees at the Committee meeting)).

[152] R. Doc. 68-3 at 7.

[153] R. Doc. 67-2 at 20.

[154] *See, e.g.*, *id.* at 30 (emphasis added) ("Do not interfere with . . . [my] *customer*."); R. Doc. 67-4 at 14 (emphasis added) ("I been [sic] working and keeping records of my fish catches for years,, [sic] dislike what [sic] NOAA wants to keep track Of [sic] my . . . *business*.").

[155] 83 Fed. Reg. at 28,799.

[156] *Id.* at 28,800.

[157] R. Doc. 66-4 at 120.

The Ocean Conservancy filed a similar comment to the one above during this comment period, again asking that fishermen be "able to retrieve information from their fishing trips such as . . . economic data."[158] All of these comments were enough for NMFS to respond to them in the Final Rule.[159] NMFS summarized these concerns into Comment 15:

> NMFS should not require reporting of economic information. Requiring operators to submit their financial information leads to a lack of buy-in and trust among participants. There are other methods to collect this information such as surveying websites, directly surveying permit holders, or simply asking the question on a random basis rather than for every trip.

Notice was further provided through reference in the notice of proposed rulemaking to the Gulf Council's amendment. The summary of the notice of proposed rulemaking noted, "NMFS proposes to implement management measures described in the Gulf For-hire Electronic Reporting Amendment, as prepared and submitted by the Gulf of Mexico (Gulf) Fishery Management Council (Gulf Council)."[160] When providing an overview of the electronic reporting requirement, the notice of proposed remaking specified it was considering implementing the reporting requirement as "described in the Gulf For-hire Reporting Amendment."[161] The notice directed readers to copies of the amendment: "Electronic copies of the Gulf For-hire Reporting Amendment may be obtained from www.regulations.gov or the Southeast Regional Office website at http://sero.nmfs.noaa.gov/sustainable_fisheries/gulf_fisheries/For-HireElectronicRep orting/index.html."[162] The amendment includes the September 2016 report from the Technical Data Committee, which discusses "the recommended data elements that are

---

[158] *Id.* at 149.
[159] 85 Fed. Reg. at 44,011.
[160] 83 Fed. Reg. at 54,069.
[161] *Id.*
[162] *Id.*

necessary to improve fisheries and socioeconomic data in the Gulf of Mexico (Gulf) for-hire fishery."[163] The Committee report provides a table of all data elements considered, their potential uses, and whether or not the Committee recommended their collection.[164] All five economic values that appear in the Final Rule are discussed in the Committee's report.[165]

Accordingly, based on the information in the notice of proposed rulemaking, the comments received, and the data in the Gulf Council's amendment referenced in the notice, interested parties were or should have been on notice that NMFS was considering the extent of the data to be collected, including socio-economic data such as charter fee, the fuel price and estimated amount of fuel used, number of paying passengers, and the number of crew for each trip.[166]

### B. The Inclusion of the Five Economic Values in the Data Collected Is Not Arbitrary or Capricious.

An agency's decision is invalid if it is arbitrary or capricious.[167] "An agency rule is arbitrary and capricious 'if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency,

---

[163] R. Doc. 66-3 at 173.

[164] *Id.* at 175-184.

[165] *See id.*

[166] To the extent the Plaintiffs complain of the notice provided for the reporting of any other data not specifically mentioned in the regulatory text—*i.e.*, any data beyond "fish harvested or discarded"—*see* R. Doc. 73-1 at 17, 31-32, the preamble in the notice of proposed rulemaking put interested parties on notice that the information requested "would include any species that were caught or harvested in or from any area . . . as well as information about the permit holder, vessel, location fished, fishing effort, [and] discards," 83 Fed. Reg. at 54,071. Plaintiffs have identified no other information NMFS is requiring charter vessels to report. A challenge to the notice provided for collection of data the Government has not sought to collect is unripe for judicial review, as such a challenge would benefit from more concrete facts and because it challenges a position the Government has not taken. *See Walmart, Inc. v. U.S. Dep't of Just.*, 21 F.4th 300, 311-12 (5th Cir. 2021) ("Because it challenges a series of positions that the government does not quite take, [the plaintiff] fails to show the 'actual controversy' that is needed for a declaratory judgment to be fit for judicial decision.").

[167] 5 U.S.C. § 706(2)(A); *see also Luminant Generation Co. v. EPA*, 714 F.3d 841, 853 (5th Cir. 2013).

or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'"[168] "If the agency's reasons and policy choices conform to minimal standards of rationality, then its actions are reasonable and must be upheld."[169]

Plaintiffs argue the NMFS was arbitrary and capricious in requiring the reporting of the five economic values because the Gulf Council's Data Collection Technical Committee recommended against the inclusion of two of those values, charter fee and crew size.[170] The Government argues NMFS was not required to adopt the recommendations of the Committee and provided sufficient reasons for not doing so.[171]

Concerning the crew size, Plaintiffs are incorrect when they assert the Committee recommended against collecting such data. The Committee recommended reporting of the number of crew *on the vessel*, finding such information"[e]ssential" and already included in the current headboat survey.[172] The Committee recommended against collecting data on the number of crew *fishing*, which is a different dataset.[173] The Final Rule does not require the reporting of the number of crew fishing. NMFS was not arbitrary or capricious when it required the number of crew members on the vessel to be reported in the Final Rule, as the Committee recommended.

Concerning the charter fee, the Committee did recommend against collecting such data in the electronic logbooks with the other data collected.[174] However, the Committee noted collection of charter fee data was "[c]ritical for ANY economic analysis/assessment"

---

[168] *Luminant Generation*, 714 F.3d at 853-54 (quoting *Tex. Oil & Gas Ass'n v. EPA*, 161 F.3d 923, 933 (5th Cir. 1998)).
[169] *Id.* at 854 (quoting *Tex. Oil & Gas Ass'n*, 161 F.3d at 934).
[170] R. Doc. 73-1 at 34.
[171] R. Doc. 79-1 at 23-24.
[172] R. Doc. 66-3 at 177.
[173] *Id.* at 183.
[174] *Id.* at 184.

and "highly recommended for [a] Separate survey" or "online."[175] The Final Rule directly responded to the Committee's charter fee recommendation, explaining why it chose to include reporting of the charter fee in the electronic logbooks over other means of reporting:

> Economic information collected as part of the electronic logbooks will be superior, in terms of quality and usefulness, to information that can be obtained from websites or separate surveys. Data gathered from websites or separate surveys are frequently outdated, often suffer from small sample size issues, and are not linked to trip characteristics. By capturing the variation in these economic data across trips, NMFS can extract information about the value of individual trip characteristics (e.g., the marginal value per fish for a given species).[176]

The Final Rule also provided a rationale behind the reporting of economic information in general:

> The collection of economic information will enhance the Gulf Council and NMFS' ability to monitor and assess the economic effects of fishing regulations and environmental factors. This information will improve the best scientific information available for regulatory decision-making; will increase the accuracy of economic impacts and value estimates specific to the for-hire industry; and will support further value-added research efforts and programs aimed at increasing net benefits to fishery stakeholders and the U.S. economy. Also, this information will help generate estimates of lost revenue when a disaster occurs (e.g., hurricane, oil spill). For example, information collected by the Individual Fishing Quota programs was instrumental during the 2010 Deepwater Horizon MC 252 oil spill to account for lost revenue.[177]

By addressing the Committee's recommendation against collecting charter fee data, NMFS considered an important aspect of the problem and provided a reasoned response. NMFS's reasons "conform to minimal standards of rationality" and must be upheld.[178] The Committee recommended collecting data on the other economic factors

---

[175] *Id.*
[176] 85 Fed. Reg. at 44,011.
[177] *Id.*
[178] *See Luminant Generation*, 714 F.3d at 854 (quoting *Tex. Oil & Gas Ass'n*, 161 F.3d at 934).

listed in the Final Rule.[179] Accordingly, the NMFS was not arbitrary or capricious in requiring the reporting of five economic values, the charter fee, the fuel price and estimated amount of fuel used, number of paying passengers, and the number of crew members for each trip.

## II.    Challenges to the Tracking Requirement

### A. The Tracking Requirement Is Not in Excess of Statutory Authority.

#### 1.   The Magnuson-Stevens Fishery Conservation and Management Act (MSA) Authorizes the Required Purchase and Use of Tracking Equipment.

A court must set aside an agency action if it is in excess of the statutory authority granted to the agency by Congress.[180] "A claim that agency action is 'in excess of statutory jurisdiction, authority, or limitations, or short of statutory right,' necessarily entails a firsthand judicial comparison of the claimed excessive action with the pertinent statutory authority."[181]

Plaintiffs argue that, while the MSA authorizes the collection of information needed to implement FMPs, it does not authorize the requirement that regulated fishermen purchase the equipment needed to collect that information.[182]  Furthermore, Plaintiffs argue, the MSA's limitation on the types of fees the Secretary may collect reinforce this interpretation, as the required purchase of equipment would be similar to an unauthorized fee.[183]  The Government argues the MSA specifically authorizes

---

[179] R. Doc. 66-3 at 177 (crew size); *id.* at 181 (fuel price and amount); *id.* at 182 (number of passengers).
[180] 5 U.S.C. § 706(2)(C); *see also FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 161 (2000) ("[A]n administrative agency's power to regulate in the public interest must always be grounded in a valid grant of authority from Congress.").
[181] *W. Union Tel. Co. v. FCC*, 541 F.2d 346, 354 (3d Cir. 1976) (quoting 5 U.S.C. § 706(2)(C)) (citing *FPC v. Moss*, 424 U.S. 494 (1976)); *see also Citizens Comm. for the Hudson Valley v. Volpe*, 425 F.2d 97, 102, 106 (2d Cir. 1970).
[182] R. Doc. 73-1 at 30.
[183] *Id.*; *see* 16 U.S.C. § 1854(d).

regulations requiring vessels to use equipment necessary for enforcement of the MSA, which necessarily includes placing some costs on the industry for the purchase of such equipment.[184]

The MSA states "[a]ny fishery management plan which is prepared by any Council, or by the Secretary, with respect to any fishery, may . . . require the use of specified types and quantities of fishing gear, fishing vessels, or equipment for such vessels, including devices which may be required to facilitate enforcement of the provisions of this chapter."[185] As the rationale behind the tracking requirement is validation of fishing effort,[186] the Court must thus determine whether the required purchase and use of tracking equipment in fact facilitates enforcement of the MSA. Two of the stated purposes of the MSA are "to conserve and manage the fishery resources found off the coasts of the United States" and "to promote domestic commercial and recreational fishing under sound conservation and management principles."[187] Furthermore, in implementing the MSA, Congress found "[t]he collection of reliable data is essential to the effective conservation, management, and scientific understanding of the fishery resources of the United States."[188]

In furtherance of these purposes, the MSA requires FMPs to "specify the pertinent data which shall be submitted to the Secretary with respect to . . . charter fishing, . . . including, but not limited to . . . areas in which fishing was engaged in[ and] time of fishing."[189] The National Standards, with which all FMPs must be consistent, requires

---

[184] R. Doc. 79-1 at 18-21.
[185] 16 U.S.C. § 1853(b)(4). "[T]his chapter" refers to the MSA.
[186] *See* 85 Fed. Reg. at 44,009, 44,011.
[187] 16 U.S.C. § 1801(b)(1), (3).
[188] *Id.* § 1801(a)(8).
[189] *Id.* § 1853(a)(5).

"[c]onservation and management measures [to] prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery for the United States fishing industry."[190]

Most broadly, the MSA requires FMPs to "contain the conservation and management measures . . . which are . . . *necessary and appropriate* for the conservation and management of the fishery, to prevent overfishing and rebuild overfished stocks, and to protect, restore, and promote the long-term health and stability of the fishery" and allows FMPs to "prescribe such other measures, requirements, or conditions and restrictions as are determined to be *necessary and appropriate* for the conservation and management of the fishery."[191] This "necessary and appropriate" phrasing is "empowering language [that] represents a delegation of authority to the agency."[192] "[T]hese statutory provisions 'vest[ ] broad authority in the Secretary to promulgate such regulations as are necessary to carry out the conservation and management measures of an approved FMP.'"[193]

Multiple courts have found the "necessary and appropriate" language allows NMFS to impose the costs of complying with certain FMP provisions on the industry.[194] Three recent cases concerned industry funding of at-sea monitors—personnel who occasionally accompany vessels to collect data on the trip and catch. In *Goethel v. Pritzker*, the court

---

[190] *Id.* § 1851(a)(1).

[191] *Id.* § 1853(a)(1)(A), (b)(14) (emphasis added).

[192] *Coastal Conservation Auth. v. U.S. Dep't of Com.*, No. 15-1300, 2016 WL 54911, at *4 (E.D. La. Jan. 5, 2016), *aff'd*, 846 F.3d 99 (5th Cir. 2017).

[193] *Loper Bright Enters., Inc. v. Raimondo*, 544 F. Supp. 3d 82, 104 (D.D.C. 2021) (quoting *Nat'l Fisheries Inst., Inc. v. Mosbacher*, 732 F. Supp. 210, 216 (D.D.C. 1990)), *appeal filed*, No. 21-5166 (D.C. Cir. July 19, 2021).

[194] *See, e.g.*, *Goethel v. Pritzker*, No. 15–cv–497–JL, 2016 WL 4076831, at *4-5 (D.N.H. July 29, 2016), *aff'd on other grounds sub nom. Goethel v. U.S. Dep't of Com.*, 854 F.3d 106 (1st Cir. 2017); *Loper Bright Enters.*, 544 F. Supp. 3d at 103-07; *Relentless Inc. v. U.S. Dep't of Com.*, ___ F. Supp. 3d ____ (D.R.I. Sept. 20, 2021), No. 20-108 WES, 2021 WL 4256067, *appeal filed*, No. 21-1886 (1st Cir. Nov. 4, 2021).

held that because "the MSA explicitly authorizes at-sea monitors" and because "the Council permissibly found . . . [the] industry funding provision 'necessary and appropriate for the conservation and management of the fishery' . . . the MSA does authorize industry funding of monitors."[195] Similarly, in *Loper Bright Enterprises, Inc. v. Raimondo*, the court held that, "[g]iven that the MSA expressly authorizes FMPs to contain provisions requiring that vessels carry at-sea monitors, as well any 'necessary and appropriate' conservation and management requirements," the MSA authorizes industry funding of monitors.[196] Finally, in *Relentless Inc. v. U.S. Department of Commerce*, the court, noting that "Congress gave the Secretary the power to take any measures that are 'necessary and appropriate' to achieve the MSA's conservation goals," held "it was reasonable for the Secretary to conclude that industry-funded monitoring is permitted under the MSA."[197]

In this case, the Court finds the required purchase and use of tracking equipment facilitates enforcement of the MSA and is accordingly authorized as "equipment for . . . vessels . . . required to facilitate enforcement" of the MSA.[198] NMFS chose to implement the tracking requirement "to validate effort (fishing trips)" and "aid with enforcement of the reporting requirement."[199] Specifically, the tracking requirement "will allow NMFS to independently determine whether the vessel leaves the dock" and, in particular, "when a fishing trip was taken, and the length of that trip."[200] The tracking requirement thus helps enforce the MSA's requirement that FMPs specify what data charter fishermen must submit, including "areas in which fishing was engaged in[] [and] time of fishing."[201]

---

[195] *Goethel*, 2016 WL 4076831, at *4.
[196] *Loper Bright Enters.*, 544 F. Supp. 3d at 104.
[197] *Relentless Inc.*, ___ F. Supp. 3d ___, 2021 WL 4256067, at *7.
[198] 16 U.S.C. § 1853(b)(4).
[199] 85 Fed. Reg. at 44,009, 44,011.
[200] *Id.*
[201] 16 U.S.C. § 1853(a)(5).

Moreover, the MSA mandates the inclusion of measures to conserve and manage the fisheries,[202] and NMFS intends to use the data from the tracking requirement to help manage the fisheries:

> The fishermen are required to have the necessary equipment . . . as conditions of their Federal for-hire permits because they possess the information that the Gulf Council and NMFS need to improve management. NMFS is responsible for performing quality control, validating the reports, and using the data, as appropriate, to help achieve various management objectives.[203]

As in *Goethel*, *Loper Bright*, and *Relentless Inc.*, the "necessary and appropriate" language in the MSA, combined with the explicit authorization to require fishermen to use certain equipment, authorizes FMPs to require regulated fishermen to bear the costs of the tracking requirement. The costs of compliance are nearly always "necessary," as "Government regulation typically imposes costs on the regulated industry."[204]

The MSA's restrictions on what fees the Secretary may charge, which the Plaintiffs argue reinforce their position that the MSA does not authorize the purchase of tracking equipment, are distinguishable from the costs of compliance with regulations in this case. The MSA's fee provisions concern scenarios in which the agency directly assesses payment against the industry.[205] However, in the case of purchasing tracking equipment, fishermen would contract with third-party dealers for purchase and installation of such equipment.[206] As the courts in *Loper Bright* and *Relentless, Inc.* noted, "fee-based program[s]" under the fee provisions of the MSA are "distinguishable 'from the industry-

---

[202] *See id.* §§ 1851(a)(1), 1853(a)(1)(A), (b)(14).

[203] 85 Fed. Reg. at 44,009.

[204] *Cf. Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 652 (2012) (Scalia, J., Kennedy, J., Thomas, J., and Alito, J., dissenting).

[205] *See* 16 U.S.C. § 1854(d); *Loper Bright Enters.*, 544 F. Supp. 3d at 106.

[206] 85 Fed. Reg. at 44,007; *see Approved Vessel Monitoring System (VMS) Units for Reporting in the Southeast For-Hire Integrated Electronic Reporting Program*, *supra* note 92.

funded observer measures at issue here, in which the fishing vessels contract with and make payments directly to third-party . . . service providers.'"[207] Furthermore, as the court in *Goethel* noted, the inclusion of an explicit fee provision in one part of the statute but not another, "does not 'support[ ] a sensible inference' that the MSA forbids an FMP under which industry must bear the cost of certain regulations."[208] Because the Secretary is not directly collecting fees from the fishermen, the MSA's fee restrictions do not apply.

Accordingly, the required purchase of tracking equipment is authorized as a measure "necessary and appropriate for the conservation and management of the fishery,"[209] namely the use of "equipment for . . . vessels . . . required to facilitate enforcement" of the MSA.[210]

### 2. NMFS's Authority to Require the Purchase and Use of Tracking Equipment Does Not Violate the Nondelegation Doctrine.

Article I, Section 1, of the Constitution vests "[a]ll legislative Powers herein granted . . . in a Congress of the United States."[211] "This text permits no delegation of those powers."[212] Therefore, "when Congress confers decisionmaking authority upon agencies Congress must 'lay down by legislative act an intelligible principle to which the person or body authorized to [act] is directed to conform.'"[213] "Those standards . . . are not demanding."[214]

---

[207] *Relentless Inc.*, 2021 WL 4256067, at *5 (first alteration in original) (quoting *Loper Bright Enters.*, 544 F. Supp. 3d at 106); *see also Loper Bright Enters.*, 544 F. Supp. 3d at 106.
[208] *Goethel*, 2016 WL 4076831, at *5-6 (alteration in original).
[209] 16 U.S.C. § 1853(a)(1)(A), (b)(14).
[210] *Id*. § 1853(b)(4).
[211] U.S. Const. art. I, § 1.
[212] *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 472 (2001) (first citing *Loving v. United States*, 517 U.S. 748, 771 (1996); and then citing *id*. at 776-77 (Scalia, J., concurring in part and concurring in judgment)).
[213] *Id*. (quoting *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928)).
[214] *Gundy v. United States*, 139 S. Ct. 2116, 2129 (2019).

Plaintiffs argue any reliance on authority from the "necessary and appropriate" language of the MSA violates the nondelegation doctrine because it is an open-ended grant of authority with no intelligible principle.[215] They argue the Court should read a cost-benefit analysis into authority conferred under the MSA's "necessary and appropriate" language.[216] The Government argues Congress has laid down an intelligible principle in the statutory context of the "necessary and appropriate" language.[217]

Discussing the nondelegation doctrine, the Supreme Court has stated it has "almost never felt qualified to second-guess Congress regarding the permissible degree of policy judgment that can be left to those executing or applying the law."[218] In fact, the Court has found the requisite "intelligible principle" lacking in only two statutes, one of which provided literally no guidance for the exercise of discretion, and the other of which conferred authority to regulate the entire economy on the basis of no more precise a standard than stimulating the economy by assuring "fair competition."[219] On the other hand, the Supreme Court has found an intelligible principle even in statutes authorizing regulations in the "public interest."[220]

---

[215] R. Doc. 86 at 35-38. The MSA's "necessary and appropriate" language was not the sole—or even main—statutory basis the Court found for the tracking requirement above. The main source of authority was the MSA's authorization for FMPs to "require the use of specified types and quantities of fishing gear, fishing vessels, or equipment for such vessels, including devices which may be required to facilitate enforcement of the provisions of this chapter." 16 U.S.C. § 1853(b)(4). Nevertheless, as the Court relied in part on the "necessary and appropriate" language, the Court finds it necessary to address the nondelegation argument.

[216] R. Doc. 86 at 35-38.

[217] R. Doc. 87 at 10-12. The Government also argues Plaintiffs' nondelegation argument was raised in a reply brief and thus was waived. *Id.* at 10. However, Plaintiffs raised their nondelegation argument in a combined reply in support of their motion for summary judgment and opposition to the Government's motion for summary judgment. The Court will thus address the nondelegation argument.

[218] *Whitman*, 531 U.S. at 474-75 (quoting *Mistretta v. United States*, 488 U.S. 361, 416 (1989) (Scalia, J., dissenting)) (citing *Mistretta*, 488 U.S at 373).

[219] *Whitman*, 531 U.S. at 474 (first citing *Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935); and then citing *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935)).

[220] *See, e.g.*, *Nat'l Broad. Co. v. United States*, 319 U.S. 190, 225–226 (1943); *N.Y. Cent. Sec. Corp. v. United States*, 287 U.S. 12, 24–25 (1932); *see also Whitman*, 531 U.S. at 474 (citing cases).

The Court declines to read a cost-benefit analysis into the MSA's "necessary and appropriate" language, as the statute already provides an intelligible principle. "[A] nondelegation inquiry always begins (and often almost ends) with statutory interpretation."[221] The MSA provides FMPs may implement measures "necessary and appropriate for the conservation and management of the fishery."[222] The MSA provides a detailed definition of "conservation and management:

> all of the rules, regulations, conditions, methods, and other measures (A) which are required to rebuild, restore, or maintain, and which are useful in rebuilding, restoring, or maintaining, any fishery resource and the marine environment; and (B) which are designed to assure that--(i) a supply of food and other products may be taken, and that recreational benefits may be obtained, on a continuing basis; (ii) irreversible or long-term adverse effects on fishery resources and the marine environment are avoided; and (iii) there will be a multiplicity of options available with respect to future uses of these resources.[223]

Furthermore, the ten National Standards apply to all FMPs.[224] Of particular note, National Standard 2 provides conservation management measures must be "based upon the best scientific information available"; National Standard 7 provides conservation management measures "shall, where practicable, minimize costs and avoid unnecessary duplication"; and National Standard 8 provides conservation and management measures shall "take into account the importance of fishery resources to fishing communities by utilizing economic and social data . . . , in order to (A) provide for the sustained participation of such communities, and (B) to the extent practicable, minimize adverse economic impacts on such communities."[225] Congress has thus provided a lengthy and

---

[221] *Gundy*, 139 S. Ct. at 2123.
[222] 16 U.S.C. § 1853(a)(1)(A), (b)(14).
[223] *Id.* § 1802(5).
[224] *Id.* § 1851(a).
[225] *Id.* §§ 1851(a)(2), (7), (8). The remaining National Standards are:

detailed intelligible principle that easily passes muster under the nondelegation doctrine.[226]

### 3. The Tracking Requirement Does Not Exceed Congress's Authority Under the Commerce Clause.

It is axiomatic that Congress cannot confer upon an agency authority that Congress itself does not possess.[227] Plaintiffs argue that Congress does not have the authority under the Commerce Clause to compel fishermen to purchase tracking equipment.[228] The Government argues the tracking requirement does not compel individuals to purchase

---

> (1) Conservation and management measures shall prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery for the United States fishing industry.
> . . . .
> (3) To the extent practicable, an individual stock of fish shall be managed as a unit throughout its range, and interrelated stocks of fish shall be managed as a unit or in close coordination.
> (4) Conservation and management measures shall not discriminate between residents of different States. If it becomes necessary to allocate or assign fishing privileges among various United States fishermen, such allocation shall be (A) fair and equitable to all such fishermen; (B) reasonably calculated to promote conservation; and (C) carried out in such manner that no particular individual, corporation, or other entity acquires an excessive share of such privileges.
> (5) Conservation and management measures shall, where practicable, consider efficiency in the utilization of fishery resources; except that no such measure shall have economic allocation as its sole purpose.
> (6) Conservation and management measures shall take into account and allow for variations among, and contingencies in, fisheries, fishery resources, and catches.
> . . . .
> (9) Conservation and management measures shall, to the extent practicable, (A) minimize bycatch and (B) to the extent bycatch cannot be avoided, minimize the mortality of such bycatch.
> (10) Conservation and management measures shall, to the extent practicable, promote the safety of human life at sea.

*Id.* § 1851(a).

[226] As part of their nondelegation argument, Plaintiffs argue the Final Rule offers no justification for the costs of the tracking requirement. R. Doc. 86 at 37-38. Without using the words, this argument is, in essence, that the Final Rule was arbitrary or capricious in imposing the tracking requirement. Moreover, Plaintiffs recognize this argument is the same as that in their "opening brief" regarding the arbitrary and capricious standard. *Id.* at 37. Accordingly, the Court will address this argument in the arbitrary and capricious discussion *infra* Section II(B)(2).

[227] *See Goethel*, 2016 WL 4076831, at *7; *Relentless Inc.*, ___ F. Supp. 3d ___, 2021 WL 4256067, at *11; *cf. Bowsher v. Synar*, 478 U.S. 714, 726 (1986) ("Congress cannot grant to an officer under its control what it does not possess.").

[228] R. Doc. 73-1 at 30-31.

tracking equipment; rather if they choose to participate in the permit program, that decision carries with it certain obligations.[229]

Congress has the power "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes."[230] "The power of Congress over interstate commerce is not confined to the regulation of commerce among the states," but extends to activities that "have a substantial effect on interstate commerce."[231] However, in *National Federation of Independent Business v. Sebelius*, a majority of the Supreme Court held the Affordable Care Act's individual mandate, which imposed a monetary penalty on any individual who failed to maintain health insurance, exceeded Congress's authority under the Commerce Clause.[232] Chief Justice Roberts noted that the individual mandate "does not regulate existing commercial activity" but "instead compels individuals to *become* active in commerce by purchasing a product."[233] Similarly, Justice Scalia, Justice Kennedy, Justice Thomas, and Justice Alito noted that under the Commerce Clause, "it must be *activity* affecting commerce that is regulated, and not merely the failure to engage in commerce."[234]

Plaintiffs argue the tracking requirement compels them to engage in commerce by requiring them to purchase and install tracking equipment. However, multiple courts have rejected similar arguments. In *Relentless, Inc.*, the court held that industry funding of at-sea monitors did not compel them to participate in commerce, namely the at-sea monitor market, because they were voluntary participants in the industry, subject to

---

[229] R. Doc. 79-1 at 21.
[230] Const. art. I, § 8.
[231] *United States v. Darby*, 312 U.S. 100, 118–119 (1941).
[232] *Nat'l Fed'n of Indep. Bus.*, 567 U.S. at 547-61 (Roberts, C.J.); *id.* at 650-60 (Scalia, J., Kennedy, J., Thomas, J., and Alito, J., dissenting).
[233] *Id.* at 552 (Roberts, C.J.).
[234] *Id.* at 658 (Scalia, J., Kennedy, J., Thomas, J., and Alito, J., dissenting).

regulation.[235] Rather, "[t]he relevant market is not the monitoring market, but rather the commercial herring fishing market."[236] "Unlike the involuntary insurance purchasers—who could not, short of leaving the country, avoid the health insurance requirement—Plaintiffs are voluntary market participants."[237] "If Plaintiffs do not want to pay for monitoring, they can decline to fish for herring, limit their herring catches to fifty metric tons per trip, leave the New England region, or purchase fishing vessels that qualify for electronic monitoring."[238] The court in *Goethel*, faced with the same argument, came to a similar conclusion: "The underlying factual premise of this argument is flawed because nothing in the Magnuson–Stevens Act compels at-sea monitoring to begin with. Fisherman [sic] who do not participate in the sector system would not be required to have monitors, regardless of who is paying for them."[239] Moreover, even if the system were only "theoretically voluntary," the agency was "not 'regulat[ing] individuals because they are doing nothing.'"[240] Rather, the regulation did not "tax[], assess[] fees, or otherwise penalize[] [fishermen] for choosing a course of action . . . that does not require at-sea monitoring."[241] "Instead," the court reasoned, "the costs of monitors are part of the permissible regulation of plaintiffs' commercial fishing activities."[242]

As in *Relentless, Inc.* and *Goethel*, the tracking requirement does not compel the Plaintiffs to engage in commerce. Plaintiffs are not being regulated for doing nothing; they are voluntary participants in the charter vessel permit program. As participants in

---

[235] *Relentless Inc.*, ___ F. Supp. 3d ____, 2021 WL 4256067, at *11-12.
[236] *Id.* at *12.
[237] *Id.*
[238] *Id.*
[239] *Goethel*, 2016 WL 4076831, at *7.
[240] *Id.* (alteration in original) (quoting *Nat'l Fed'n of Indep. Bus.*, 567 U.S. at 552).
[241] *Id.*
[242] *Id.*

commerce, Congress has the power to regulate them, even if such regulation imposes costs on regulated parties.[243] Unlike the uninsured in *National Federation of Independent Business*, who could not escape the requirements of the individual mandate, Plaintiffs may avoid the tracking requirement by declining to participate in the permit program.

### B.  NMFS's Responses to Comments Were Not Arbitrary or Capricious.

A court may set aside an agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[244] This standard is "[h]ighly deferential" and  "presumes the validity of agency action."[245] "The requirement that agency action not be arbitrary or capricious includes a requirement that the agency . . . respond to 'relevant' and 'significant' public comments."[246] "Comments are 'significant,' and thus require response, only if they raise points 'which, if true . . . and which, if adopted, would require a change in an agency's proposed rule.'"[247] "Moreover, comments which themselves are purely speculative and do not disclose the factual or policy basis on which they rest require no response. There must be some basis for thinking a position taken in opposition to the agency is true."[248] The requirement to respond is not "particularly demanding."[249] "[T]he agency [is not required] to discuss every item of fact or opinion included in the submissions made to it in informal rulemaking"; rather, "the

---

[243] *Cf. Nat'l Fed'n of Indep. Bus.*, 567 U.S. at 652 (Scalia, J., Kennedy, J., Thomas, J., and Alito, J., dissenting) ("Government regulation typically imposes costs on the regulated industry.").

[244] 5 U.S.C. § 706(2)(A).

[245] *City of Portland v. EPA*, 507 F.3d 706, 713 (D.C. Cir. 2007) (quoting *Nat'l Ass'n of Clean Air Agencies v. EPA*, 489 F.3d 1221, 1228 (D.C. Cir. 2007)).

[246] *Id.* (alteration in original) (quoting *Public Citizen, Inc. v. FAA*, 988 F.2d 186, 197 (D.C. Cir. 1993)); *see also Huawei Techns.*, 2 F.4th at 449 (citing *Carlson v. Postal Regul. Comm'n*, 938 F.3d 337, 344 (D.C. Cir. 2019)).

[247] *Huawei Techns.*, 2 F.4th at 449 (alteration in original) (quoting *City of Portland*, 507 F.3d at 714-15).

[248] *Home Box Office, Inc. v. FCC*, 567 F.2d 9, 35 n.58 (D.C. Cir. 1977).

[249] *Pub. Citizen, Inc. v. FAA*, 988 F.2d 186, 197 (D.C. Cir. 1993).

agency's response to public comments need only 'enable [the Court] to see what major issues of policy were ventilated . . . and why the agency reacted to them as it did.'"[250]

### 1. NMFS Considered Comments Concerning Privacy.

Plaintiffs argue NMFS failed to respond to several comments raising Fourth Amendment concerns.[251] The Government argues, because these comments largely focused on the use of location data by other agencies, NMFS reasonably interpreted these comments to concern data use and thus sufficiently responded to them.[252]

Four comments, quoted more fully above,[253] raised Fourth Amendment concerns using identical language: "Providing all confidential transiting details is a violation of our 4th Amendment right to privacy and not necessary to manage the fishery. Such details are considered confidential by NOAA and utilized by other agencies not associated with management of the fishery."[254] NMFS addressed the "confidential transiting details" aspect of these comments:

> NMFS will protect these data in accordance with applicable law. For example, under section 402(b)(1) of the Magnuson-Stevens Act, the data submitted to NMFS under the Gulf For-hire Reporting Amendment shall be confidential and shall not be disclosed, except under the limited circumstances specified in the Magnuson-Stevens Act, such as to Council or Federal employees who are responsible for fishery management. As noted in 50 CFR 600.415(e), anyone "having access to these data are prohibited from unauthorized use or disclosure and are subject to the provisions of 18 U.S.C. 1905, 16 U.S.C. 1857, and NOAA/NMFS internal procedures, including NAO 216-100." Additionally, all data reported through the Gulf for-hire reporting program will be collected through software that meets standards set out by NMFS, including data confidentiality and protection of personal information online, and will be treated as confidential in accordance with NOAA Administrative Order 216-100, Protection of Confidential Fisheries Statistics. The release of data in aggregate or

---

[250] *Id.* (second and fourth alterations in original) (quoting *Auto. Parts & Accessories Ass'n v. Boyd*, 407 F.2d 330, 335, 338 (D.C. Cir. 1968)) (citing *Simpson v. Young*, 854 F.2d 1429, 1435 (D.C. Cir. 1988)).
[251] R. Doc. 73-1 at 35-36; R. Doc. 86 at 40-41.
[252] R. Doc. 79-1 at 25; R. Doc. 87 at 13.
[253] *See supra* text accompanying note 94.
[254] R. Doc. 67-4 at 7-8; R. Doc. 68-2 at 21-22; R. Doc. 70-3 at 27-28; R. Doc. 67-4 at 20-21.

summary form that does not directly or indirectly disclose the identity or business of any person who submits the information is authorized under section 402(b)(3) of the Magnuson-Stevens Act.[255]

NMFS's interpretation of these four comments and its subsequent response was reasonable. It is incumbent upon the commenter to "disclose the factual or policy basis on which [his or her comment] rest[s],"[256] and the agency "need not sift pleadings and documents to identify arguments that are not stated with clarity by a petitioner."[257] "Just as the opportunity to comment is meaningless unless the agency responds to significant points raised by the public, so too is the agency's opportunity to respond to those comments meaningless unless the interested party clearly states its position."[258] The only basis for their privacy objections that the commenters raised was that their "transiting details" are "confidential" according to NOAA. NMFS addressed this concern and was not required to dig for another basis of generalized Fourth Amendment concerns.

The Court finds *Hussion v. Madigan*[259] persuasive. In that case, the Eleventh Circuit held it was "unable to find . . . the Agency's limited acknowledgment of general due process concerns evince[d] an 'entire[ ] fail[ure]' to consider them" when it addressed specific due process concerns raised in several of these comments.[260] *Hussion* involved

---

[255] 85 Fed. Reg. at 44,010.
[256] *See Home Box Office*, 567 F.2d at 35 n.58.
[257] *Huawei Techns.*, 2 F.4th at 449.
[258] *Am. Great lakes Ports Ass'n v. Zukunft*, 296 F. Supp. 27, 53 (D.D.C. 2017) (quoting *Northside Sanitary Landfill, Inc. v. Thomas*, 849 F.2d 1516, 1520 (D.C. Cir. 1988)), *aff'd sub nom. Am. Great lakes Ports Ass'n v. Schultz*, 952 F.3d 510 (D.C. Cir. 2020); *cf. Conf. of State Bank Supervisors v. Off. Of Thrift Supervision*, 792 F. Supp. 837, 846 n.8 (D.D.C. 1992) (citations omitted) ("Plaintiffs also state that [the agency] failed to respond adequately to 'the transition period' that was suggested by the American Bankers Association. When read in full, however, this comment does not specifically suggest that [the agency] adopt a transition period. Rather, this comment describes of a variety of proposals that were put before Congress when Congress was considering relaxing the statutory restrictions upon interstate branching by banks. . . . The court finds that this specific reference to a transition period does not amount to a material comment or issue that [the agency] must respond to in light of the way in which it was presented. [The agency] properly considered the larger material concern of many commenters that the proposed rule was contrary to the will of Congress because Congress considered and rejected proposals to allow branching by banks.").
[259] *Hussion v. Madigan*, 950 F.2d 1546 (11th Cir. 1992).
[260] *Id.* at 1554 (third and fourth alterations in original).

46

regulations meant to "streamline" eviction proceedings in a housing project funded by the agency.[261] Several commenters complained that the regulations deprived them of their constitutional due process.[262] The agency responded to several specific concerns these commenters raised, addressing, for example, "self-help evictions" and "the rubber-stamping of unwarranted eviction decisions by state courts."[263] However, the agency did not specifically acknowledge more "general due process concerns."[264] The court held that the agency's responses were sufficient, reasoning "[t]he APA does not require the Agency to respond to comments which, in essence, reflect a policy-based preference for the most exacting guarantees of due process over the interest shared by owners and other tenants in minimizing the cost and delay of good-cause evictions."[265] Rather, the agency needed to only address the specific "significant objections raised," which were "on the record, accounted for in the Agency's action."[266] As in *Hussion*, in this case, NMFS addressed the specific confidentiality objections, but was not required to acknowledge general privacy objections that failed to provide another basis for their concerns.

To the extent the commenters' general Fourth Amendment concerns raised important issues, the Court is satisfied that NMFS and the Gulf Council considered the important aspects of the problem.[267] "The failure to respond to comments is significant only insofar as it demonstrates that the agency's decision was not based on a consideration of the relevant factors."[268] Courts have looked to the rulemaking record to

---

[261] *Id.* at 1548-49.
[262] *Id.* at 1553-54.
[263] *Id.* at 1553.
[264] *Id.* at 1554.
[265] *Id.*
[266] *Id.*
[267] *See Motor Vehicle Ass'n of U.S.*, 463 U.S. at 43.
[268] *Covad Commc'ns Co. v. FCC*, 450 F.3d 528, 550 (D.C. Cir. 2006) (quoting *Thompson v. Clark*, 741 F.2d 401, 409 (D.C. Cir. 1984)).

review the factors considered.[269] For example, in *Thompson v. Clark*, the D.C. Circuit held that a final rule, which did not directly address *any* comments, was not arbitrary or capricious.[270] Several comments objected to the proposed increase in federal oil and gas rental fees on the grounds that "the increases would drive out small participants and concentrate leases in the hands of large corporations."[271] The final rule stated only that "no substantive views [had been] presented" in the comments.[272] The court, however, noted that the agency in its "analysis supporting the rule (referred to and made publicly available in the [notice of proposed rulemaking])" contained information and analysis that addressed this issue.[273] The court found this analysis in the record to be enough, reasoning "nothing had been presented [in the comments] which required some explanation beyond that already contained within the rulemaking record to assure us that 'all relevant factors ha[d] been considered.'"[274]

In this case, looking to the rulemaking record, the Gulf Council's Data Collection Technical Committee recommended, "Location data would be collected passively through a device . . . with a ping frequency of approximately 30 minutes. This ping frequency would balance the need for spatial information with the privacy concerns of vessel operators as it would be sufficient to establish regions of fishing (and depths) but not exact fishing locations."[275] Similarly, the Gulf Council amendment notes the Council selected an "archived vessel position system," as opposed to a "real-time" system, in order

---

[269] *See, e.g.*, *Thompson*, 741 F.2d at 409; *Appalachian Power Co. v. EPA*, 249 F.3d 1032, 1063 (D.C. Cir. 2001) (looking to "record documents" to see if the agency addressed relevant factors raised in comments).
[270] *Thompson*, 741 F.2d at 409.
[271] *Id.*
[272] *Id.* (alteration in original).
[273] *Id.*
[274] *Id.* (alteration in original) (quoting *Home Box Office*, 567 F.2d at 36).
[275] R. Doc. 64-2 at 175.

to "balance the needs of collecting and reporting timely information while minimizing the . . . burden to the industry."[276] The proposed regulatory text and final regulatory text actually took a more conservative approach than the Technical Committee, requiring a minimum ping frequency of once per hour.[277] The preamble in the Final Rule reiterated the finding that the archived position reporting was chosen to minimize the burden on the industry.[278] The rulemaking record thus shows that concerns about privacy and the burden on the industry were considered throughout the rulemaking process and affected the ultimate provisions of the Final Rule.

Moreover, in addressing concerns about the tracking requirement, although not specifically addressing privacy concerns, the Final Rule repeatedly notes that tracking equipment has been required for vessels with federal commercial permits for Gulf reef fish since 2006.[279] In *Aeronautical Repair Station Association v. FAA*, the D.C. Circuit noted that the agency sufficiently responded to comments concerning privacy and Fourth Amendment concerns by stating, "albeit succinctly: '[T]he issues regarding invasion of privacy were resolved more than 15 years ago when the drug testing regulation carefully balanced the interests of individual privacy with the Federal government's duty to ensure aviation safety.'"[280] Similarly, in this case the Final Rule's discussion of the longtime tracking requirement for commercial fishing vessels shows NMFS considered the regulatory norms for the fishing industry and types of burdens it ought to impose.

Accordingly, to the extent the commenters' general Fourth Amendment concerns raised important issues, the Court is satisfied "all relevant factors ha[ve] been

---

[276] R. Doc. 66-3 at 76.
[277] 83 Fed. Reg. at 54,076, 54,078; 85 Fed. Reg. at 44,018, 44,020.
[278] 85 Fed. Reg. at 44,012.
[279] 85 Fed. Reg. at 44,007, 44,012-13.
[280] *Aeronautical Repair Station Ass'n v. FAA*, 494 F.3d 161, 173 (D.C. Cir. 2007) (alteration in original).

considered."[281] The discussions in the rulemaking record and the issues addressed in the Final Rule show "the agency considered and rejected petitioners' arguments . . . . That is all the APA requires."[282]

### 2. NMFS Considered Comments Concerning the Tracking Requirement's Necessity, Burden, and Cost.

Plaintiffs argue NMFS failed to respond to several comments concerned with the necessity, burden, and cost of the tracking requirement.[283] They argue NMFS's reasons for imposing the tracking requirement on the charter fishing industry are conclusory and lack a cost-benefit analysis.[284] The Government argues the Final Rule explains the need for the tracking requirement and NMFS carefully considered the costs of the tracking requirement compared to a charter vessel business's income.[285] The Government also argues the APA does not require detailed citations and explanations.[286]

Several commenters objected to the need for tracking requirement when similar location information is already provided in reporting. For example, Willy Hatch commented, "Tracking does not provide any additional data that would be provided by filling out a vessel trip report."[287] Other commenters objected to the inclusion of the tracking requirement on small charter vessels because of the burden it would impose, compared to larger commercial vessels who already use tracking equipment. For example, Chuck Pollard commented, "Your proposal would treat [charter boats] like larger

---

[281] *Thompson*, 741 F.2d at 409 (quoting *Home Box Office*, 567 F.2d at 36).
[282] *See City of Waukesha v. EPA*, 320 F.3d 228, 258 (D.C. Cir. 2003) (holding "general and generic" response to comments were sufficient).
[283] R. Doc. 73-1 at 36-38.
[284] *Id.*
[285] R. Doc. 79-1 at 25-26.
[286] R. Doc. 79-1 at 25-26.
[287] R. Doc. 67-4 at 12; *see also* R. Doc. 67-2 at 20 ("Putting gps and reporting restrictions on charter boat operators will not give usable information that cannot be gained from current reporting).

commercial fishing enterprises with greater compliance resources."[288] Finally, other commenters objected to the cost of purchasing, installing, and maintaining tracking equipment on their vessels. For example, James Branca commented, "It's extremely alarming that there is no mention of a price for the device(several [sic] thousand dollars) or monthly fee for the GPS tracking device that would be required to have my boat tracked on my dime."[289]

Responding to the comments that "a location tracking system is unnecessary to provide validation of a vessel trip," the Final Rule states:

> The Gulf Council determined, and NMFS agrees, that requiring each Gulf for-hire vessel be equipped, at a minimum, with archivable vessel location tracking (cellular VMS) best balances the need to collect and report timely information with the need to minimize the cost and time burden to the industry. The vessel location tracking system is an additional mechanism that verifies vessel activity without a report having to be completed by the vessel operators. The vessel location tracking system will allow NMFS to independently determine whether the vessel leaves the dock. This will help validate effort and aid with enforcement of the reporting requirements.[290]

The Final Rule later explains what unique validation the tracking requirement adds: "[C]urrent reporting requirements . . . would not allow for the same level of trip validation, because [they] would not require GPS unit hardware to be permanently affixed to the vessel.[291] The Gulf Council adopted the requirement that the tracking equipment be

---

[288] R. Doc. 68-1 at 1; *see also* R. Doc. 67-4 at 4 ("I can see how this works on commercial offshore vessels where their trips are usually 3-5 days—however, we do mostly 4.5-hour trips."); *id.* at 5-6 (same); *id.* at 11, 17, 19, 22 ("Common sense should be used here and not treat . . . charter boats similar to large commercial fishing vessels.").

[289] R. Doc. 68-2 at 16; *see also* R. Doc. 68-1 at 1 ("GPS monitoring systems will only add additional costs and work burdens to charter/headboat operators with limited financial and personnel resources.").

[290] 85 Fed. Reg. at 44,012.

[291] *Id.* at 44,016. Plaintiffs argue the need for such regulation is unnecessary in part because the vast majority of fish are caught by commercial fishing vessels, not charter vessels. R. Doc. 73-1 at 37. However, the Government disputes the figure Plaintiffs cite for this proposition as based on incomplete data and as beyond the APA scope of review because it is not contained in the administrative record. R. Doc. 79-2 at 12-13; *see Camp v. Pitts*, 411 U.S. 138, 142 (1973) ("[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court."). Accordingly, as this fact was not before NMFS in the administrative record, the Court will not consider it.

permanently affixed to the vessel in order to know the position reported is actually the vessel, as opposed to an unrelated position anyone could otherwise submit.[292] NMFS further elaborated in the Final Rule on the balance between ease of enforcement and burden imposed:

> The Gulf for-hire reporting program is designed to both monitor for-hire landings to determine in-season closures and post-season quota adjustments, and to enhance data collection efforts to provide for better fisheries management . . . . [R]esponsibility for the program is appropriately shared by NMFS and the fishermen. The fishermen are required to have the necessary equipment and report in a timely manner as conditions of their Federal for-hire permits because they possess the information that the Gulf Council and NMFS need to improve management. NMFS is responsible for performing quality control, validating the reports, and using the data, as appropriate, to help achieve various management objectives.[293]

NMFS further responded why the burden on charter fishing vessels would not be more significant compared to commercial fishing vessels:

> NMFS does not expect that a continually operating VMS unit will drain the vessel's battery. VMS units have been required for vessels with Federal commercial permits for Gulf reef fish since 2006. Some of those vessels are relatively small and have not reported any problems with batteries draining due to the VMS units being on all the time. The VMS units vary in amperage draw, but the units generally draw less than 1,000 milliamperes while active. NMFS may approve solar-powered cellular VMS units that can store power lasting for 1 to 2 weeks. Furthermore, some units may allow a Gulf for-hire vessel owner or operator to use a 4-hour position reporting option when in-port, which would further reduce battery usage.
>
> . . . .
>
> The results of pilot testing of VMS units on charter vessels as small as 30 feet in length indicate that the units and antennae can be placed successfully. Also, VMS units have been required for vessels with Federal commercial permits for Gulf reef fish since 2006. Some of those Gulf reef

---

[292] R. Doc. 65-1 at 303-07; *see Thompson*, 741 F.2d at 409 (holding "[t]he failure to respond to comments is significant only insofar as it demonstrates that the agency's decision was not 'based on a consideration of the relevant factors'" and looking to the background in the administrative record to see what factors were considered (quoting *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416 (1971)).
[293] 85 Fed. Reg. at 44,009.

fish vessels are relatively small and fishermen have not found the systems to be impractical or unfeasible.[294]

Plaintiffs argue NMFS's reasoning is conclusory because it lacks a proper cost-benefit analysis under National Standard 7. National Standard 7 provides that conservation management measures "shall, where practicable, minimize costs and avoid unnecessary duplication."[295] However, it is well-settled that, under National Standard 7, "in making a decision on the practicability of a fishery management amendment, the Secretary does not have to conduct a formal cost/benefit analysis of the measure."[296] The regulatory guidelines for National Standard 7 state, "Management measures should not impose unnecessary burdens on the economy, on individuals, on private or public organizations, or on Federal, state, or local governments. Factors such as fuel costs, enforcement costs, or the burdens of collecting data may well suggest a preferred alternative."[297] However, "an evaluation of effects and costs, especially of differences among workable alternatives, including the status quo, is adequate."[298] Ultimately, a court's job on review "is not to undertake [its] own economic study, but to determine whether the [agency] 'has established in the record a reasonable basis for its decision.'"[299]

NMFS examined the costs of the tracking requirement. This analysis, quoted in full above,[300] found cellular-based units would cost between $150 and $800 plus monthly service fees of $40 to $75.[301] These estimates came from quotes from the vendors of

---

[294] *Id.* at 44,013.
[295] 16 U.S.C. § 1851(a)(7).
[296] *Alaska Factory Trawler Ass'n v. Balbridge*, 831 F.2d 1456, 1460, 1465 (9th Cir. 1987); *see also* 50 C.F.R. § 600.340(c); *Sea Watch Int'l v. Mosbacher*, 762 F. Supp. 370, 380 (D.D.C. 1991); *Loper Bright Enters.*, 544 F. Supp. 3d at 111-12.
[297] 50 C.F.R. § 600.340(b); *see also Loper Bright Enters.*, 544 F. Supp. 3d at 110.
[298] 50 C.F.R. § 600.340(c); *see also Loper Bright Enters.*, 544 F. Supp. 3d at 110.
[299] *See Huawei*, 2 F.4th at 452 (second alteration in original) (quoting *Chem. Mfrs. Ass'n*, 870 F.2d at 251).
[300] *See supra* text accompanying notes 100-101.
[301] 85 Fed. Reg. at 44,013.

cellular equipment that NMFS was testing for eventual approval for use to comply with the tracking requirement.[302] Plaintiffs argue it is unreasonable for NMFS to have relied on vendor quotes; however, an agency may rely on "the evidence it ha[s]" and need not "conduct or commission [its] own empirical or statistical studies"[303] Official quotes from the vendors on specific tracking equipment was reasonable data to consider in making a cost estimate.[304] Moreover, it was reasonable for NMFS to use the prices for the cheaper cellular equipment, which meets the minimum archival transmission requirement, as opposed to more expensive satellite equipment, which transmits data in real-time, since the minimum archival transmission is all that the Final Rule requires.

Based on a study by Louisiana State University, NMFS found the average monthly cash outflows of charter businesses to be $5,171.[305] Compared to this data, the average startup costs for the tracking requirement amounted to 3.1% of annual charter vessel net income, and the recurring charges amounted to 1.8% of annual charter vessel net income.[306] Moreover, NMFS noted that it was in the process of making a reimbursement program, which was already available for the purchase of approved satellite tracking equipment, available to fishermen for the purchase of approved cellular tracking equipment as well.[307] As predicted, that reimbursement program for cellular tracking

---

[302] *Id.* at 44,015.

[303] *See Huawei*, 2 F.4th at 453-54 (quoting *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1160 (2021)) (examining a cost-benefit analysis).

[304] Plaintiffs argue devices at these quoted prices do not exist, but they point to no evidence in the record for this proposition. *See* R. Doc. 73-1 at 38-39. On the other hand, the Government states two of these devices NMFS was testing at the time of the Final Rule's formulation have now been approved. R. Doc. 79-1 at 28 n.10; *see Approved Vessel Monitoring System (VMS) Units for Reporting in the Southeast For-Hire Integrated Electronic Reporting Program*, *supra* note 92 (listing the Faria FB eTerm-C and Woods Hole Group Nemo as approved).

[305] 85 Fed. Reg. at 44,015.

[306] *Id.*

[307] *Id.* at 44,013.

equipment is now in effect.[308] NMFS also reasonably acknowledged "[s]ome vessel owners and operators may be more or less affected than others by this final rule depending on their existing technology assets and data service plans at the time of implementation."[309] For example, some vessel owners may require an additional cellular device and data plan to submit electronic reports if they choose to purchase tracking equipment that lacks the capability to submit reports, but in this day and age, NMFS reasonably "assume[d] that most owners or operators of for-hire vessels already have a basic smartphone and data plan in order to meet the needs of their businesses."[310]

Finally, NMFS laid out a detailed comparison, quoted in full above,[311] of the costs and benefits of the selected requirement just discussed with those of the alternative proposals NMFS and the Gulf Council considered. One of these alternatives was not requiring the installation of tracking equipment and instead relying on the previous reporting requirements alone; however, as explained, this no-action option was not preferred as it did not provide the necessary validation of data that a device permanently affixed to the vessel would.[312] The remaining two alternatives required the submission of real-time location data, as opposed to the archived location data required in the Final Rule.[313] NMFS and the Gulf Council did not select these final two alternatives because of the significantly higher start up and recurring costs compared to the requirement they ultimately settled on.[314]

---

[308] 85 Fed. Reg. 40,915.
[309] *Id.* at 44,015.
[310] *Id.*
[311] *See supra* text accompanying note 102.
[312] 85 Fed. Reg. at 44,016.
[313] *Id.* at 44,016-17.
[314] *Id.*

NMFS appropriately responded to the comments it received regarding the necessity, burden, and costs of the tracking requirement. It identified a unique benefit of the tracking requirement—accurate location data affixed to the vessel—which could not be obtained from current reporting. NMFS considered the burdens the tracking requirement would impose on smaller charter vessels and conducted a thorough analysis of the costs. It compared the costs and benefits of the selected equipment to that of alternatives. NMFS found the chosen tracking requirement achieved a balance of costs and benefits, rejecting the no-action alternative that provided the least burden but little benefits as well as real-time tracking alternatives that would have provided the most benefits but also the most burden. Ultimately, NMFS's reasoned response was not arbitrary or capricious.

### C. The Final Rule Complied with the Regulatory Flexibility Act.

Under the Regulatory Flexibility Act ("RFA"), when an agency promulgates a final rule after first being required to promulgate a notice of proposed rulemaking, the agency shall prepare a final regulatory flexibility analysis.[315] This analysis must include, among other requirements,

> a description of the steps the agency has taken to minimize the significant economic impact on small entities consistent with the stated objectives of applicable statutes, including a statement of the factual, policy, and legal reasons for selecting the alternative adopted in the final rule and why each one of the other significant alternatives to the rule considered by the agency which affect the impact on small entities was rejected.[316]

---

[315] 5 U.S.C. § 604(a).
[316] *Id.* § 604(a)(5).

Compliance with the RFA is subject to judicial review.[317] However, the RFA is purely "procedural."[318] The RFA "does not command an agency to take specific substantive measures, but, rather, only to give explicit consideration to less onerous options."[319] Courts review "only to determine whether an agency has made a 'reasonable, good-faith effort' to carry out the mandate of the RFA."[320] This review is "highly deferential, 'particularly . . . with regard to an agency's predictive judgments about the likely economic effects of a rule.'"[321] "[T]here is no requirement under the RFA as to the 'specific amount of detail' with which an agency must discuss various alternatives."[322]

Plaintiffs argue the Final Rule's final regulatory flexibility analysis was neither reasonable nor in good faith because it did not consider an alterative to the tracking requirement that did not require purchasing tracking equipment. Plaintiffs also argue the analysis of costs was flawed because it was based on quotes from vendors of equipment NMFS was testing for eventual approval for use with the tracking requirement and because it assumed most fishermen would not require an additional cell phone and data plan.[323] The Government argues the final regulatory flexibility analysis did consider a no-action alternative that would not require tracking equipment.[324] Moreover, the

---

[317] *Id.* § 611(a)(1); *see also Alenco Commc'ns, Inc. v. FCC*, 201 F.3d 608, 625 (5th Cir. 2000).

[318] *See, e.g.*, *Alenco*, 201 F.3d at 625; *Am. Health Care Ass'n v. Burwell*, 217 F. Supp. 3d 921, 941 (N.D. Miss. 2016); *Relentless, Inc.*, ___ F. Supp. 3d ___, 2021 WL 4256067, at *11; *Loper Bright Enters.*, 544 F. Supp. 3d at 124.

[319] *Alenco*, 201 F.3d at 625 n.20 (quoting *Associated Fisheries of Me., Inc. v. Daley*, 127 F.3d 104, 114 (1st Cir. 1997)).

[320] *Id.* at 625 (quoting *Associated Fisheries*, 127 F.3d at 114).

[321] *Am. Health Care Ass'n*, 217 F. Supp. 3d at 941 (alteration in original) (quoting *Helicopter Ass'n Int'l, Inc. v. FAA*, 722 F.3d 430, 432–33 (D.C. Cir. 2013)).

[322] *Goethel*, 2016 WL 4076831, at *8 (quoting *Little Bay Lobster Co. v. Evans*, 352 F.3d 462, 471 (1st Cir. 2003)).

[323] R. Doc. 73-1 at 40-41.

[324] R. Doc. 79-1 at 26-29.

Government argues, it conducted a reasonable analysis of the respective costs of alternative proposals.[325]

The Court finds the final regulatory flexibility analysis to be reasonable and in good faith. The NMFS considered a no-action alternative that would not have required the purchase and use of tracking equipment.[326] However, as explained in Section II(B)(2) above, NMFS rejected this alternative because it would not provide the same level of validation as equipment affixed to the vessel.[327] "[T]here is no requirement as to the amount of detail with which specific comments need to be discussed."[328] NMFS considered the lower-cost no-action alternative, and that is all the RFA requires.

Moreover, as explained in Section II(B)(2) above, it was not unreasonable for NMFS to rely on vendor quotes for the costs of devices in its analysis or to assume most fishermen nowadays have a cell phone. The RFA does not require complex "cost-benefit analysis or economic modeling."[329] It "mandates only that the agency describe the steps it took 'to minimize the significant economic impact on small entities consistent with the stated objectives of applicable statutes.'"[330] The case Plaintiffs cite in support of their argument that NMFS failed to provide a factual basis for its cost estimates is unpersuasive as it involved an agency that excluded important costs by deferring their consideration until a later rulemaking.[331] Instead, in this case, NMFS reasonably considered estimates based on the information before it while acknowledging "[s]ome vessel owners and

---

[325] *Id.*
[326] 85 Fed. Reg. at 44,016.
[327] *Id.*
[328] *Little Bay Lobster Co.*, 352 F.3d at 471.
[329] *Alenco*, 201 F.3d at 625.
[330] *Id.* (quoting 5 U.S.C. § 604(a)(5)).
[331] *Nat'l Fed'n of Indep. Bus. v. Perez*, No. 5:16-cv-00066-C, 2016 WL 3766121, at *38 (N.D. Tex. June 27, 2016).

operators may be more or less affected than others by this final rule depending on their existing technology assets and data service plans at the time of implementation."[332] Especially considering courts are highly deferential to an agency's predictive judgments about the economic effects of a rule,[333] the Court does not find the reliance on these quotes and estimates unreasonable or in bad faith. Accordingly, the Court finds the Final Rule complied with the RFA.

### D. The Plaintiffs Have Abandoned Their Fifth Amendment Due Process Claim and Did Not Bring a Fifth Amendment Takings Claim in Their Complaints; the Court Will Not Allow Them to Amend Their Complaint at Such a Late Stage of the Case.

In their motion for summary judgment, Plaintiffs argue they are entitled to summary judgment that the required placement of tracking equipment on their vessels constitutes a taking under the Fifth Amendment.[334] The Government argues Plaintiffs did not make a takings claim in either their complaint or their amended complaint.[335] Rule 8 of the Federal Rules of Civil Procedure requires pleadings to contain "a short and plain statement of the claim showing that the pleader is entitled to relief."[336] The purpose of this requirement is to "to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"[337]

In both their complaint and amended complaint, Plaintiffs make only one Fifth Amendment claim, which is based on a violation of due process:

> [I]f the data demanded is created by a device bought and paid for by Plaintiffs it belongs to them and the seizure of such data without any cause

---

[332] 85 Fed. Reg. at 44,015.
[333] *Am. Health Care Ass'n*, 217 F. Supp. 3d at 941.
[334] R. Doc. 73-1 at 27-29.
[335] R. Doc. 79-1 at 29-30.
[336] Fed. R. Civ. P. 8(a)(2).
[337] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration in original) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

at all, never mind probable, of that data by Defendants violates the due process clause of the Fifth Amendment to the U.S. Constitution.[338]

A claim that deprivation of property without cause violates due process invokes the principle under procedural due process that "some form of hearing is required before an individual is finally deprived of a property interest."[339] Other references to the Fifth Amendment in the complaints also focus on due process. Explaining Fifth Amendment protections, the complaints state, "The Fifth Amendment protects life, liberty, and property from deprivation by the Government without due process of law."[340] The prayer for relief requests a declaratory judgment that the tracking requirement violates the Fifth Amendment's "protection against deprivation of property without adequate due process of law."[341]

The parties intended for this "case to be decided via cross motions for Summary Judgment."[342] Plaintiffs do not argue their Fifth Amendment due process claim in their motion for summary judgment.[343] Nor do they assert a standalone due process claim in their opposition to the Government's cross-motion for summary judgment.[344] Instead, they mention due process under the Fifth Amendment only in their attempt to show they brought a takings claim in their complaints.[345] As a result, the Government has moved for

---

[338] *See* R. Doc. 1 at ¶ 84; R. Doc. 54 at ¶ 82.

[339] *See Matthews v. Eldridge*, 424 U.S. 319, 333 (1976).

[340] R. Doc. 1 at ¶ 31; R. Doc. 54 at ¶ 29.

[341] R. Doc. 1 at 25; R. Doc. 54 at 25. The claim's reference to probable cause also invokes the Fourth Amendment's general warrant requirement for unreasonable searches and seizures. *See Missourie v. McNeely*, 569 U.S. 141, 148 (2013) ("[A] warrantless search of the person is reasonable only if it falls within a recognized exception."). This interpretation is reinforced by the restatement of the claim as a common question of law in the class allegations: "whether seizing data and proprietary information without warrant or even reasonable suspicion of wrongdoing violates the Due Process Clause of the Fifth Amendment of the Constitution." *See* R. Doc. 1 at ¶ 112(i); R. Doc. 54 at ¶ 113(i).

[342] R. Doc. 49 at 2.

[343] *See* R. Doc. 73-1.

[344] *See* R. Doc. 86.

[345] *See id.* at 30-31.

summary judgment on Plaintiffs' Fifth Amendment due process claim as abandoned.[346]
In *Hargrave v. Fibreboard Corp.*, the Fifth Circuit held a third-party plaintiff had
abandoned the alternative theories of recovery raised in its complaint when it did not brief
them in opposition to a motion for summary judgment.[347] The Court finds Plaintiffs have
abandoned their Fifth Amendment due process claim by failing to raise it in their motion
for summary judgment or in their opposition to the Government's cross-motion for
summary judgment, which the parties intended to dispose of all claims.

Next, Plaintiffs argue the use of the word "seizure" in their complaints transforms
their due process claim into a takings claim.[348] Invocation of the Fifth Amendment's due
process protections does not amount to making a takings claim. The mere mention of
"seizure" is insufficient to place the Government on notice that Plaintiffs are bringing a
takings claim. Ultimately, Plaintiffs' first mention of a takings claim for the placement of
tracking equipment on their vessels is in their motion for summary judgment. "A claim
which is not raised in the complaint but, rather, is raised only in . . . a motion for summary
judgment is not properly before the court."[349]

"[W]hen a claim is raised for the first time in . . . a summary judgment motion, the
district court should construe that claim as a motion to amend the complaint under
Federal Rule of Civil Procedure 15(a)."[350] Rule 15(a) provides the Court should grant leave

---

[346] R. Doc. 79-1 at 29 n.12.
[347] *Hargrave v. Fibreboard Corp.*, 710 F.2d 1154, 1164 (5th Cir. 1983); *see also Vela v. City of Houston*, 276 F.3d 659, 678-79 (5th Cir. 2001) (reaffirming *Hargrave* and applying its reasoning to defenses raised in an answer); *Black v. N. Panola Sch. Dist.*, 461 F.3d 584, 588, n.1 (5th Cir. 2006); *Lofton v. City of W. Point*, Civil Nos. 1:10CV282–SA–DAS, 1:10CV316–SA–DAS, 2012 WL 1135862, at *12 (N.D. Miss. Apr. 4, 2012).
[348] R. Doc. 86 at 30.
[349] *See Cutera v. Bd. of Supervisors of La. State Univ.*, 429 F.3d 108, 113 (5th Cir. 2005) (citing *Fisher v. Metro. Life Ins. Co.*, 895 F.2d 1073, 1078 (5th Cir. 1990)).
[350] *See Riley v. Sch. Bd. Union Par.*, 379 F. App'x 335, 341 (5th Cir. 2010) (first citing *Stover v. Hattiesburg Pub. Sch. Dist.*, 549 F.3d 985, 989 n. 2 (5th Cir. 2008); and then citing *Sherman v. Hallbauer*, 455 F.2d 1236, 1242 (5th Cir. 1972)).

to amend freely when justice so requires. Leave to amend is not "automatic," but the Court must possess a "substantial reason" to deny leave to amend.[351] A court possesses a "substantial reason" when, for instance, a plaintiff has acted with "undue delay, bad faith or dilatory motive" in seeking leave to amend; the plaintiff has made "repeated failures to cure deficiencies by amendments previously allowed"; "undue prejudice [will result] to the opposing party by virtue of allowance of the amendment"; or the amendment would be completely futile.[352] This suit was filed on August 20, 2020.[353] The Amended Scheduling Order set the deadline for Plaintiffs to seek leave to file an amended complaint as June 8, 2021.[354] After this extension, the Court granted Plaintiffs leave to file an amended complaint on June 9, 2021,[355] but Plaintiffs did not add a takings claim in that pleading. The Court will not allow Plaintiffs to amend their complaint eighteen months after suit was filed and seven months after the deadline to file such a motion—after an extension of time to do so was already granted—when dispositive summary judgment motions are pending.

### E.  The Tracking Requirement Does Not Violate the Fourth Amendment.

Plaintiffs are correct  that a court must set aside an agency action if it is "contrary to constitutional right, power, privilege, or immunity."[356] Plaintiffs argue the tracking requirement is a warrantless search and thus facially violates the Fourth Amendment's

---

[351] *Jones v. Robinson Prop. Grp., L.P.*, 427 F.3d 987, 994 (5th Cir. 2005).

[352] *Id.*

[353] R. Doc. 1.

[354] R. Doc. 51 at 2. This Amended Scheduling Order was later vacated in part, but only to the extend it set deadlines for the instant cross motions for summary judgment. *See* R. Doc. 72. The original Scheduling Order set the deadline to amend the complaint as April 19, 2021, R. Doc. 35 at 8, but, after this deadline had passed, on motion of the parties, R. Doc. 49, the Court extended the deadline to June 8, 2021, R. Doc. 51 at 2.

[355] R. Doc. 53.

[356] 5 U.S.C. § 706(2)(B).

protection against unreasonable searches and seizures.[357] Defendants argue the warrantless requirement is not a search, but even if it is, it is reasonable under the closely regulated industry exception to the Fourth Amendment.[358] Plaintiffs argue the closely regulated industry exception is inapplicable, and a warrant or precompliance review is required.[359]

When a plaintiff brings a facial challenge to a statute or regulation, the "plaintiff must establish that a 'law is unconstitutional in all of its applications.'"[360] "But when assessing whether a statute meets this standard, the Court has considered only applications of the statute in which [the statute] actually authorizes or prohibits conduct."[361] Thus, "when addressing a facial challenge to a statute authorizing warrantless searches, the proper focus of the constitutional inquiry is searches that the law actually authorizes, not those for which it is irrelevant."[362] In this case, the relevant conduct is hourly location monitoring, with some exceptions, from tracking equipment required to be placed on charter fishing vessels participating in the federal Gulf charter vessel permit program. The Court assumes without deciding that the tracking requirement constitutes a Fourth Amendment search because, even if the tracking requirement constitutes a search, the search is reasonable under the closely regulated industry exception.

Under the closely regulated industry exception, some industries "'have such a history of government oversight that no reasonable expectation of privacy' exists for

---

[357] R. Doc. 73-1 at 19-27; R. Doc. 86 at 13-30.
[358] R. Doc. 79-1 at 34-46-35; R. Doc. 87 at 19-27.
[359] R. Doc. 73-1 at 19-27; R. Doc. 86 at 13-30.
[360] *City of Los Angeles v. Patel*, 576 U.S. 409, 418 (2015) (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008)).
[361] *Id.*
[362] *Id.*

individuals engaging in that industry."[363] If an industry is closely regulated, a warrantless search is permissible if certain criteria are met.[364] The rationale behind the exception is that "a person [who] chooses to engage in a closely regulated industry and to accept a license which is conditioned upon such warrantless intrusion and inspection . . . does so with full knowledge of the restrictions on his privacy," and "[h]e is also free not to submit to such regulation and warrantless inspection by declining to seek a federal permit."[365] Nevertheless, warrantless inspections in a closely regulated industry must still satisfy the three criteria the Supreme Court laid out in *New York v. Burger*: "(1) a substantial government interest, (2) a regulatory scheme that requires warrantless searches to further the government interest, and (3) 'a constitutionally adequate substitute for a warrant.'"[366]

### 1. The Fishing Industry Is a Closely Regulated Industry.

The Government argues the fishing industry is a closely regulated industry because of the long history of regulation meant to protect a valuable resource and, subsequently, the public.[367] Plaintiffs argue the fishing industry is not a closely regulated industry because the fishing industry does not pose a clear and significant risk to the public welfare.[368]

To determine whether an industry is closely regulated, courts "consider the history of warrantless searches in the industry, how extensive the regulatory scheme is, whether

---

[363] *Zadeh v. Robinson*, 928 F.3d 457, 464 (5th Cir. 2019) (quoting *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 313 (1978)).
[364] *See id.* at 464-65.
[365] *Balelo v. Balrige*, 724 F.2d 753, 765 (9th Cir. 1984) (en banc) (citing *United States v. Biswell*, 406 U.S. 311, 315-16 (1972)).
[366] *Zadeh*, 928 F.3d at 465 (quoting *New York v. Burger*, 482 U.S. 691, 702-03 (1987))
[367] R. Doc. 79-1 at 36-39. R. Doc. 87 at 20-23.
[368] R. Doc. 73-1 at 23-25; R. Doc. 86 at 21-26.

other states have similar schemes, and whether the industry would pose a threat to the public welfare if left unregulated."[369] The fact that an industry "is extensively regulated and has licensure requirements" is insufficient; "the doctrine is essentially defined by 'the pervasiveness and regularity of the federal regulation' and the effect of such regulation upon an owner's expectation of privacy."[370] "Another key factor is 'the duration of a particular regulatory scheme.'"[371]

The fishing industry has a long history of regulation. The Federal Government has regulated fishing since at least 1793, when Congress enacted the Enrollment and Licensing Act of February 18, 1793, which granted licenses for the fishing of certain categories of fish.[372] Even this early Act allowed for searches of licensed vessels:

> *And be it further enacted*, That it shall be lawful for any officer of the revenue, to go on board of any ship or vessel, whether she shall be within or without his district, and the same to inspect, search and examine, and if it shall appear, that any breach of the laws of the United States has been committed, whereby such ship or vessel, or the goods, wares and merchandise on board, or any part thereof, is, or are liable to forfeiture, to make seizure of the same.[373]

Regulation of the fishing industry goes back even further. As the Third Circuit has put it, "the expectation of finding the game warden looking over one's shoulder at the catch is virtually as old as fishing itself."[374] Regulation of the fishing industry has continued throughout U.S. history. One of the direct predecessors to the MSA, the Act of May 20, 1964, imposed fishing restrictions and authorized warrantless searches of fishing vessels:

---

[369] *Zadeh*, 928 F.3d at 465 (first citing *New York v. Burger*, 482 U.S. 691, 704 (1987); and then citing *Patel*, 576 U.S. at 424).

[370] *Id.* at 465 (quoting *Burger*, 482 U.S. at 701).

[371] *Id.* (quoting *Burger*, 482 U.S. at 701).

[372] *See Lovgren v. Byrne*, 787 F.2d 857, 865 n.8 (3d Cir. 1986); *Douglas v. Seacoast Prods., Inc.*, 431 U.S. 265, 273 (1977).

[373] Enrollment and Licensing Act of Feb. 18, 1793, ch. 8, § 27, 1 Stat. 305, 315.

[374] *Lovgren*, 787 F.2d at 865.

> Such person so authorized [to enforce this Act] shall have the power . . . with or without a warrant or other process, to search any vessel and, if as a result of such search he has reasonable cause to believe that such vessel or any person on board is in violation of any provision of this Act or the regulations issued thereunder, then to arrest such person.[375]

The provisions of the MSA itself, in effect since 1977, authorize warrantless searches: "Any officer who is authorized . . . to enforce the provisions of this chapter may . . . with or without a warrant or other process . . . (ii) board, and search or inspect, any fishing vessel which is subject to the provisions of this chapter."[376] In 2007, Congress amended the MSA to include data collection within the authorization of warrantless searches, allowing officers to "access, directly or indirectly, for enforcement purposes any data or information required to be provided under this subchapter or regulations under this subchapter, including data from vessel monitoring systems, satellite-based maritime distress and safety systems, or any similar system."[377] Under the MSA, other types of commercial fishing vessels also have been subject to similar tracking requirements for decades in all fishery regions.[378] The NOAA's website compiles a list of dozens of categories of vessels required to have tracking equipment by applicable regulations.[379] For example, since 1997 scallop vessels in the Northeast region that are issued a full-time or part-time limited access scallop permit, or scallop vessels fishing under a certain small dredge program, or certain vessels issued a limited access multispecies or scallop permit,

---

[375] Act of May 20, 1964, Pub. L. No. 88-308, § 8(d)(2), 78 Stat. 194, 195 (repealed 1977).

[376] 16 U.S.C. § 1861(b)(1)(A)(ii); *see also* Magnuson-Stevens Fishery Conservation and Management Act (MSA), Pub. L. No. 94-265, § 311(b)(1)(B), 90 Stat. 331, 358 (1976) (amended 1980).

[377] 16 U.S.C. § 1861(b)(1)(A)(vi); *see also* Magnuson-Stevens Fishery Conservation and Management Reauthorization Act of 2006, Pub. L. No. 109-479, sec. 111(a)(3), 120 Stat. 3575, 3596 (2007).

[378] *See Regional Vessel Monitoring Information*, NOAA Fisheries, https://www.fisheries.noaa.gov/national/enforcement/regional-vessel-monitoring-information (last visited Feb. 28, 2022) (listing the tracking equipment requirements for each fishery region). For example, the tracking requirements for vessels in the Northeast Region are contained in 50 C.F.R. § 648.10. The tracking requirements for vessels in the Alaska Region are contained in 50 C.F.R. §§ 679.5, 679.7, 679.28, 679.42, 680.23.

[379] *See Regional Vessel Monitoring Information*, *supra* note 378.

must use tracking equipment.[380] That requirement has expanded to twelve categories of vessels in the current regulation.[381] Similarly, eleven categories of vessels fishing in the Alaska region are currently required to use tracking equipment.[382] Similar requirements are in force in all fishing regions.[383]

Plaintiffs argue the MSA alone cannot provide evidence of close regulation because that is the regime they challenge.[384] That argument would be persuasive if the Government's proffered proof that the fishing industry is highly regulated were the challenged charter vessel tracking requirement itself,[385] but that is not the case. Instead, the longstanding provisions of the MSA have authorized warrantless searches for over forty-five years in various scenarios, noted above, which Plaintiffs do not dispute. Furthermore, in the 2007 amendment Congress expanded the MSA's grant of authority for warrantless searches to encompass data collection, including through tracking equipment.

Numerous courts have recognized that, because "[t]hose who venture on the seas are presumed to do so cognizant of the raft of regulations designed to promote their safe passage . . . , the 'reasonable' expectation of privacy is often less aboard a vessel than on land."[386] Considering the history of regulation and this lesser expectation of privacy at

---

[380] Fisheries of the Northeastern United States; Technical Amendment, 62 Fed. Reg. 14,644, (Mar. 27, 1997) (to be codified at 50 C.F.R. pts. 600, 648).

[381] 50 C.F.R. § 648.10(b).

[382] *See* 50 C.F.R. §§ 679.5, 679.7, 679.28, 679.42, 680.23.

[383] *See Regional Vessel Monitoring Information*, *supra* note 378.

[384] R. Doc. 86 at 22; *see Patel*, 576 U.S. at 425 ("The City wisely refrains from arguing that § 41.49 itself [(the challenged ordinance)] renders hotels closely regulated.").

[385] *See Patel*, 576 U.S. at 425.

[386] *United States v. Ortega*, 644 F.2d 512, 514 (5th Cir. 1981) (citing *United States v. Whitmire*, 595 F.2d 1303, 1312 (5th Cir. 1979)); *see also United States v. Thompson*, 928 F.2d 1060, 1064 (11th Cir. 1991) ("At sea, a person's expectation of privacy may be severely restricted compared with expectations of privacy on land."); *United States v. Vilches-Navarrete*, 523 F.3d 1, 13 (1st Cir. 2008) (alteration in original) ("[T]he circumstances and exigencies of the maritime setting afford people on a vessel a lesser expectation of privacy than in their homes, obviating the usual fourth amendment requirements of a warrant." (quoting *United States v. Green*, 671 F.2d 46, 53 (1st Cir. 1982))); *United States v. Soto*, 988 F.2d 1548, 1553 (10th

sea, courts have also held the fishing industry is a closely regulated industry.[387] For example, in *Lovgren v. Byrne*, the Third Circuit, holding that a dock owner was part of the closely regulated fishing industry, noted "while the Magnuson Act is of relatively recent origin, the fishing industry has been the subject of pervasive governmental regulation almost since the founding of the Republic," specifically pointing to the Enrollment and Licensing Act of February 18, 1793 and the history of regulations "as old as fishing itself."[388] The court also noted the dock owner's "expectation of privacy" was limited due to the historic regulation of vessels at sea: "Also relevant to [the dock owner's] expectation of privacy is the fact that his dock is located on the territorial boundary of our nation and services vessels which are returning from voyages beyond its territorial waters."[389] Ultimately, "[g]iven the long history of governmental control of such border activity, as well as the government regulation of the fishing industry," the court reasoned, "one can conclude with confidence that [the dock owner], when he decided to engage in his business, must have been aware that government intrusions were bound to occur in the regular course of that business."[390]

Similarly, in *Balelo v. Balrige*,[391] *United States v. Raub*,[392] and *United States v. Kaiyo Maru No. 53*[393] the Ninth Circuit held three different times the fishing industry is

---

Cir. 1993) ("The right to exclude others, normally a consideration in determining the reasonability of an expectation of privacy, is less significant at sea." (citing *United States v. Lopez*, 761 F.2d 632, 635 (11th Cir. 1985))); *United States v. DSD Shipping*, No. 15–00102–CG–B, 2015 WL 5164306, at *15 (S.D. Ala. Sept. 2, 2015) ("Privacy interests at sea may be more restrictive than those applicable on land.")

[387] *See, e.g.*, *Lovgren*, 787 F.2d at 865-66; *United States v. Raub*, 637 F.2d 1205, 1209 (9th Cir. 1980); *Balelo*, 724 F.2d at 765; *United States v. Kaiyo Maru No. 53*, 699 F.2d 989, 995-96 (9th Cir. 1983); *United States v. Tsuda Maru*, 470 F. Supp. 1223, 1229-30 (D. Alaska 1979); *Goethel*, 2016 WL 4076831, at *9.

[388] *Lovgren*, 787 F.2d at 865 & n.8.

[389] *Id.* at 865-66.

[390] *Id.* at 866.

[391] *Balelo*, 724 F.2d 753.

[392] *Raub*, 637 F.2d 1205.

[393] *Kaiyo Maru*, 699 F.2d 989.

closely regulated. For example, in *Belelo*, the court noted "'fishing has a long history of being a closely regulated industry' . . . beg[inning] in 1793."[394] The court also noted the specific statute at issue, which Congress passed just twelve years prior in 1972 for "the protection of marine mammals," made "commercial fishermen . . . aware since 1972 that to take porpoise they must have a permit which is subject to conditions that will insure that marine mammals are given the protection required by Congress."[395] The alleged unconstitutional search, an observer program, "had been one such condition."[396] Any fisherman "who does not wish to expose himself to the observation of his open deck activities," the court reasoned, "is free not to submit to such an intrusion by refraining from seeking a permit."[397]

Plaintiffs argue these cases finding the fishing industry closely regulated are no longer good law since the Supreme Court's recent holding in *City of Los Angeles v. Patel*.[398] Plaintiffs argue *Patel* held that, to be a closely regulated industry, the industry must "pose[] a clear and significant risk to the public welfare."[399] However, this is an overly broad reading of *Patel*. In *Patel*, the Court held that the hotel industry was not a closely regulated industry, and a city ordinance that authorized warrantless inspection of hotel records was an unreasonable search and seizure.[400] The Supreme Court did clarify that risk to the public welfare is one factor to consider when determining whether an industry is closely regulated, but it is not the be-all and end-all. Indeed, *Patel* itself, after considering the risk to the public welfare and concluding hotels did not pose such a risk,

---

[394] *Belelo*, 724 F.2d at 765 (quoting *Raub*, 637 F.2d at 1208, 1209 n.5).
[395] *Id.*
[396] *Id.*
[397] *Id.*
[398] R. Doc. 73-1 at 23-25; R. Doc. 86 at 22-25; *see Patel*, 576 U.S. 409.
[399] R. Doc. 73-1 at 23-25; R. Doc. 86 at 22-25; *see Patel*, 576 U.S. at 424.
[400] *Patel*, 576 U.S. at 424-28.

also noted the regulatory scheme was not so "comprehensive" as to place hotel owners on notice of periodic inspections, and the history of regulation did not show a "clear" legacy of government oversight.[401]

This interpretation is in line with courts' analysis of closely regulated industries post-*Patel*. In *Zadeh v. Robinson*, which Plaintiffs cite in support of their argument that risk to the public welfare is required,[402] the Fifth Circuit listed "whether the industry would pose a threat to the public welfare if left unregulated" as only one of four factors "courts consider."[403] Moreover, in ultimately holding the medical profession is not a closely regulated industry, the Fifth Circuit in *Zadeh* did not even address the danger to the public welfare when analyzing these factors.[404] Indeed other courts post-*Patel* have not required there be a risk to the public welfare when extending closely regulated status to other industries. In *Killgore v City of South El Monte*, the Ninth Circuit reaffirmed the California massage industry was a closely regulated industry after *Patel*.[405] The court noted the "comprehensive" regulations and the "long history of government regulation" in California but did not require there be a risk to the public welfare.[406] In *United States v. Hamad*, the Seventh Circuit held the district court did not commit plain error in holding retail cigarette sales were part of a closely regulated industry.[407] The court noted "there is a long history of regulation and licensing of cigarette sales in Chicago" but did not discuss the risk to the public welfare.[408] In *Goethel*, the court held the fishing industry

---

[401] *See id.* at 425-26.

[402] R. Doc. 73-1 at 25; R. Doc. 86 at 23.

[403] *Zadeh*, 928 F.3d at 465.

[404] *See id.* at 465-66. Instead, the decision in *Zadeh* turned on the limited scope of regulations which generally only apply to segments of the industry, a lack of history of warrantless searches, and the high expectation of privacy in medical records.

[405] *Killgore v. City of South El Monte*, 3 F.4th 1186, 1189-92 (9th Cir. 2021).

[406] *See id.*

[407] *United States v. Hamad*, 809 F.3d 898, 905-06 (7th Cir. 2016).

[408] *See id.*

was a closely regulated industry because "the regulatory presence is 'so pervasive,'" but the court did not discuss the risk to the public welfare.[409]  Similarly, in *Free Speech Coalition, Inc. v. Attorney General United States*, the Sixth Circuit revisited a prior holding in light of *Patel* and held producers of sexually explicit images are not part of a closely regulated industry.[410] The court noted "the regulations in this area are not as pervasive as in other industries previously deemed closely regulated" but did not address—much less rest its opinion on—whether there was a risk to the public welfare.[411]

Although it is not required, addressing the public welfare factor in this case, the Court finds there is a risk to the public welfare and this factor weighs in favor of classifying the fishing industry as closely regulated. As the Ninth Circuit has noted, the MSA "was adopted upon a clear showing that the supply of foodfish was dangerously depleted. Congress was aware that an important national asset was at stake and that strong measures were necessary."[412] In enacting the MSA, Congress found the United States' fishery resources "contribute to the food supply, economy, and health of the Nation and provide recreational opportunities."[413] However, "[t]here [was] danger that irreversible effects from overfishing w[ould] take place."[414] Congress found a "national program . . . [was] necessary to prevent overfishing, to rebuild overfished stocks, to insure conservation, to facilitate long-term protection of essential fish habitats, and to realize the full potential of the Nation's fishery resources," which would in turn "assure that our citizens benefit from the employment, food supply, and revenue which could be generated

---

[409] *Goethel*, 2016 WL 4076831, at *9.
[410] *Free Speech Coal., Inc. v. Att't'y Gen. U.S.*, 825 F.3d 149, 169-71 (7th Cir. 2016).
[411] *See id.*
[412] *Kaiyo Maru*, 699 F.2d at 995.
[413] 16 U.S.C. § 1801(a)(1).
[414] *Id.* § 1801(a)(5).

thereby."[415] These findings show Congress thought the fishing industry, if left unregulated, would overfish and deplete the United States' fishery resources, which would endanger the public welfare by harming the nation's food supply, economy, and health.[416]

Because of the long history of regulations, which include authorization of warrantless searches; the decreased expectation of privacy these regulations create on vessels at sea; and the risk overfishing poses to the general welfare if the fishing industry is left unregulated, the Court finds the fishing industry is a closely regulated industry.

### 2. The Tracking Requirement Meets the Criteria in *New York v. Burger*.

In order to pass muster under the closely regulated industry exception, warrantless inspections in a closely regulated industry must satisfy the three *Burger* criteria: "(1) a substantial government interest, (2) a regulatory scheme that requires warrantless searches to further the government interest, and (3) 'a constitutionally adequate substitute for a warrant.'"[417]

First, the Government has a substantial interest in protecting the fisheries and preventing overfishing. Plaintiffs do not seriously dispute the first of the *Burger* criteria. In fact, they admit "the government has an interest in conservation."[418] As noted in

---

[415] *See id.* §§ 1801(a)(7)-(8).

[416] Plaintiffs argue any danger to the public welfare caused by overfishing is miniscule in part because the vast majority of fish are caught by commercial fishing vessels, not charter vessels. R. Doc. 86 at 25. However, the Government disputes the figure Plaintiffs cite for this proposition as based on incomplete data. R. Doc. 79-2 at 12-13; *see Pitts*, 411 U.S. at 142 ("[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court."). In any event, this fact is not material as it does not affect the Court's analysis. The proper classification of the industry is the fishing industry as a whole, not merely the charter fishing industry. *See, e.g.*, *Raub*, 637 F.2d at 1209 (clarifying the relevant industry was not the "salmon fishing" industry but the "commercial fishing" industry); *Lovgren*, 787 F.2d at 865 (holding a dock owner who, while "himself is not the operator of a vessel, . . . services licensed vessels" was part of the "fishing industry").

[417] *Zadeh*, 928 F.3d at 465 (quoting *New York v. Burger*, 482 U.S. 691, 702-03 (1987)).

[418] R. Doc. 73-1 at 26. Plaintiffs do argue there can be no substantial interest in tracking individuals who have no known propensity to violate the law and who may be using their vessels for personal reasons. R. Doc. 86 at 27. Plaintiffs cite no evidence for their argument that charter vessels have no known propensity for breaking the law, *see* R. Doc. 73-2, and the Government disputes the fact that charter vessels are

Section II(E)(1) above, Congress enacted the MSA to prevent overfishing and the depletion of the fisheries.[419] The fisheries are important national asset necessary for a strong food supply, the economy, and overall health of the nation.[420] Numerous courts have held there is a strong federal interest in protecting fishery resources.[421]

Second, the tracking requirement is necessary to further the Government's interest in protecting the fisheries. As explained in Section II(B)(2) above, the purpose of the tracking requirement is to "allow NMFS to independently determine whether the vessel leaves the dock."[422] Because the tracking requirement "verifies vessel activity without a report having to be completed by the vessel operators . . . [it] will help validate effort and aid with enforcement of the reporting requirements."[423] The requirement that the tracking equipment be permanently affixed to the vessel allows NMFS to know the position reported is actually the permitted vessel, as opposed to an unrelated position anyone could otherwise submit; "current reporting requirements . . . would not allow for the same level of trip validation."[424]

Plaintiffs argue the tracking requirement is unnecessary because the electronic reporting requirement already requires reporting of general locations fished, and the Supreme Court in *Patel* rejected the argument that warrantless searches are necessary if they are meant merely to validate records.[425] Again, this is an overly broad reading of

---

frequently used for personal reasons, R. Doc. 79-2 at 13. In any event, these facts do not change the Court's analysis as to the substantial interest in protecting the fisheries, which the Government has regardless of a vessel's actual activities on the waters. These arguments go more to the necessity of the tracking requirement for charter vessels in furthering this interest, than whether there is an interest at all.

[419] 16 U.S.C. § 1801(a).

[420] *Id.*

[421] *See, e.g.*, *Lovgren*, 787 F.2d at 866; *Raub*, 637 F.2d at 1209; *Kaiyo Maru*, 699 F.2d at 995; *Tsuda Maru*, 470 F. Supp. at 1229; *Goethel*, 2016 WL 4076831, at *9.

[422] 85 Fed. Reg. at 44,012.

[423] *Id.*

[424] *See id.* at 44,016; R. Doc. 65-1 at 303-07.

[425] R. Doc. 73-1 at 26; R. Doc. 86 at 27; *see Patel*, 576 U.S. at 427.

*Patel*. In *Patel*, the Court held a city ordinance that authorized warrantless inspection of hotel records was not necessary because the short period of time for "precompliance review would . . . [not] giv[e] operators a chance to falsify their records."[426] An officer could still "conduct[] a surprise inspection by obtaining an ex parte warrant or, where an officer reasonably suspects the registry would be altered, . . . guard[] the registry pending a hearing on a motion to quash."[427] In essence, the hard records at issue in *Patel* were not going anywhere, and the officers could easily return to verify the same information after a short time.[428]

On the other hand, the *Patel* Court was not faced with the movements of vessels, which cannot be verified once the vessel changes location. As the Ninth Circuit noted in *Kaiyo Maru*, warrantless searches of vessels at sea were necessary in part because "the nature of the industry prevents procurement of a warrant for a specific vessel in advance," namely, the officers "could not tell when or where they will encounter  a vessel fishing" because "[f]ishing vessels are assigned to large areas,  they are frequently authorized to move from area to area, and they move in and out of the [Fishery Conservation Zone] without restriction."[429] The Fifth Circuit likewise has noted the fleeting movements of vessels require a different approach than the traditional warrant requirement:

> [T]here are characteristics of ships at sea that make it difficult to apply traditional warrant requirements to them. The sea is boundless and vessels may travel in any direction with none to observe them. The exact location of a vessel at any time may be difficult to pinpoint. While it would be easy in a warrant application to describe the vessel, it would be difficult, as the facts here show, to state where and when it will be searched.[430]

---

[426] *Patel*, 576 U.S. at 427 (first citing *Barlow's, Inc.*, 436 U.S., at 320; and then citing *Donovan v. Lone Steer, Inc.*, 464 U.S. 408, 411, 415 (1984)).

[427] *Id.* (first citing *Barlow's, Inc.*, 436 U.S., at 319-21; and then citing *Riley v. California*, 573 U.S. 373, 388-89 (2014)).

[428] *See id.*

[429] *Kaiyo Maru*, 699 F.2d at 995-96.

[430] *United States v. Cadena*, 588 F.2d 100, 102 (5th Cir. 1979).

Similarly, in *Lovgren*, the Ninth Circuit held warrantless searches of fish caught were necessary because "the government in this case will rarely have time to obtain a warrant before the status quo is changed" because "[t]he fish are highly perishable and even in the best of circumstance are unlikely to remain on the docks for any length of time."[431] As in these analogous cases, in this case the tracking requirement is necessary because there is no other way to confirm the locations of vessels. Fishermen may, whether deliberately or unintentionally, misstate the locations they fished in the electronic reports. Requiring a warrant or precompliance review would negate any benefit the Government might receive. Without the tracking equipment, the data the Government needs, the locations actually fished, would already be lost once the vessel moves, and there would be no accurate way to verify the locations fishermen report.

Plaintiffs also argue the tracking requirement is unnecessary because the Government could instead require fishermen to submit "no fishing" reports and spot check vessels for validation.[432] However, the Government need not resort to less intrusive alternatives if those methods are cost prohibitive or provide insufficient data.[433] In *Balelo*, the Ninth Circuit rejected alternatives to the stationing of observers on vessels—"aerial surveillance and the like"—because they were "prohibitive in terms of cost and . . . ineffective in terms of data collection."[434] Similarly, in this case, "no fishing" reports provide no more benefit than the electronic reporting of locations fished, which, as

---

[431] *Lovgren*, 787 F.2d at 866; *see also Burger*, 482 U.S. at 710 ("Because stolen cars and parts often pass quickly through an automobile junkyard, 'frequent' and 'unannounced' inspections are necessary in order to detect them.").

[432] R. Doc. 86 at 27-28.

[433] *See Balelo*, 724 F.2d at 766.

[434] *Id.* (citing *Wyman v. James*, 400 U.S. 309, 322 (1971) ("Although these secondary sources might be helpful, they would not always assure verification of actual residence or of actual physical presence in the home, which are requisites for AFDC benefits.")).

explained, may intentionally or inadvertently misstate actual locations fished. In fact, "no fishing" reports would be of any use only when a vessel is docked for long periods; they are hardly a substitute for the collection of locations fished. The tracking requirement provides the only accurate data of the vessels' locations. Moreover, these reports and subsequent validations would require NMFS "to increase staffing to a level infeasible with current funding."[435]

Plaintiffs again point to *Patel*, which noted that, as an alternative to warrantless inspections, warranted spot checks would not "prove unworkable" because "there is no basis to believe that resort to such measures will be needed to conduct spot checks in the vast majority of them."[436] However, as explained, *Patel* dealt with hard records that were not going anywhere, which officers could easily return to verify after a short time. A spot check on a vessel would provide no information about the locations fished. It would show only whether a vessel was docked or not. NMFS need not resort to an alternative so ineffective in collecting data, especially when Congress has found "[t]he collection of reliable data is essential to the effective conservation, management, and scientific understanding of the fishery resources of the United States."[437]

---

[435] R. Doc. 79-1 at 40; *see* 85 Fed. Reg. at 44,009 ("As additional funding for dock-side validation becomes available, staff with the Gulf for-hire reporting program will . . . develop any needed changes in methodology and staffing requirements.").

[436] *Patel*, 576 U.S. at 427.

[437] 16 U.S.C. § 1801(a)(8). As noted above, Plaintiffs argue the tracking requirement is unnecessary in part because the vast majority of fish are caught by commercial fishing vessels, not charter vessels. R. Doc. 73-1 at 26. However, the Government disputes the figure Plaintiffs cite for this proposition as based on incomplete data. R. Doc. 79-2 at 12-13. However, this fact is immaterial, as Congress found regulation of the entire fishing industry is required to combat overfishing. *See* 16 U.S.C. § 1801(a) ("If placed under sound management before overfishing has caused irreversible effects, the fisheries can be conserved and maintained so as to provide optimum yields on a continuing basis. . . . A national program for the conservation and management of the fishery resources of the United States is necessary to prevent overfishing, to rebuild overfished stocks, to insure conservation, to facilitate long-term protection of essential fish habitats, and to realize the full potential of the Nation's fishery resources. . . . While both provide significant cultural and economic benefits to the Nation, recreational fishing and commercial fishing are different activities. Therefore, science-based conservation and management approaches should be adapted to the characteristics of each sector."); *see also Van Valin v. Locke*, 671 F. Supp. 2d 1, 9 (D.D.C.

Because the tracking requirement is the only way to provide accurate data on the locations fished, it is necessary to further the Government's interest in protecting the fisheries.

Third, the tracking requirement provides a constitutionally adequate substitute for a warrant. In order for a warrant substitute authorized by statute to be constitutionally adequate, "the regulatory statute must perform the two basic functions of a warrant: it must advise the owner of the commercial premises that the search is being made pursuant to the law and has a properly defined scope, and it must limit the discretion of the inspecting officers."[438] Courts have held the provisions themselves of the published regulations and statutes at issue may provide affected individuals notice of inspections. For example, in *Burger*, the Supreme Court found the statute authorizing "frequent" and "unannounced" inspections at vehicle-dismantling and related industries provided an adequate substitute for a warrant.[439] The vehicle dismantlers were on notice of these inspections because "[t]he statute inform[ed] the operator of a vehicle dismantling business that inspections will be made on a regular basis."[440] The statute further "place[d] the operator on notice as to how to comply with the statute" and "notifie[d] the operator as to who is authorized to conduct an inspection."[441] Similarly, in *Belelo*, in addressing the notice provided by the statute, the Ninth Circuit noted, "The Act also requires publication of proposed regulations, and clearly defines its objectives and purposes."[442]

---

2009) (finding on APA review that regulations limiting the activities of charter vessels were equitable, even though they represent a small portion of the industry, in part because regulations may "sacrifice the interests of some groups of fishermen, for the benefit . . . of the fishery as a whole" (quoting *Alliance Against IFQs v. Brown*, 84 F.3d 343, 350 (9th Cir. 1996))).

[438] *Zadeh*, 928 F.3d at 467 (quoting *Burger*, 482 U.S. at 703).

[439] *Burger*, 482 U.S. at 710-11.

[440] *Id.* at 711.

[441] *Id.*

[442] *Belelo*, 724 F.2d at 766.

In *Goethel*, the court noted "the explicit provisions of the MSA give fishermen notice 'that the government will conduct periodic inspections for specific purposes.'"[443]

While the statute must also limit the discretion of searching officers, it need not contain the most exacting limitations. For example, in *Burger*, the Supreme Court found the "the 'time, place, and scope' of the inspection [was] limited to place appropriate restraints upon the discretion of the inspecting officers."[444] Specifically, officers could only conduct inspections "during [regular] business hours"; these inspections were limited to the vehicle-dismantling and related industries; and the scope of the search was "narrowly defined" to "records, as well as 'any vehicles or parts of vehicles which are subject to the record keeping requirements of this section and which are on the premises.'"[445] Similarly, in *United States v. Biswell*, the Supreme Court held that regulatory provisions of the Gun Control Act that permitted warrantless inspections of both records and inventory "at all reasonable times" gave a firearms dealer adequate notice of "the purposes of the inspector [and] the limits of his task."[446]

In this case, the MSA and implementing regulations put fishermen who choose to participate in the federal Gulf charter vessel permit program on notice that their data may be collected without a warrant. The MSA specifically allows officers to "access, directly or indirectly, for enforcement purposes any data or information required to be provided under this subchapter or regulations under this subchapter, including data from vessel

---

[443] *Goethel*, 2016 WL 4076831, at *9; *cf. also Raub*, 637 f.2d at 1210 (noting the "[r]ecent publicity about the federal regulation of fishing in the . . . area" and concluding "[s]uch notoriety would make any person . . . who chooses to enter the commercial fishing business in the . . . area aware of the numerous and detailed federal regulations, and cause him to expect identification stops of his vessel to be made by law enforcement officers.").

[444] *Burger*, 482 U.S. at (citation omitted) (quoting *Biswell*, 406 U.S. at 315) (citing *Donovan v. Dewey*, 452 U.S. 594, 605 (1981)).

[445] *Id.* at 711-12 (alteration in original).

[446] *Biswell*, 406 U.S. at 312 n.1, 316; *see also Burger*, 482 U.S. at 711 n.22 (noting the same).

monitoring systems, satellite-based maritime distress and safety systems, or any similar system."[447] The tracking requirement provides specific details on the data collection, such as who must participate, what is necessary to comply, and when the collection will occur.[448]

The tracking requirement also sufficiently limits the discretion of those who conduct the searches. In fact, since the data collection is automated, unlike a traditional search by an officer, there actually is no exercise of discretion; the search is the same as stated in the regulation each time. Nevertheless, the tracking requirement does limit the manner and scope of data collection. Location data is collected only once her hour.[449] The Final Rule also contains two exceptions to the hourly collection of data: (1) an in-port exemption that allows the location data to be transmitted every four hours when the vessel is docked; and (2) a power-down exemption that allows for location data transmission requirements to be suspended when the vessel is out of the water for more than 72 hours.[450] The tracking requirement is thus limited to times when the vessel is actively fishing or soon to be fishing, similar to the unannounced inspections during regular business hours in *Burger*. However, unlike *Burger*, the searches in this case are announced, as they take place regularly, generally once per hour. This ping frequency is narrow in scope, as it is sufficient to establish regions of fishing but not exact fishing locations.[451] Just as the program in *Burger* was limited to the vehicle dismantling industry, the tracking requirement is limited to vessels participating in the federal charter vessel permit program. Furthermore, those who have access to this data—analogous to

---

[447] 16 U.S.C. § 1861(b)(1)(A)(vi).
[448] 50 C.F.R. § 622.26(b)(5); *see also id.* § 622.374(b)(5).
[449] 85 Fed. Reg. at 44,006-07.
[450] 85 Fed. Reg. at 44,020.
[451] *See* R. Doc. 64-2 at 175.

the inspecting officers in more traditional inspections—is limited to NMFS, the Coast Guard, and their designees.[452] Ultimately, collection of location data is "not so random or infrequent that the vessel owner has no real expectation that his property will from time to time be inspected."[453]

In analyzing whether an inspection regime provides an adequate substitute for a warrant, courts note the extent of regulations in the industry, as "it is the pervasiveness and regularity of the federal regulation that ultimately determines whether a warrant is necessary to render an inspection program reasonable under the Fourth Amendment."[454] For example, in *Kaiyo Maru*, in holding warrantless inspections of vessels at sea provided an adequate substitute for a warrant, the court noted "foreign fishing in the [Fishery Conservation Zone] has become such a highly regulated enterprise that, given the other limitations of the inspection program, a warrant is unnecessary," and "[v]essel owners and operators 'cannot help but be aware that [the vessel] will be subject to periodic inspections undertaken for specific purposes.'"[455] In this case, NMFS and the FMPs have for decades established tracking requirements for numerous portions of the commercial fishing industry.[456] Because the tracking requirement for charter fishing vessels—similar to tracking requirements that are widespread throughout the commercial fishing industry—provides notice of location data collection, occurs at regular intervals with a limited scope of collection, and is carried out by select agencies. The longstanding practice of tracking in the fishing industry reinforces the Court's determination that the tracking

---

[452] 50 C.F.R. § 622.26(b)(5)(iii); *id.* § 622.374(b)(5)(v); *see Kaiyo Maru*, 699 F.2d at 996 (noting "enforcement is limited to officers authorized by the Secretaries of Commerce and Transportation" in holding an inspection regime provided an adequate substitute for a warrant).

[453] *See Kaiyo Maru*, 699 F.2d at 996.

[454] *Id.* (quoting Donovan, 452 U.S. at 606).

[455] *Id.* (quoting Donovan, 452 U.S. at 600).

[456] *See Regional Vessel Monitoring Information*, *supra* note 378.

requirement sufficiently provides notice and limits discretion to contain an adequate substitute for a warrant.

Therefore, because the tracking requirement meets all three *Burger* criteria, the Court finds it reasonable under the closely regulated industry exception to the Fourth Amendment warrant requirement. Accordingly, the tracking requirement does not violate the Fourth Amendment's protections against unreasonable searches and seizures.

## CONCLUSION

**IT IS ORDERED** that the motion for summary judgment[457] filed by Defendants the U.S. Department of Commerce, the National Oceanic and Atmospheric Administration, the National Marine Fisheries Service, and their respective heads in their official capacities is **GRANTED**.

**IT IS FURTHER ORDERED** that the motion for summary judgment[458] filed by Plaintiffs Billy Wells; Mexican Gulf Shipping Co.; Allen Walburn; A&B Charters, Inc.; Kraig Dafcik; Joseph Dobin; Joey D. Charters; Frank Ventimiglia; Ventimiglia Charters; Jim Rinckey; and Fishing Charters of Naples is **DENIED**.[459]

**New Orleans, Louisiana, this 28th day of February, 2022.**

_____
**SUSIE MORGAN**
**UNITED STATES DISTRICT JUDGE**

---

[457] R. Doc. 79.
[458] R. Doc. 73.
[459] The motion to stay enforcement of the tracking requirement filed by Plaintiffs Billy Wells; Mexican Gulf Shipping Co.; Allen Walburn; A&B Charters, Inc.; Kraig Dafcik; Joseph Dobin; Joey D. Charters; Frank Ventimiglia; Ventimiglia Charters; Jim Rinckey; and Fishing Charters of Naples is **DENIED AS MOOT**. R. Doc. 90.